Joseph Mais (005470)
Shane Swindle (011738)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona  85012-2788
T: (602) 351-8000
F: (602) 648-7000
jmais@perkinscoie.com
sswindle@perkinscoie.com

Anne C. Ronan (006041)
Timothy M. Hogan (004567)
**ARIZONA CENTER FOR LAW IN THE
  PUBLIC INTEREST**
514 West Roosevelt Street
Phoenix, Arizona  85003
T:  (602) 258-8850
F: (602) 258-8757
aronan@aclpi.org
thogan@aclpi.org

*Attorneys for Plaintiffs*

William Kapell (admitted *pro hac vice*)
Julia L. Davis (admitted *pro hac vice*)
**CHILDREN'S RIGHTS, INC.**
330 Seventh Avenue, Fourth Floor
New York, New York  10001
T:  (212) 683-2210
F:  (212) 683-4015
wkapell@childrensrights.org
jdavis@childrensrights.org

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| B.K. by her next friend Margaret Tinsley; C.P. and B.T. by their next friend Jennifer Kupiszewski; A.T.; A.C-B; M.C-B; J.C-B; D.C-B; J.M. and J.C. by their next friend Susan Brandt, for themselves and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Gregory McKay, in his official capacity as Director of the Arizona Department of Child Safety; and Cory Nelson, in his official capacity as Director of the Arizona Department of Health Services,<br><br>Defendants. | No. 2:15-cv-00185-PHX-ROS<br><br>**FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND REQUEST FOR CLASS ACTION**<br><br>(Assigned to the Honorable Roslyn O. Silver) |

Plaintiffs, by their undersigned attorneys, bring this civil action for declaratory and injunctive relief, and allege as follows:

## INTRODUCTION

1.      This is a civil rights class action brought by the Named Plaintiffs, children in Arizona state foster care custody, on behalf of themselves, a general class of children who are or will be placed in such custody following reports that they have suffered child abuse or neglect, and certain subclasses of these children.

2.      Plaintiffs are among the State's most vulnerable citizens.  Through no fault of their own, they find themselves in the legal custody of the State after having already suffered the trauma of being abused or neglected by their own families.  Plaintiffs seek declaratory and injunctive relief to end certain child welfare policies and practices described herein exposing them to yet further physical and emotional harm and unreasonable risk of harm while in the State's care.

3.      On May 29, 2014, legislation was enacted giving responsibility for the state's child welfare operations to the state Department of Child Safety ("DCS") and removing such responsibility from the state Department of Economic Security ("DES").  As of May 29, 2014, DCS, which was established as an independent agency, is legally responsible for managing the state's child welfare system.

4.      Plaintiffs name Gregory McKay, the Director of DCS, as a defendant.  Defendant McKay, who is sued solely in his official capacity, directly and indirectly controls and is responsible for the policies and practices of DCS, including those set forth herein.

5.      Plaintiffs also name Cory Nelson, the Director of the state Department of Health Services ("DHS"), as a defendant.  DHS is responsible for providing mental and behavioral health services to children in Arizona state foster care custody.  Defendant Nelson, who is sued solely in his official capacity, directly and indirectly controls and is responsible for the policies and practices of DHS, including those set forth herein.

6.      Over the past several years, while foster care rates across the nation have been on the decline, Arizona has experienced a dramatic increase in the number of children in state foster care.  From 2003 to 2012, the number of children in the State's foster care custody nearly doubled.  More recently, Arizona's foster care population grew from 10,207 as of March 31, 2010 to 15,037 as of September 2013, a 47.3% increase.  The number of children in out-of-home care grew by another 10% from February 2013 to February 2014.  As of September 30, 2014, there are 16,990 children in state foster care custody who have been placed in out-of-home care.

7.      This huge growth in the state's foster care population has been fueled by extensive state budget cuts to important support services that had previously helped keep families together.  In particular, state funding for DES's contracts with community-based providers who offered in-home services to children, aimed at making removal of children into foster care unnecessary, was cut in half in recent years, from $43 million in fiscal year 2008 to under $22 million in fiscal year 2012.

8.      These cuts followed the state's termination of its Family Builders program in 2004, which had provided family-centered assessments, case management, and services for families with children deemed to be at low or only potential risk of being abused or neglected.

9.      According to the Arizona Chapter of the American Academy of Pediatrics "[c]uts to DES family support services including child care assistance, housing assistance, substance-abuse treatment and job training for families has resulted in a 40% increase in the number of children who needed to be placed in foster care since 2009 and these children are staying in foster care longer because their parents are not provided with the services they need."

10.     As former Governor Brewer publicly acknowledged in 2014, the Arizona "child welfare system is broken, impeded by years of structural and operational failures." Defendants DCS and DHS (collectively the "Defendants") are legally responsible for overseeing this "broken" system.

11.     Defendants are well aware that the following structural and operational failures continue to plague the state's child welfare system:

- **A severe shortage in and inaccessibility of physical, mental and behavioral health services available to children in state care.** As a result, far too many children in state foster care custody do not receive the health care services they desperately need and all children in state care are subject to an unreasonable risk that they will suffer physical and emotional harm and deterioration while in the state's care.

- **A widespread failure to conduct timely investigations of reports that children have been maltreated while in state foster care custody.** As a result of the state's deficient investigation practices, children in state foster care custody are placed at an undue risk of suffering physical and emotional harm while in state care.

- **A severe and sustained shortage of family foster homes.** As a result of this shortage, children in state foster care are emotionally harmed and subjected to an unreasonable risk of harm by being placed far from their families and communities, separated from their siblings, and forced to experience disruptive school changes.

- **A widespread failure to engage in basic child welfare practices aimed at maintaining family relationships, such as placing siblings together, placing children with their biological parents on a trial reunification basis, coordinating visits between children in state foster care and their biological families, and having caseworkers make regular visits with the children's biological parents to monitor progress toward family reunification.** These failures subject children in state foster care to an unreasonable risk of suffering emotional harm while in state care. Moreover, as a result of these deficiencies, children are subjected to unreasonable delays in being reunified with their families, causing them to suffer further emotional harm.

12.     The state child welfare agency and DHS have failed to remedy these ongoing failures.

13.     Moreover, Arizona officials have long been aware of these deficiencies and harms. As far back as 2003, the Maricopa County Attorney's Office released a report on the state's child welfare system, *In Harm's Way*, detailing the system's deficiencies. Among its findings, the report identified a shortage of foster homes and stated that "[p]art of the reason many feel that children stay in a 'risky' situation is the inability to place them elsewhere." The report concluded that the state's child welfare system was "overloaded without the proper resources to ensure the safety of all children."

4

14.     That same year, then Governor Janet Napolitano acknowledged that "[t]he system for protecting Arizona's children from abuse and neglect, which has been falling apart for years due to poor design and chronic under-funding, is in critical need of repair." Governor Napolitano convened an "Advisory Commission on CPS Reform" that issued an *Action Plan for Reform of Arizona's Child Protection System* in September 2003 (the "*Action Plan*").  The *Action Plan* noted several systemic deficiencies in the state's child welfare system, including a shortage of foster homes and limited access to services for foster children.

15.     In the years since *In Harm's Way* and the *Action Plan* were released, the child welfare system has continued to suffer from a vast shortage of foster homes and inadequate access to child services, despite the known harm that these structural impairments have caused children in state foster care to suffer.

16.     As a result of the state's failure to remedy these problems, plaintiffs have been, and continue to be, exposed to harm and an unreasonable risk of harm, in violation of their federal constitutional and statutory rights.

## JURISDICTION AND VENUE

17.     This action is brought pursuant to 42 U.S.C. § 1983 to redress violations of the United States Constitution and the provisions of the federal Medicaid Act, including 42 U.S.C. §§ 1396a(a)(10)(A)(i)(I), 1396a(a)(43)(C), 1396d(a)(4)(B) and 1396d(r), that require states to provide early and periodic screening, diagnostic and treatment ("EPSDT") services.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), and authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

18.     Venue is proper here pursuant to 28 U.S.C. § 1391(b) because the claims arise in this district.

# PARTIES

## A.    The Named Plaintiffs

### B.K.

19.    As of February 3, 2015, B.K. is a ten-year-old girl in state foster care with a permanency goal of permanent foster care, meaning that DCS has concluded that she has little, if any, chance of leaving foster care over the next eight years.  She has spent more than half of her life in state foster care.  During her time in state foster care, B.K. has been deprived of needed physical and mental health care, separated from her siblings, deprived of contact with her mother and siblings, and placed in institutional settings on two different occasions.  As a result of these experiences, B.K. has been subjected to emotional harm and/or an ongoing unreasonable risk of harm.

20.    B.K. first entered voluntary state custody in 2005 when she was five months old.  At that time, B.K.'s mother had a substance abuse problem and could not care for her. B.K. remained in the legal custody of the state child welfare agency until September 2006 when she was returned to her mother.

21.    In 2008, then three-year-old B.K. and her three siblings were removed from their mother's home.  Upon assuming their care, the state child welfare agency immediately separated the four siblings, placing B.K. and her brother in a licensed foster home, and their two sisters in a second foster home.  In late 2009, the state child welfare agency returned B.K. and her siblings to their mother's care.

22.    In 2012, B.K. and her three siblings were again removed from their mother's home and placed in state foster care custody.  Upon coming into state care for the third time, B.K. was diagnosed with Posttraumatic Stress Disorder ("PTSD"), a mood disorder, psychosis and anxiety.  An investigation showed that B.K. had been physically abused by her mother, and had bumps and bruises on her head and behind her ears.

23.    Despite her fragile emotional state, the state child welfare agency separated B.K. from all of her siblings, placing her in a group home on "emergency shelter" status.

Though such placements are supposed to be short-term, B.K. remained at the group home for more than two years.

24.     While at the group home, the state child welfare agency failed to ensure that B.K. obtained the glasses she needed to see properly.  The state child welfare agency also failed to discover that B.K. was walking with a limp, and failed to make sure that she received the orthopedic shoes she needed.  Despite months of complaints from B.K. about a toothache, the state child welfare agency failed to make sure she saw a dentist while she was living at the group home.

25.     From the time B.K. was placed at the group home in 2012 until early 2014, the state child welfare agency and DHS also failed to ensure that B.K. received consistent counseling and needed mental health services.  During this time, B.K. was saying that she was hearing voices that were telling her to hurt other people or that someone would die.  One time she was so scared by the voices that she called the police.  The state child welfare agency knew that the group home was failing to arrange for B.K.'s transportation to appointments with health care providers, but failed to see to it that B.K. received undisrupted services.  The group home also enrolled B.K. in a specialized school where she was the only girl.

26.     In May 2014, the state child welfare agency finally placed B.K. in a foster home after she had spent 25 months in the group home.  The state child welfare agency placed her with a man and his great-nephew who went to the same specialized school as B.K.  The man told the state child welfare agency that he was concerned about B.K.'s mental health and asked the state to make sure she received an updated psychological evaluation.  The last complete evaluation had been conducted five years earlier when B.K. was four.  The updated assessment was never performed.  After only eight weeks, B.K. was moved to a second foster home with neighbors of the man and his great-nephew.  After two weeks at this second home, the foster parents packed up B.K.'s things and dropped her off at a DCS office.

27.     In August 2014, DCS moved B.K. to a shelter.  The move to shelter care caused B.K. to have to change schools, resulting in educational and social disruption. Moreover, the counselor who had been treating B.K. at the group home refused to drive to see B.K. at the shelter because of the distance involved, and DCS again failed to ensure that B.K. received transportation to her counseling sessions.

28.     During August 2014, B.K.'s behavioral health coordinator concluded that B.K. should be placed in a "Home Care Training to Home Care Client Services" ("HCTC") therapeutic foster home.  No such placement was made and B.K. remained in a shelter until September.  While at the shelter, B.K. had no contact with her mother or three older siblings, even though her siblings have been returned to their mother's care.  B.K.'s mental health deteriorated at the shelter and she threatened to hurt herself and others.  She was admitted to a psychiatric hospital for a week to be stabilized.

29.     In late September 2014, DCS moved B.K. from the hospital to a non-therapeutic foster home.  This resulted in another change in schools.  DCS did not ensure that she had regular contact with her mother or siblings.

30.     In December 2014, still waiting to be placed in an HCTC home, B.K. had another psychiatric crisis and threatened suicide.  The state child welfare agency moved her out of the foster home and DHS admitted her to another psychiatric hospital.  She stayed in the hospital for a week and a half.

31.     In late December, months after her providers agreed she needed a therapeutic foster home, B.K. was finally discharged from the hospital to an HCTC placement.  This resulted in yet another change in schools.

**C.P.**

32.     As of February 3, 2015, C.P. is a seven-year-old boy who has been in state foster care custody since June 2013, with a permanency goal of adoption.  During his time in state foster care, he has attended at least eight different schools and has had to live in at least 11 different placements, including two stays in shelters and a placement in a foster home where he was physically abused.  While in state foster care, he has been separated

1  from his siblings, deprived of visits with them, and has been deprived of access to both the

2  mental health services and placements he desperately needs.  As a result of these

3  experiences, C.P. has been subjected to physical and emotional harm and/or an ongoing

4  unreasonable risk of harm.

5      33.    C.P. and his two sisters were taken into state foster care custody after being

6  exposed to neglect and domestic violence.  They were initially placed in an unlicensed

7  foster home for four days before being moved to their grandmother's home.  During the

8  two-month period that C.P. was with his grandmother, she repeatedly asked the state child

9  welfare agency for help with C.P.'s mental health needs, but C.P. did not receive any

10  mental health care services.  Ultimately, his grandmother asked the state child welfare

11  agency to remove C.P. and his siblings from her home.

12      34.    The state child welfare agency then separated C.P. and his older sister from

13  their younger sister. C.P. and his older sister were placed in a Spanish-speaking foster

14  home, even though the children do not speak Spanish.  The home was almost an hour away

15  from C.P.'s grandmother and the foster home where C.P.'s younger sister was placed.

16  Within ten days of arriving at the Spanish-speaking foster home, C.P. and his older sister

17  were separated and placed in two different foster homes.

18      35.    In early September 2013, the state child welfare agency moved C.P. to yet

19  another foster home.  After months in foster care, C.P. was belatedly assigned a therapist.

20  Even then, however, C.P.'s foster mother refused to take C.P. to his appointments  and the

21  state child welfare agency and DHS failed to arrange for other transportation.  As a result,

22  C.P. did not have a single therapy session during the four months he lived at the foster

23  home.

24      36.    The foster mother was also reported to the state Child Abuse Hotline, to

25  C.P.'s DES case manager and to the state licensing office, after she placed C.P. in the front

26  seat of her car without a car seat or booster seat.  DCS did not conduct an investigation of

27  these reports.  Moreover, the case manager acknowledged that she had made an earlier

28

report to the Child Abuse Hotline herself when it was discovered that the foster mother had left C.P. unsupervised with another foster child.  DCS did not investigate that report either.

37.     In January 2014, C.P. began visiting at another home where his older sister was living.  When his foster mother failed to pick him up from a visit, the state child welfare agency simply told the family whom C.P. was visiting to keep him.  C.P. subsequently disclosed that his former foster mother had hit him with a spoon.  Though the state child welfare agency investigated the reported abuse, DCS never entered any investigation findings into the agency's Children's Information Library and Data Source ("CHILDS") system, nor did the state child welfare agency close the investigation.

38.     C.P. started living at the new foster home with his older sister in January 2014.  Shortly thereafter, he became suicidal.  Though he had a crisis stabilization team in place, it failed to promptly respond to this crisis, and the foster mother called the police who took C.P. to the hospital.  C.P. did not see his older sister again for nearly a year.

39.     C.P. was admitted to a psychiatric hospital for a week.  He was diagnosed with PTSD and his doctors indicated that he needed immediate intensive trauma therapy and specialized therapy at a therapeutic HCTC home.  C.P.'s stabilization team agreed that C.P. needed to be placed in a foster home equipped to respond to his needs. Nevertheless, when C.P. left the hospital, the state child welfare agency took him directly to a shelter. He spent ten days in that shelter before being moved to a second shelter, a move that also resulted in C.P. having to change schools.

40.     In February 2014, three weeks after arriving at the second shelter, C.P. became suicidal again, telling staff about his plan to get a knife and hurt himself.  He was hospitalized for a second time and prescribed psychotropic medication.  He remained in the hospital for two weeks before being discharged in March 2014.  Again, the doctors at the psychiatric hospital recommended that C.P. be released to a therapeutic HCTC home.

41.     Instead, the state child welfare agency placed C.P. in a non-therapeutic foster home.  C.P. had to switch schools again and was inappropriately placed in first grade instead of kindergarten, where he should have been enrolled based on his age and school

experience.  He stayed in first grade for a month before anyone realized he was in the wrong grade.

42.     In April 2014, the state child welfare agency finally placed C.P. in an HCTC home.  Unfortunately, he was required to switch schools again as a result of this latest placement.

43.     In December 2014, both of C.P.'s two sisters were adopted.  During the year before they were adopted, C.P. had only one sibling visit with one of his sisters, even though his mental health assessments indicate that his sisters are the only people with whom he has meaningful attachments.  Moreover, as of February 3, 2015, not only has he had no contact with either of them since they were adopted, but he has not received the intensive trauma therapy that was recommended for him in January 2014, and because his HCTC placement is temporary, his providers have decided that he should not receive intensive trauma therapy until he is in a more stable home.

**B.T.**

44.     As of February 3, 2015, B.T. is a fourteen-year-old boy diagnosed with PTSD who has a permanency goal of adoption. During his many years in state foster care custody, he has been shuffled through numerous institutional settings despite his young age, separated from his siblings, denied sibling visitation, deprived of much needed mental health care, and has had to endure repeated educational disruptions.  As a result of these experiences, B.T. has been subjected to emotional harm and/or an ongoing unreasonable risk of harm.

45.     In January 2005, B.T. was taken into foster care for the first time, along with his two older brothers.  B.T. and one of his older brothers were placed together in a group home, and the other brother was separated and placed in a different group home.

46.     A month after being taken into state foster care, B.T. had a psychological evaluation, which indicated that he needed therapeutic treatment.  He had to wait six months before his first therapy session.

47.     In June 2005, B.T. was removed from the group home and separated from the brother with whom he was placed there.  He was moved to a kinship foster home with a paternal aunt.  By December 2005, B.T. had spent six months in his new home without any visits with his older brothers.  He did not see his brothers again until January 2006.

48.     In August 2006, B.T.'s aunt told the state child welfare agency that B.T. was not receiving the counseling that he needed.  She requested that B.T. have an updated psychological evaluation, but no such evaluation was conducted.  During this same time period, the state child welfare agency was again failing to provide B.T. with regular visits with one of his brothers.

49.     In September 2006, B.T.'s aunt told the state child welfare agency that she could no longer care for B.T. since the state was not providing him with the mental health services he needed.  Rather than DHS providing those services, the state child welfare agency moved B.T. to an emergency receiving foster home.

50.     In October 2006, B.T. threatened to kill himself and the foster family with whom he was temporarily placed.  Despite his mounting mental health issues, B.T. still was not receiving regular therapy.  The state child welfare agency responded to this latest crisis by removing B.T. from the home.  B.T., then six years old, was again placed in a group home.

51.     Shortly thereafter, the state child welfare agency received reports that B.T. was struggling emotionally in the group home.  Again, an updated psychological evaluation for B.T. was requested, but the evaluation was not scheduled until December 2006.  The state child welfare agency and DHS also failed during this time to ensure that B.T. received needed counseling.

52.     B.T.'s evaluation indicated that he needed individual therapy every other week.  He was also prescribed psychotropic medication.  A psycho-educational evaluation was recommended, but never conducted.

53.     In January 2008, B.T. was placed in a pre-adoptive home with one of his brothers.  A month later, the family told the state child welfare agency that B.T. needed more intensive counseling and a different counselor who could better meet B.T.'s needs.

54.     In August 2008, both B.T. and his brother were adopted.  In March 2011, however, they were both taken back into state foster care.  Shortly after this occurred, B.T. reported that his adoptive father had been beating him with a belt.

55.     The state child welfare agency immediately separated B.T. from his brother, placing the two boys in different non-therapeutic group homes.  The group home where B.T. was placed told the state child welfare agency that B.T. desperately needed counseling.  Despite this, B.T. did not receive any counseling while at the group home.

56.     A month after being brought back into state foster care, B.T. was hospitalized in an acute care mental health facility for two weeks.  After leaving the hospital, the state child welfare agency returned B.T. to the group home.

57.     Once back at the group home in May 2011, B.T.'s mental health worsened. DHS approved B.T. for a therapeutic HCTC placement, but did not have one available for him.

58.     Stuck in the group home, B.T. responded by trying to run away.  B.T. spent the night at a juvenile detention center.  In that one night, his group home filled his open bed with another child.  As a consequence, the state child welfare agency moved B.T. to a new group home hours away from his prior placement.

59.     In July 2011, B.T. was moved to an HCTC home, but he was still not receiving trauma therapy and no psycho-sexual evaluation had been completed, despite one having been recommended months earlier.  It was not until October 2011 that a psycho-sexual evaluation was conducted.

60.     During April 2012, the state child welfare agency and DHS began looking for another HCTC placement to better meet B.T.'s needs.  Unable to find one, the state child welfare agency instead moved him to a non-therapeutic group home/shelter in August 2012.  By October 2012, B.T. reported "I feel like I get tossed around like a bag of

chips." He threatened to kill himself three times while in this non-therapeutic congregate care placement.

61.    In November 2012, the shelter told the state child welfare agency that B.T. needed a higher level of care.  The next month he was moved again, this time to a therapeutic group home.  While placed there, B.T. continued to express suicidal thoughts.

62.    In January 2013, B.T. was returned to the same non-therapeutic group home/shelter that had told the state just two months earlier that B.T. needed a higher level of care.  B.T. remained at that shelter for a few more weeks before the state child welfare agency moved him again to a therapeutic group home two hours from his home community.  In May 2013, the brother with whom B.T. was adopted in 2008 was placed in a pre-adoptive placement with a family that ultimately adopted him.  B.T. felt defeated and said he thought he would never get out of the group home.  The following month, B.T. grabbed the steering wheel of a van driven by group home staff, saying, "I want us all to die."  That same day, the state's therapeutic team coordinating B.T.'s behavioral health services reported that "with a few exceptions, B.T. is doing well over the last 2 weeks."

63.    Following the apparent suicide attempt, B.T.'s treating psychiatrist recommended that B.T. be placed in a residential treatment facility.  An application was made the following month.  While that request was pending, the state child welfare agency moved B.T. to another therapeutic group home far from his home county.  In September 2013, the state child welfare agency moved B.T. to yet another therapeutic group home.

64.    In March 2014, the state child welfare agency moved B.T. to a non-therapeutic family foster home, but this placement disrupted after DHS failed to provide B.T. with any therapy to support his transition to a family home.  In July 2014, B.T. was moved to another non-therapeutic foster home.  By September, B.T. had only had a single therapy session.

65.    In October, DCS moved B.T. to a shelter where he stayed for more than a month.  B.T. did not receive any therapy sessions in the placement.  In early November, his Child and Family Team ("CFT") recommended and the state child welfare agency and

DHS approved B.T. for a therapeutic HCTC placement.  No such placement was made.  Instead, DCS placed B.T. in another therapeutic group home.

66.     Almost every time the state child welfare agency has moved B.T. over the last three and a half years, he had to go to a new school.

67.     In December 2014, B.T. threatened to commit suicide while living in the therapeutic group home.  In January 2015, B.T. was placed in juvenile detention in Maricopa County following an incident in a prior group home.

68.     Now 14 years old, B.T. has spent half his life in Arizona foster care custody and does not expect to find a permanent family.

**A.T.**

69.     As of February 3, 2015, A.T. is a ten-year-old boy in state foster care living in a non-therapeutic group home, with a permanency goal of adoption.  He was taken into state foster care custody most recently in September 2011 with his nine-year-old brother.  During his time in state foster care, A.T. has been placed in institutional care; deprived of necessary physical, dental and mental health care services; separated from his brother and deprived of sibling visitation; and, has been subject to missed visits by his state child welfare caseworker.  As a result of these experiences, A.T. has been subjected to emotional harm and/or an ongoing unreasonable risk of harm.

70.     A.T. and his younger brother were taken into state foster care custody after their father committed suicide in mid-2011.  This was their second time in state foster care.  They had also been in state foster care custody prior to 2007.  Their mother's parental rights were terminated in January 2007.

71.     Following their father's suicide, the state child welfare agency placed A.T. and his brother in an unlicensed kinship home with an uncle, his wife and their young son.  In November 2011, A.T.'s brother was removed from the home and placed in a therapeutic group home.  A.T. remained with his uncle's family.

72.     During the period from November 2012 to March 2013, the state child welfare agency failed to arrange for sibling visits between A.T. and his brother, and A.T.'s

1    state caseworker failed to make monthly visits, as required under state policy.  In February

2    2013, the state child welfare agency was ordered to ensure that the boys had visitation with

3    each other twice weekly.  The state child welfare agency was also ordered to transfer

4    A.T.'s case to the adoption unit to begin the process of finding a permanent family.  As

5    alleged below, the state child welfare agency failed to comply with that order.

6            73.     As of March 2013, A.T. had not had a routine physical or seen a dentist in a

7    year.

8            74.     At a status hearing in April 2013, the juvenile court made a finding of "no

9    reasonable efforts" against the state child welfare agency for its failure to arrange for

10   sibling visitation, to help A.T. progress with his schooling, and to transfer A.T.'s case to

11   the adoption unit.  Despite this ruling, and despite the fact that A.T. had been free for

12   adoption since he re-entered care in 2011, the state child welfare agency still failed to

13   transfer A.T.'s case to the adoption unit 13 months later, in May 2014.

14           75.     In November 2013, a mental health evaluation was scheduled for A.T. and

15   his brother.  The appointment could not proceed because the state child welfare agency and

16   DHS failed to arrange transportation for the boys.  As a result, the evaluation had to be re-

17   scheduled for the following month.

18           76.     The evaluation was not completed until February 2014.  The evaluator

19   concluded that more information was needed with regard to A.T.'s response to his father's

20   suicide before any therapeutic services could be recommended.  Nonetheless, the state

21   child welfare agency and DHS failed to request any further assessments.

22           77.     In February 2014, A.T. also reported that his aunt and uncle left him for two

23   to three hours at a time to care for his five-year-old cousin while they delivered

24   newspapers in the early mornings.  Around the same time, A.T.'s uncle posted a video on

25   YouTube of himself tasering a 15-year-old child living in the house while another child is

26   heard crying in the background.  A.T.'s aunt and uncle were also using corporal

27   punishment to discipline A.T.  While these facts were known to the state child welfare

28   agency, it never investigated them.

78.     That same month, A.T.'s uncle and aunt announced that they were leaving the state and would not be taking A.T. with them.  A.T. was thereupon removed from the uncle's home and placed in the same foster/adoptive home as his brother, but no services were put in place for the first three weeks to help A.T. with the transition.  Shortly after being placed in the foster/adoptive home, A.T. started saying he wanted to die.

79.     The state child welfare agency subsequently moved A.T. to an emergency respite foster home.  His brother's foster family told the state child welfare agency it was willing to have A.T. return to live with them, but not until A.T. received the behavioral health services he needed.  Nevertheless, in April 2014, the state child welfare agency moved A.T. to a non-therapeutic group home out of his home county and 1½ hours away from his brother.  The state child welfare agency did not arrange visits between the two boys.

80.     In May 2014, the juvenile court directed the state child welfare agency to immediately place A.T. back in his home county.  As A.T. was receiving no therapy or counseling at the time, the court also ordered the state child welfare agency to obtain therapy for A.T. immediately, beginning no later than the end of the month.  However, in July 2014, DCS and DHS again failed to coordinate A.T.'s transportation and A.T. was unable to go to his scheduled psychological evaluation.

81.     Despite the May 2014 court order, A.T. remained in a non-therapeutic group home two hours away from his home community for five months.  During that time he had to travel nearly two hours each way to obtain needed mental health services.  DCS moved A.T. to a non-therapeutic group home in his home county in September 2014.

**The C-B Siblings**

82.     The C-B siblings include two brothers, A.C-B and M.C-B, and two sisters, J.C-B and D.C-B, all of whom were taken into state foster care custody in January 2014. As of February 3, 2015, A.C-B is six years old, M.C-B is eight years old, J.C-B is three years old and D.C-B is seven years old. Also as of that date, their permanency goal is reunification. During their time in state foster care, they have been unnecessarily

separated, deprived of needed mental health care and parental visitation, and the sisters were placed in an inappropriate institutional setting.  As a result of these experiences, they have been subjected to emotional harm and/or an ongoing unreasonable risk of harm.

83.    Because of the traumatizing circumstances that led to their being taken into foster care, the siblings' lawyer requested at the first juvenile court hearing of the case in January 2014 that DHS immediately provide the children with trauma therapy.  As alleged further below, the state child welfare agency and DHS delayed those services for nine months.

84.    The state child welfare agency initially placed the four siblings with a relative 2½ hours away from the home from which they were removed.  Because of this distant placement, their urgent response assessments, required for every child taken into foster care, were delayed, and the children never received any behavioral health services while in this placement.

85.    In March 2014, the state child welfare agency removed the children from the relative and placed them in separate locations.  The state child welfare agency placed eight-year-old M.C-B and five-year-old A.C-B in a licensed family foster home.  Six-year-old D.C-B and two-year-old J.C-B were placed in a non-therapeutic group home.  None of the siblings received behavioral health services while in these placements.

86.    That same month, M.C-B and A.C-B's foster parents requested that M.C-B receive a psychological evaluation.  The evaluation was not conducted for eight months.

87.    In April 2014, the state child welfare agency moved all four of the C-B siblings to their father's home.  The children's state child welfare case manager never visited them in the home. The state child welfare agency and DHS also failed to ensure that any of the children received behavioral health services or counseling, even though D.C-B and A.C-B were exhibiting sexualized behaviors indicative of possible sexual abuse.  Only two weeks after being placed there, the children's father requested that the state child welfare agency remove them.

88.     In May 2014, the state child welfare agency again split up the siblings, this time into three different foster homes.  M.C-B and A.C-B were placed in the same foster home where they had previously been placed.  The state child welfare agency placed each of the girls, D.C-B and J.C-B, in separate foster homes.

89.     From the time they were taken into custody to May 2014, none of the siblings had any visits with their biological mother.

90.     Following a juvenile court hearing in early June 2014, DCS agreed to ensure that all four children receive therapy – not just an intake or enrollment – with a trauma therapist by June 20.  DCS also agreed to pay for the services if DHS would not pay.  In addition, the court directed DCS to provide the children with relational therapy with both parents.  DCS further agreed to work with the children's father to help meet his transportation needs in order to facilitate visitation with the children, including providing him with a gas card.  DCS failed to provide any of these services or supports.

91.     Consequently, on July 2, 2014, the juvenile court made a "no reasonable efforts" finding with regard to DCS's failure to provide services for the siblings.  The court called the agency's conduct "appalling."

92.     In late July 2014, D.C-B was placed in the same foster home as M.C-B and A.C-B.  As of February 3, 2015, J.C-B remains in a separate foster home.

93.     In August 2014, eight months after being brought into foster care, the three eldest siblings finally had their behavioral health evaluations completed.

94.     In mid-September 2014, nine months after being taken into foster care, M.C-B and A.C-B had received only one therapy session.  Though their CFT recommended that they receive weekly therapy sessions, the facility where the therapist is located can only accommodate therapy sessions every other week.

95.     By September 2014, D.C-B had received only two sessions with a therapist.  J.C-B had an intake meeting with her therapist, but her therapy sessions had not yet started.

96.     In December 2014, DHS had only just begun the psychological evaluation that M.C-B's foster parents first requested in March 2014.  In addition, M.C-B and A.C-B are both struggling in school with attention problems.

**J.M.**

97.     As of February 3, 2015, J.M. is a nine-year-old boy with a permanency goal of adoption.  He was taken into state foster care when he was six years old.  During his time in state foster care custody, J.M. has been deprived of needed mental health care, placed in institutions on numerous occasions, and has had his education repeatedly disrupted.  As a result of these experiences, J.M. has been subjected to emotional harm and/or an ongoing unreasonable risk of harm.

98.     J.M. was brought into state foster care in May 2012.  The state child welfare agency initially placed him in a shelter for five days, then moved him to live with his grandmother.  When she could not care for him, the state child welfare agency moved J.M. to a group home in a different county.  J.M. remained there for two months.

99.     In July 2012, the state child welfare agency moved J.M. to an unlicensed kinship home back in his home community.  J.M. entered first grade that summer.  The state child welfare agency failed to ensure that J.M. had transportation to and from school.  As a consequence, J.M. missed sixty days of schooling.

100.    In September 2013, J.M. was moved to another kinship placement two hours from his home county.  As a result of this placement change, J.M. had to start second grade at a new school.  The move also resulted in a change in J.M.'s mental health providers, disrupting his mental health care.

101.    In October 2013, the state child welfare agency moved J.M. to a licensed family foster home back in his home county, resulting in yet another school change for J.M.

102.    In February 2014, the state child welfare agency moved J.M. to a non-therapeutic group home in another county two hours away.  As a result, he had to enroll at his fourth school in less than two years since being brought into state foster care.  His

teachers began developing an Individualized Education Program ("IEP") for him, but it was not finalized or implemented.  He was also diagnosed with ADHD.

103.    Between February and June 2014, J.M. had to move among four different group homes, all two hours from his home community.  During this period, DHS took the position that J.M. could not be placed in an HCTC therapeutic foster home until he had first received, and exhausted, out-patient counseling.  But each time J.M. was forced to move to a different group home, he had to start his therapy over again with a new therapist.

104.    J.M.'s visitation with his mother was also disrupted when he was moved among these various group homes.  J.M. has no siblings and his mother is his only intimate family relationship.  She had trouble traveling the two hours by bus to see J.M. at his group homes and the state child welfare agency refused to coordinate alternative transportation for her.  Instead, the state child welfare agency required eight-year-old J.M. to travel three hours each way in a transport van for a two-hour visit with his mother.

105.    In June 2014, DCS removed J.M. from his most recent group home and returned him to a shelter.  This placement resulted in another disruption in his education and mental health treatment.  With each educational disruption, J.M.'s new school has had to re-start the IEP process of assessment and planning.  DCS has failed to ensure that his IEP was completed or provided to his new school, which had to be ordered by the juvenile court.

106.    Later in June 2014, the state child welfare agency and DHS finally approved J.M. for an HCTC placement after counseling proved inadequate.  However, at that time, there were no HCTC placements available and J.M. continued to live at the shelter for four months.  In late October, DCS moved him to a licensed non-therapeutic foster home.  It was not until November 2014 that his current school concluded the necessary evaluations and finalized his IEP.

**J.C.**

107.    As of February 3, 2015, J.C. is a ten-year-old boy with a permanency goal of adoption.  He was taken into state foster care when he was eight.  During the 2½ years he

has been in Arizona foster care, J.C. has suffered delays in needed health care treatment after being diagnosed with PTSD; he has been placed in inappropriate institutional settings; and he has been shuffled through numerous schools.  He was also physically abused while in state foster care custody.  As a result of these experiences, J.C. has been subjected to emotional and physical harm and/or an ongoing unreasonable risk of harm.

108.    J.C. was brought into state foster care custody in March 2012.  He displayed behaviors that suggested he had been sexually abused, and was placed in an HCTC home.  However, in September 2012, he was moved from that home and placed in a non-therapeutic group home.  Not surprisingly, his mental health immediately deteriorated.  Among other things, he soiled his pants and banged his head against the wall.  Despite this, the state child welfare agency kept J.C. in the group home for seven months.

109.    The state child welfare agency moved J.C. back with his father in March 2013, while retaining legal custody over J.C.  J.C.'s father did not take J.C. to his therapy sessions.  Nonetheless, the state child welfare agency left J.C. with his father and failed to ensure that J.C. received the care he needed.

110.    Two months later, nine-year-old J.C. attempted suicide by taking an overdose of his psychotropic medication.  He was transported to the emergency room and admitted to a psychiatric hospital for ten days.  The state child welfare agency then returned him to his father's home, still retaining legal custody over J.C.

111.    In March 2014, J.C. disclosed that his father had been physically abusing him by hitting him with a belt.  The state child welfare agency then removed J.C. from his father's home.  The abuse was so severe that the police criminally investigated J.C.'s beating.

112.    After removing him from his father, the state child welfare agency placed J.C. in a non-therapeutic group home.  As a result of this placement change, J.C. had to change schools and has had significant problems adjusting.  In July, DCS moved J.C. again, this time to a therapeutic group home in another county, resulting in another school

disruption.  In August 2014, DCS moved J.C. to an HCTC foster home.  As of February 3, 2015, he is still living there.

**B.      The Next Friends**

113.    Pursuant to Fed. R. Civ. P.  17(c)(2), Named Plaintiffs A.T., A.C-B, M.C-B, J.C-B, D.C-B, J.M., and J.C. appear through their next friend Susan M. Brandt.  Ms. Brandt is Social Work Supervisor at the Office of Children's Counsel in Tucson, Arizona.  She resides in Tucson.

114.    Pursuant to Fed. R. Civ. P.  17(c)(2), Named Plaintiffs B.T. and C.P. appear through their next friend Jennifer L. Kupiszewski.  Ms. Kupiszewski is an attorney in private practice in Scottsdale who has previously represented children and parents in dependency matters.  She resides in Scottsdale, Arizona.

115.    Pursuant to Fed. R. Civ. P.  17(c)(2), Named Plaintiff B.K. appears through her next friend Margaret R. Tinsley, a retired attorney who has previously represented children and parents in dependency matters.  Ms. Tinsley resides in Tempe, AZ.

**C.      The Defendants**

116.    Defendant Gregory McKay is the Director of DCS and is being sued in his official capacity.  Director McKay maintains his principal office at the Department of Child Safety, 1717 West Jefferson S/C005A, Phoenix, Arizona 85007.  Director McKay is mandated under state law to carry out the purposes of DCS, including the formulation of policies, plans and programs to effectuate DCS's missions and purposes.

117.    Defendant Cory Nelson is the Director of DHS and is being sued in his official capacity.  Director Nelson maintains his principal office at the Department of Health Services, 150 North 18th Avenue, Phoenix, Arizona 85007.  Director Nelson is mandated under state law to administer DHS, including the formulation of policies, plans and programs to provide mental and behavioral health services to children in DCS foster care custody.

**FIRST CAUSE OF ACTION – VIOLATION OF PLAINTIFFS' SUBSTANTIVE DUE PROCESS RIGHTS UNDER THE U.S. CONSTITUTION**

118.   Paragraphs 1-117 above are repeated and re-alleged as if fully set forth herein.

119.   This claim is asserted against defendants McKay and Nelson in their official capacities on behalf of a class of children who are or will be in the legal custody of the Arizona Department of Child Safety due to a report or suspicion of abuse or neglect (the "General Class").

120.   DCS provides and is legally obligated to provide members of the General Class with physical and dental health care services through the state Comprehensive Medical and Dental Program ("CMDP").  DCS administers the CMDP.

121.   DHS provides and is legally obligated to provide members of the General Class with mental and behavioral health services through ADHS Behavioral Health Services ("BHS").  BHS delivers these services through contracts with Regional Behavioral Health Authorities ("RBHAs") across the state.

122.   DCS is also responsible for monitoring the physical, behavioral and emotional health status and needs of all members of the General Class and coordinating the physical, behavioral and mental health services provided to those children to ensure that they receive the health care services they need while in state foster care.

123.   Many children in state foster care need such services to help them cope with the significant trauma to which they were exposed before being removed from their homes. For example, according to the Arizona Office of the Auditor General, "as of September 2013, approximately 31 percent of the children in out-of-home care aged 13 or older were clinically diagnosed as emotionally disturbed."

124.   DCS and DHS are failing to fulfill their obligations to provide, coordinate and monitor medical, dental, mental and behavioral health services to members of the General Class.  As a result, members of the General Class are being harmed and subjected to an unreasonable risk of harm and deterioration while in DCS state foster care custody.

125.   In both its 2011 and 2012 annual reports, Arizona's state-wide Citizen Review Panel ("CRP") found that many children in state foster care were not receiving adequate mental and behavioral health assessments and services.  The CRP "repeatedly observed untreated mental health problems" among children in state foster care.  It also found that a "lack of access to comprehensive and timely mental health assessments and services exacerbated the problems of the children" and resulted in, among other things, "multiple disrupted foster and adoptive placements, delays in children obtaining permanency, and CPS involvement in the next generation of children."

126.   Moreover, according to the CRP's 2012 report, "[w]hen services were provided, they were observed to be brief and limited with cases being closed without observation of sustained behavior changes and few aftercare services in place.  When children were removed, delays between the time of referral and assessment were observed to cause even longer delays before intervention was provided."

127.   Similarly, in its 2013 Report, the CRP found that "the continuum of services . . . for families is limited."  According to the report, "comprehensive services were lacking and existing services are unable to maintain long term change in these families."

128.   The CRP is not alone in noting unacceptable shortages and delays in the provision of needed services.  According to a 2012 report issued by DES's own consultant, "[a]s much as half of the time a child spends in [foster care] is spent waiting on services."  More recently, the Office of the Auditor General's report on DCS policy and practice recognized the "[i]nadequate access to behavioral health services" for youth in foster care.

129.   The Arizona Chapter of the Foster Family-Based Treatment Association ("FFTA") has also noted the severe shortage of mental health services delivered by professional foster homes (also known as "therapeutic foster homes") to children in state foster care.  These services, referred to in Arizona as "Home Care Training to Home Care Client Services" ("HCTC"), are supposed to be available to children in state foster care who need therapeutic family-based intervention.  These therapeutic foster homes are

administered by DHS through RBHAs.  DCS pays room and board for children in state foster care placed in HCTC homes.

130.     There are currently only about 400 HCTC homes for more than 16,500 children in state foster care.  Moreover, most of these homes are only licensed for 1 or 2 placements, severely limiting the number of children for whom these homes are available. The severe shortage of HCTC homes places members of the General Class at an unreasonable risk of deteriorating while in state foster care.

131.     The shortage of HCTC providers, coupled with the short-term nature of HCTC services (DHS has a practice of requiring such services to be re-authorized every 90 days), also subjects children in state foster care to emotionally harmful placement instability, as children are moved out of HCTC homes far too soon after being placed there.  The CRP's 2013 Report specifically found that the HCTC placement structure "causes disruption when a specialized placement is required to meet a child's needs."  This placement disruption causes children with higher needs to "yo-yo" up and down in terms of their behaviors, thereby driving additional placement moves, which results in even further unnecessary re-traumatization.

132.     The Arizona Auditor General has also recognized the state child welfare agency's and DHS's practice of failing to provide "long-term solutions for children in need of continued support" for their mental health needs.  According to the Auditor General's Report, "[c]hildren whose behavioral health improves in therapeutic foster homes may be moved to less restrictive family settings, but without the same continued support, their behaviors may worsen, resulting in placement disruptions and subsequent placement in congregate care."

133.     DCS and DHS further abdicate their legal duty to provide care for members of the General Class by leaving the decision whether children should be placed in HCTC homes to the six RBHAs that operate throughout the state, rather than allowing that decision to be made by the children's Child and Family Teams ("CFTs").  Making matters worse, the RBHAs have different processes for determining whether HCTC should be

provided to the children in their geographic regions.  As a result, the availability of HCTC turns in part on the fortuitous circumstance of where the member of the General Class happens to live at the time HCTC is requested.

134.   DCS caseworkers also fail to meet their obligation under agency policy to participate in CFT meetings, including inter-agency meetings with DHS, that are a prerequisite to members of the General Class receiving behavioral health services.  When DCS caseworkers do not join CFT meetings, essential information about a child's needs is not shared, treatment planning and referrals are held up, and services are delayed.  These deficiencies expose members of the General Class to an undue risk that they will not receive the behavioral services they require, leading to a deterioration of the child's condition while in state foster care custody.

135.   Remarkably, even former DES Director Carter acknowledged at an October 17, 2013 meeting of the CPS Oversight Committee that DES does not collect data in a way that enables the child welfare agency to show that a particular set of family interventions is effective.  At the same meeting, Ms. Sotomayor, then Assistant Director for the former DES Division of Children, Youth and Families, agreed that it is unclear whether a number of services provided by DES "are appropriate or adequate" for families.

136.   In addition to the lack of adequate mental health services, far too many children in state foster care fail to receive needed physical health care services.  According to the state's Practice Improvement Case Review ("PICR") for 2013, DCS failed to properly assess and address the children's physical health needs in a third (34%) of the cases reviewed.  The same review found that 22% of children who had been in foster care for more than 12 months had not received a comprehensive physical health examination.  In addition, more than 40% of children who had been in care for less than a year did not receive an examination within 30 days as required by agency policy.  Based on the same 2013 PICR, DCS had failed to assess and provide necessary services to address the children's mental health needs in nearly one in five cases reviewed.

137.   Based on the 2012 PICR, the state child welfare agency failed to meet the physical health care needs of children in state foster care in 49% of the cases reviewed.

138.   Moreover, according to the state child welfare agency's own data, during federal fiscal year 2012, 36% of children in state foster care ages three to six did not receive well-care visits required under the periodicity schedule that the state is required to establish under the EPSDT provisions of the federal Medicaid Act.  A nearly identical percentage of adolescents in foster care likewise failed to receive such required health care visits.  Similar failures in providing such services to these age groups were reported for federal fiscal years 2009, 2010 and 2011.

139.   In addition, according to the state's PICR for 2013, 34% of children who had been in state foster care for more than six months were found not to have had a dental examination within the most recent six months.  During 2012, the number of children who had missed required dentist visits was nearly four in ten.

140.   The inadequacy of the health care services provided to the General Class subjects these children to harm and/or an unreasonable risk of suffering ongoing physical and emotional harm and deterioration while in state foster care.

141.   A state assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to protect a child from an unreasonable risk of harm once it takes that child into its legal foster care custody.

142.   Defendant McKay directly and indirectly controls and is responsible for the child welfare policies and practices of DCS.  The foregoing DCS policies and practices fail to satisfy its affirmative duty to protect the General Class, including the Named Plaintiffs, from an unreasonable risk of physical and emotional harm.  These failures are a substantial factor leading to, and proximate cause of, the ongoing violation of the General Class's constitutionally protected liberty and privacy rights.

143.   Defendant Nelson directly and indirectly controls and is responsible for the policies and practices regarding the provision of mental and behavioral health services by DHS.  The foregoing DHS policies and practices fail to satisfy its affirmative duty to

protect the General Class, including the Named Plaintiffs, from an unreasonable risk of emotional harm.  These failures are a substantial factor leading to, and proximate cause of, the ongoing violation of the General Class's constitutionally protected liberty and privacy rights.

144.   The foregoing policies and practices of DCS and DHS described herein constitute a policy, pattern, custom and/or practice that shocks the conscience, is outside the exercise of any professional judgment, and amounts to deliberate indifference to the constitutionally protected rights and liberty and privacy interests of the Named Plaintiffs and other members of the General Class.  As a result, all members of the General Class have been harmed or are being subjected to an ongoing unreasonable risk of harm, in deprivation of their substantive due process rights guaranteed by the Fourteenth Amendment to the United States Constitution.

145.   These substantive due process rights include, but are not limited to:  the right of members of the General Class to protection from harm and unreasonable risk of harm while in state foster care custody; the right to a living environment that protects the physical, mental and emotional safety and well-being of the General Class; the right to necessary treatment, care and services to prevent members of the General Class from deteriorating or being harmed physically, psychologically or otherwise while in state foster care; and the right to adequate caseworker supervision and monitoring of the General Class's safety and well-being.

146.   As of September 30, 2014, there were 16,990 members of the General Class. The General Class is sufficiently numerous to make individual joinder impracticable.

147.   Named Plaintiffs' First Cause of Action raises questions of fact and law that are common to, and typical of, all members of the General Class.  Such common questions of fact include:

a.   Whether DCS has a practice of failing to provide members of the General Class with legally required medical and dental services necessary to keep

the General Class safe and properly cared for, and to prevent them from deteriorating physically while in state foster care custody;

b.      Whether DHS has a practice of failing to provide members of the General Class with legally required mental and behavioral health services necessary to keep the General Class safe and properly cared for, and to prevent them from deteriorating emotionally and psychologically while in state foster care custody; and

c.      Whether DCS has a practice of failing to coordinate and ensure that the General Class are provided with the legally required mental and behavioral health services to keep the General Class safe and properly cared for, and to prevent them from deteriorating emotionally and psychologically while in state foster care custody.

148.    Such common questions of law include whether DCS's and DHS's actions and inactions violate the General Class's substantive due process rights to be free from harm and an unreasonable risk of harm while in state foster care custody.

149.    Named Plaintiffs will fairly and adequately protect the interests of the General Class they seek to represent.

150.    Named Plaintiffs and the putative General Class are represented by:

a.      Attorneys employed by Perkins Coie LLP, an international law firm with an office in Phoenix, Arizona, whose attorneys have extensive experience in complex civil and public interest litigation, including class action litigation;

b.      Attorneys employed by the Arizona Center for Law in the Public Interest, a nonprofit legal organization based in Phoenix whose attorneys also have extensive experience in complex civil and public interest litigation, including class action litigation; and

c.      Attorneys employed by Children's Rights, Inc., a nonprofit legal organization whose attorneys have substantial experience and expertise in child welfare class actions nationally.

151.    The attorneys and organizations listed above have investigated all claims in this action and have committed sufficient resources to represent the General Class.

152.    Each Named Plaintiff appears by a next friend, and each next friend is sufficiently familiar with the facts of the child's situation to fairly and adequately represent the child's interests in this litigation.

153.    Defendants McKay and Nelson have acted or failed to act on grounds generally applicable to the General Class, necessitating declaratory and injunctive relief. Plaintiffs' counsel know of no conflicts between or among members of the General Class.

**SECOND CAUSE OF ACTION – VIOLATION OF PLAINTIFFS' RIGHTS UNDER THE EPSDT PROVISIONS OF THE MEDICAID ACT**

154.    Paragraphs 1-153 above are repeated and re-alleged as if fully set forth herein.

155.    This claim is asserted against defendants McKay and Nelson in their official capacities on behalf of all members of the General Class who are eligible for Medicaid (the "Medicaid Subclass").

156.    Medicaid is a joint federal-state program under Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq*., designed to provide medically necessary physical and mental health care to, among others, eligible children.

157.    States that choose to participate in the Medicaid program are reimbursed by the federal government for a portion of the cost of providing Medicaid benefits.  To receive federal funds, states must comply with the requirements set forth in Title XIX of the Social Security Act and its implementing regulations.  Among those requirements, states are required to develop state plans that identify the medical services available to eligible beneficiaries.

158.    Children in state foster care are eligible beneficiaries of Medicaid services under 42 U.S.C. § 1396a(a)(10)(A)(i)(I).

159.    Under 42 U.S.C. § 1396a(a)(10)(A) and 42 U.S.C. § 1396d(a)(4)(B), states are required to provide EPSDT services to eligible children in state foster care.  The required

screening services are set forth in 42 U.S.C. § 1396d(r)(1), while §§ 1396a(a)(43)(C) and 1396d(r)(5) require states to provide necessary health care, diagnostic services and treatment to correct or ameliorate defects or physical and mental illnesses and conditions discovered by those screening services.

160.    Under 42 U.S.C. § 1396d(r)(1)(A)(i) and 42 C.F.R. § 441.58, states are required to establish periodicity schedules setting forth when the screening services required under the Medicaid Act must be provided.

161.    Moreover, under 42 U.S.C. § 1396a(a)(8) and 42 C.F.R. § 435.930(a), states must provide EPSDT services with reasonable promptness.

162.    The policy underlying the EPSDT mandate is to prevent illness, as well as to ensure that health problems are comprehensively diagnosed and then treated as soon as they are detected, before they become more complex and their treatment more costly.

163.    Pursuant to a contract with the Arizona Health Care Cost Containment System ("AHCCCS"), DCS serves as the statewide administrator responsible for the provision of physical, dental, vision and hearing health care services, including screening, diagnostic and treatment services, to members of the Medicaid Subclass.  In that capacity, DCS is legally obligated to ensure that members of the Medicaid Subclass receive such medical services.  DCS provides such medical services through CMDP.

164.    DCS also determines the Medicaid eligibility of every child in state foster care custody.

165.    Pursuant to a contract with AHCCCS, DHS serves as the statewide administrator responsible for the provision of mental and behavioral health care services, including screening, diagnostic and treatment services, to members of the Medicaid Subclass.  In that capacity, DHS is legally obligated to ensure that members of the Medicaid Subclass receive such medical services.  DHS provides such services through BHS, which, in turn, delivers these services through contracts with RBHAs across the state.

166.   Under Arizona's EPSDT Periodicity Schedule, DCS is required to provide annual physical examinations to members of the Medicaid Subclass who are age three and older, and more frequent physical examinations to members of the Medicaid Subclass under age three.  The state's Periodicity Schedule further requires DCS to provide annual vision screenings to members of the Medicaid Subclass ages 4-6, 8, 10 and 12 years old, and semi-annual dental examinations to members of the Medicaid Subclass who are six months of age or older.

167.   DCS's Policy and Procedure Manual further provides that it is the responsibility of the DCS foster care caseworker to ensure that a child entering foster care be given a complete medical examination that meets EPSDT requirements within 30 days after initial placement in out-of-home care.

168.   As for mental and behavioral health services, DHS is required under Arizona's EPSDT Periodicity Schedule to provide members of the Medicaid Subclass age three and older with annual psychosocial/behavioral assessments.  For members of the Medicaid Subclass under the age of three, the Periodicity Schedule requires DHS to provide more frequent psychosocial/behavioral assessments.

169.   Under DHS policy, DHS is also responsible for conducting an Urgent Response assessment of every child within 24 hours of removal from his or her home to detect both initial and delayed effects of trauma.

170.   Defendants have a practice of failing to provide members of the Medicaid Subclass with the screening, diagnostic and treatment services required under the EPSDT provisions of the Medicaid Act, in violation of 42 U.S.C. §§ 1396a(a)(10)(A)(i)(I), 1396a(a)(43)(C), 1396d(a)(4)(B) and 1396d(r).

171.   Defendants also have a practice of failing to provide such services with reasonable promptness, in violation of 42 U.S.C. § 1396a(a)(8) and 42 C.F.R. § 435.930(a).

172.   The foregoing policies and practices of defendant McKay, who directly and indirectly controls and is responsible for the policies and practices of DCS, and defendant Nelson, who directly and indirectly controls and is responsible for the policies and

practices of DHS, violate the rights of Named Plaintiffs and the Medicaid Subclass under the Medicaid Act.

173. As of September 30, 2014, there were over 10,000 members of the Medicaid Subclass. The Medicaid Subclass is sufficiently numerous to make individual joinder impracticable.

174. Named Plaintiffs' Second Cause of Action raises questions of fact and law that are common to, and typical of, all members of the Medicaid Subclass. Such common questions of fact include:

a. Whether DCS has a practice of failing to provide members of the Medicaid Subclass with screening services that comply with the state's Periodicity Schedule;

b. Whether DCS has a practice of failing to provide members of the Medicaid Subclass with medically necessary diagnostic and treatment services;

c. Whether DHS has a practice of failing to provide members of the Medicaid Class with screening services that comply with the state's Periodicity Schedule; and

d. Whether DHS has a practice of failing to provide members of the Medicaid Subclass with medically necessary diagnostic and treatment services.

175. Such common questions of law include whether DCS's and DHS's actions and inactions violate the Medicaid Subclass's rights under the EPSDT provisions of the federal Medicaid Act.

176. Named Plaintiffs will fairly and adequately protect the interests of the Medicaid Subclass they seek to represent.

177. Named Plaintiffs and the putative Medicaid Subclass are represented by:

a. Attorneys employed by Perkins Coie LLP, an international law firm with an office in Phoenix, Arizona, whose attorneys have extensive experience in complex civil and public interest litigation, including class action litigation;

b.      Attorneys employed by the Arizona Center for Law in the Public Interest, a nonprofit legal organization based in Phoenix whose attorneys also have extensive experience in complex civil and public interest litigation, including class action litigation; and

c.      Attorneys employed by Children's Rights, Inc., a nonprofit legal organization whose attorneys have substantial experience and expertise in child welfare class actions nationally.

178.   The attorneys and organizations listed above have investigated all claims in this action and have committed sufficient resources to represent the Medicaid Subclass.

179.   Each Named Plaintiff appears by a next friend, and each next friend is sufficiently familiar with the facts of the child's situation to fairly and adequately represent the child's interests in this litigation.

180.   Defendants McKay and Nelson have acted or failed to act on grounds generally applicable to the Medicaid Subclass, necessitating declaratory and injunctive relief.  Plaintiffs' counsel know of no conflicts between or among members of the Medicaid Subclass.

**THIRD CAUSE OF ACTION – VIOLATION OF PLAINTIFFS' SUBSTANTIVE DUE PROCESS RIGHTS UNDER THE U.S. CONSTITUTION**

181.   Paragraphs 1-180 above are repeated and re-alleged as if fully set forth herein.

182.   This claim is asserted on behalf of the General Class against defendant McKay in his official capacity.

**Members of the General Class Are Not Receiving Timely Investigations of Reports That They Have Been Maltreated in State Foster Care Custody.**

183.   In late 2013, it was publicly disclosed for the first time that the state child welfare agency had failed to investigate 6,600 reports of alleged child abuse and neglect between 2009 and 2013, choosing instead to simply set those reports aside.  In July 2014,

it was disclosed that in another 14,000 cases, no documentation had been entered in the child's or family's case file for 60 days or more through April 2014.

184.    While the legislation passed on May 29, 2014 attempts to address those enormous backlogs, DCS's failure to complete child maltreatment investigations in a timely manner is not limited to those 20,600 reports and cases.  In fact, DCS is also failing to initiate and complete investigations in a timely manner of reports that children have been abused or neglected *while in state foster care*.  DES's own consultants acknowledged in 2012 that foster care workers "often have a backlog" of new maltreatment reports involving children in state foster custody.

185.    According to the state child welfare agency's own data, during federal fiscal year 2012, the state child welfare agency failed to initiate investigations into 36% of all reports that children in state foster care custody had been abused or neglected, within the time frames required under state policy. During the six-month period from October 1, 2012 through March 31, 2013, 54% of all investigations involving children in state foster care were initiated late.

186.    State law and agency policy further requires that the outcomes of child maltreatment investigations be entered into the State's child welfare information database within 45 days and that investigations be closed within 60 days.  However, according to state data, during the six-month period from October 1, 2012 to March 31, 2013, the state child welfare agency failed to meet this 60-day deadline in the large majority of investigations involving children already in state foster care, regardless of the level of risk to which members of the General Class were exposed.  In fact, 72% of investigations into high risk reports involving a present danger to children in state foster care were still not closed after 60 days; 73% of investigations into reports involving an impending danger to children in care were not closed in a timely manner; 72% of investigations into reports that children in care had been abused or neglected within the past 30 days were not closed within the required period; and 78% of investigations were not closed within the required timeframe where the reports involved children in state foster care who had been abused or

neglected more than 30 days prior, the date of the last occurrence of abuse or neglect was unknown, or the child was exposed to an unreasonable risk of harm.

187.   These widespread delays in initiating and completing investigations into reported child abuse and neglect subject members of the General Class to an unreasonable risk of physical and emotional harm while in state foster care.

188.   A state assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to protect a child from an unreasonable risk of harm once it takes that child into its legal foster care custody.

189.   Defendant McKay directly and indirectly controls and is responsible for the child welfare policies and practices of DCS.  The foregoing DCS policies and practices fail to satisfy its affirmative duty to protect the General Class, including the Named Plaintiffs, from an unreasonable risk of physical and emotional harm.  These failures are a substantial factor leading to, and proximate cause of, the ongoing violation of the General Class's constitutionally protected liberty and privacy rights.

190.   The foregoing policies and practices of DCS described herein constitute a policy, pattern, custom and/or practice that shocks the conscience, is outside the exercise of any professional judgment, and amounts to deliberate indifference to the constitutionally protected rights and liberty and privacy interests of the Named Plaintiffs and other members of the General Class.  As a result, all members of the General Class have been harmed or are being subjected to an ongoing unreasonable risk of harm, in deprivation of their substantive due process rights guaranteed by the Fourteenth Amendment to the United States Constitution.

191.   These substantive due process rights include, but are not limited to: the right of members of the General Class to protection from harm and unreasonable risk of harm while in state foster care custody; the right to a living environment that protects the physical, mental and emotional safety and well-being of the General Class; the right to necessary treatment, care and services to prevent members of the General Class from deteriorating or being harmed physically, psychologically or otherwise while in state foster

37

care; and the right to adequate caseworker supervision and monitoring of the General Class's safety and well-being.

192.   As of September 30, 2014, there were 16,990 members of the General Class. The General Class is sufficiently numerous to make individual joinder impracticable.

193.   Named Plaintiffs' Third Cause of Action raises questions of fact and law that are common to, and typical of, all members of the General Class.  Such common questions of fact include whether DCS has a practice of failing to conduct timely investigations into reports that members of the General Class have been abused or neglected while in state foster care custody.

194.   Such common questions of law include whether DCS's actions and inactions violate the General Class's substantive due process rights to be free from harm and an unreasonable risk of harm while in state foster care custody.

195.   Named Plaintiffs will fairly and adequately protect the interests of the General Class they seek to represent.

196.   Named Plaintiffs and the putative General Class are represented by:

a.   Attorneys employed by Perkins Coie LLP, an international law firm with an office in Phoenix, Arizona, whose attorneys have extensive experience in complex civil and public interest litigation, including class action litigation;

b.   Attorneys employed by the Arizona Center for Law in the Public Interest, a nonprofit legal organization based in Phoenix whose attorneys also have extensive experience in complex civil and public interest litigation, including class action litigation; and

c.   Attorneys employed by Children's Rights, Inc., a nonprofit legal organization whose attorneys have substantial experience and expertise in child welfare class actions nationally.

197.   The attorneys and organizations listed above have investigated all claims in this action and have committed sufficient resources to represent the General Class.

198.    Each Named Plaintiff appears by a next friend, and each next friend is sufficiently familiar with the facts of the child's situation to fairly and adequately represent the child's interests in this litigation.

199.    Defendant McKay has acted or failed to act on grounds generally applicable to the General Class, necessitating declaratory and injunctive relief.  Plaintiffs' counsel know of no conflicts between or among members of the General Class.

### FOURTH CAUSE OF ACTION – VIOLATION OF PLAINTIFFS' SUBSTANTIVE DUE PROCESS RIGHTS UNDER THE U.S. CONSTITUTION

200.    Paragraphs 1-199 above are repeated and re-alleged as if fully set forth herein.

201.    This claim is asserted against Defendant McKay in his official capacity on behalf of all members of the General Class, except those children who are or will be in a kinship placement (the "Non-Kinship Subclass").

### A.    The Non-Kinship Subclass Suffers from a Severe Shortage of Foster Homes.

202.    The state child welfare agency has failed to provide members of the Non-Kinship Subclass with an adequate number and array of foster care placements.  The severe shortage of foster care placements frequently results in the state child welfare agency placing members of the Non-Kinship Subclass in the first available bed, rather than selecting placements based on the children's needs.

203.    While Arizona's population of children in out-of-home care has grown by 56% from September 2009 to March 2014, the number of Arizona foster families has only increased by 9%, and the percentage of children placed in licensed foster homes has decreased by 9%, during the same time period.

204.    As of September 30, 2014, there were 9,418 children in state foster care who were not placed with relatives or in trial home reunification settings.  Nevertheless, the state child welfare agency reported that it had licensed only 4,397 foster homes to accept children in state foster care.  Moreover, these foster homes provided only 5,669 available

spaces that could potentially match the needs of the children in DCS's custody.  Even assuming that each of these spaces matched the needs of the Non-Kinship Class, 3,749 class members would still be without a foster home.

205.    A spokeswoman for DCS acknowledged in July 2014 that the department "desperately needs more foster families to care for the increased number of children in out-of-home care."

206.    A recent DCS report stated that "[h]omes are needed for children of all ages, however the most significant shortages of homes are for teens, sibling groups, and children who have complex medical needs."  The agency admits that "[t]here is a significant need for additional foster and adoptive homes in all areas of Arizona."

207.    According to a recent audit by the Arizona Auditor General, the state child welfare agency "has not adequately implemented" performance-based contracting in the contracts it has entered into with private child placing agencies to recruit foster parents, identify and arrange child placement options, and supervise and monitor licensed foster parents.  The audit also found that the state child welfare agency has not developed policies and procedures for monitoring the performance measures in its contracts, has not used performance measure data to assess contractor performance, and has not adequately designed the contracts to incentivize performance.

208.    In addition to the inadequate recruiting of new foster homes, a 2012 survey conducted by Arizona State University noted that programs and financial benefits available to foster families have been drastically cut in recent years due to severe budget constraints. For example, in 2009, the state cut foster family reimbursement rates and allowances for clothing.

209.    The scarcity of foster homes in Arizona is a well-known problem.  In 2012, *The Arizona Republic* reported that "[t]he state is in dire need of families to care for children removed from their homes because of suspected abuse or neglect.  But families leave the foster care system faster than new ones come in.  Many who leave say it's not

necessarily the children who have caused them to turn in their license but their frustration with the system's inability to help them."

210.   Former DCS director Charles Flanagan has also acknowledged to members of the state legislature that there are many instances when children have slept in agency offices because the agency did not have a placement for them.

211.   In fact, according to a recent press account, over just a six-day span from September 28 to October 4, 2014, 36 members of the Non-Kinship Subclass spent at least one night in DCS office buildings in Maricopa and Pima counties.  Of those 36 children, 10 were between 2 and 5 years old, 11 were between 6 and 12 years old, and 15 were between 13 and 18 years old. According to Gene Burns, who supervises DCS after-hours units, "[i]n the 17 years [he has] been here, the biggest shock to [him] is when [DCS] bought cribs" for the young children sleeping at DCS's offices.  As he acknowledged, "[t]his is not the place to put a kid."

**B.     Because of the Shortage of Foster Homes, Members of the Non-Kinship Subclass Are Frequently Placed Far from Their Home Communities.**

212.   DCS's failure to maintain an adequate array of foster homes harms members of the Non-Kinship Subclass by causing them to be placed, or putting them at an unreasonable risk of being placed, far from their home communities.  Such placements disconnect members of the Non-Kinship Subclass from family, friends and neighbors, and frequently lead to highly disruptive changes in schooling.

213.   Only 31% of all children in foster care as of September 30, 2012, for whom removal and current zip code information was available, were placed within the same zip code as their homes.  Moreover, nearly half of these children were placed outside their home city.

214.   Consultants retained by DES reported that in 2011, almost 60% of children in state foster care were placed over an hour from their homes.  As the consultant recognized, "[t]his makes parent visits and services difficult and contributes to Ongoing staff driving more hours and spending more time away from their other cases."

**C.     Because of the Shortage of Foster Homes, Members of the Non-Kinship Subclass Are Frequently Separated from Their Siblings.**

215.    For children entering state foster care, siblings can serve as a crucial buffer against the emotional upheaval of being separated from their parents.  Sibling relationships can also promote resilience as children navigate the trauma of removal.  In recognition of the importance of maintaining sibling relationships, federal law requires states to make reasonable efforts to place siblings together, unless contrary to a sibling's safety or well-being – a requirement echoed in Arizona state policy.

216.    DCS's failure to maintain an adequate array of foster homes harms members of the Non-Kinship Subclass by causing them to be separated, or putting them at an unreasonable risk of being separated, from their siblings.  As of September 30, 2013, the state child welfare agency failed to place all siblings together in 35% of cases, and failed to place at least two siblings together in 24% of cases.  Based on information the state child welfare agency submitted to the federal government in 2012, in nearly 40% of cases when at least two siblings entered out-of-home care, the state child welfare agency failed to place them together.  The Sstate child welfare agency's performance was nearly as bad every year from 2008 through 2011.  A DES official acknowledged in 2012 that it had become more difficult to place siblings in the same home because of the shortage of foster families and because more children stay in care longer.

217.    A state assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to protect a child from an unreasonable risk of harm once it takes that child into its legal foster care custody.

218.    Defendant McKay directly and indirectly controls and is responsible for the child welfare policies and practices of DCS.  The foregoing DCS policies and practices fail to satisfy its affirmative duty to protect the Non-Kinship Subclass, including the Named Plaintiffs, from an unreasonable risk of physical and emotional harm.  These failures are a substantial factor leading to, and proximate cause of, the ongoing violation of the Non-Kinship Subclass's constitutionally protected liberty and privacy rights.

219.    The foregoing policies and practices of DCS described herein constitute a policy, pattern, custom and/or practice that shocks the conscience, is outside the exercise of any professional judgment, and amounts to deliberate indifference to the constitutionally protected rights and liberty and privacy interests of the Named Plaintiffs and other members of the Non-Kinship Subclass.  As a result, all members of the Non-Kinship Subclass have been harmed or are being subjected to an ongoing unreasonable risk of harm, in deprivation of their substantive due process rights guaranteed by the Fourteenth Amendment to the United States Constitution.

220.    These substantive due process rights include, but are not limited to:  the right of members of the Non-Kinship Subclass to protection from harm and unreasonable risk of harm while in state foster care custody; the right to a living environment that protects the physical, mental and emotional safety and well-being of the Non-Kinship Subclass; the right to necessary treatment, care and services to prevent members of the Non-Kinship Subclass from deteriorating or being harmed physically, psychologically or otherwise while in state foster care; and the right to adequate caseworker supervision and monitoring of the Non-Kinship Subclass's safety and well-being.

221.    As of September 30, 2014, there were 9,454 members of the Non-Kinship Subclass.  The Non-Kinship Subclass is sufficiently numerous to make individual joinder impracticable.

222.    Named Plaintiffs' Fourth Cause of Action raises questions of fact and law that are common to, and typical of, all members of the Non-Kinship Subclass.  Such common questions of fact include:

      a.    Whether DCS maintains an adequate number and array of foster home placements for members of the Non-Kinship Subclass; and

      b.    Whether a shortage of foster homes subjects members of the Non-Kinship Subclass to an unreasonable risk of being placed far from their families, schools and home communities.

223.    Such common questions of law include whether DCS's actions and inactions violate the Non-Kinship Subclass's substantive due process rights to be free from harm and an unreasonable risk of harm while in state foster care custody.

224.    Named Plaintiffs will fairly and adequately protect the interests of the Non-Kinship Subclass they seek to represent.

225.    Named Plaintiffs and the putative Non-Kinship Subclass are represented by:

a.    Attorneys employed by Perkins Coie LLP, an international law firm with an office in Phoenix, Arizona, whose attorneys have extensive experience in complex civil and public interest litigation, including class action litigation;

b.    Attorneys employed by the Arizona Center for Law in the Public Interest, a nonprofit legal organization based in Phoenix whose attorneys also have extensive experience in complex civil and public interest litigation, including class action litigation; and

c.    Attorneys employed by Children's Rights, Inc., a nonprofit legal organization whose attorneys have substantial experience and expertise in child welfare class actions nationally.

226.    The attorneys and organizations listed above have investigated all claims in this action and have committed sufficient resources to represent the Non-Kinship Subclass.

227.    Each Named Plaintiff appears by a next friend, and each next friend is sufficiently familiar with the facts of the child's situation to fairly and adequately represent the child's interests in this litigation.

228.    Defendant McKay has acted or failed to act on grounds generally applicable to the Non-Kinship Subclass, necessitating declaratory and injunctive relief.  Plaintiffs' counsel know of no conflicts between or among members of the Non-Kinship Subclass.

**FIFTH CAUSE OF ACTION – VIOLATION OF PLAINTIFFS' RIGHTS TO FAMILY INTEGRITY UNDER THE U.S. CONSTITUTION**

229.    Paragraphs 1-228 above are repeated and re-alleged as if fully set forth herein.

230.   This claim is asserted against Defendant McKay in his official capacity on behalf of all members of the General Class who have been assigned a permanency goal of family reunification (the "Reunification Subclass").

231.   Despite the fact that over 50% of children in state foster care have a permanency goal of family reunification, the state child welfare agency is failing to preserve family relationships after children are removed from their homes.

232.   One of the principal ways that states preserve the family relationships of children in foster care is to place siblings together when they are removed from their homes, as required under federal and state law.  In 2012, however, Arizona failed to place siblings together in nearly 40% of cases when at least two siblings entered out-of-home care.  As of September 30, 2013, the state child welfare agency failed to place all siblings together in 35% of cases, and failed to place at least two siblings together in 24% of cases.

233.   Moreover, as alleged in paragraphs 212-214 above, the state child welfare agency routinely places children in its care far from their home communities, knowingly interfering with their ability to maintain connections with their families.

234.   Another way that states preserve the family relationships of children in foster care is to place such children, when appropriate, with one or both biological parents on a "trial reunification" basis, while maintaining legal custody over the child.  Arizona, however, systematically fails to do so.  As of September 30, 2014, only 0.21% of children in state foster care custody (36 out of 16,990 children) were placed with their parents on a trial reunification basis.

235.   As of September 30, 2013, only 0.29% of children in out-of-home care (23 of the 7,875 children) who had a permanency goal of family reunification were in a trial reunification placement.

236.   Similarly, only 1.6% of the children in care who exited to reunification during federal fiscal year 2012 (60 out of 3,684) were in a trial home visit placement at the time of exit.  The national average was 37.5%.  Moreover, only 0.5% of children in

1  custody during federal fiscal year 2012 (97 out of 21,267) had a most recent placement

2  type of trial home visit.  The national average was 11.0%.

3      237.  When children in state foster care custody are not placed with their families

4  on a trial reunification basis, DCS is under a legal duty to coordinate contact between these

5  children and their biological parents, as well as any siblings from whom the child may

6  have been separated when taken into custody.  The state child welfare agency has

7  recognized that "there is a strong correlation between consistent and timely visitation and

8  positive outcomes for children who have been removed from their home.  Regular parent-

9  child visitation, along with CPS Specialists' visits with the child, are both associated with

10  achieving permanency and other indicators of child well-being."

11      238.  For 2012, however, the state child welfare agency reported that barely half

12  (51%) of children in out-of-home care whose cases were reviewed as part of the child

13  welfare agency's PICR had visits with their parents and siblings at a frequency consistent

14  with the child's safety and best interests.  During calendar year 2013, a similarly low

15  percentage of children (56%) whose cases were reviewed in connection with the PICR had

16  adequate visits with parents and siblings.

17      239.  The state child welfare agency's poor performance in coordinating family

18  visits is no surprise given the long wait lists that children in foster care face before being

19  provided with transportation to and from, and supervision of, family visits.  As of October

20  2013, there were 475 families waiting for such visitation services.  Remarkably, the state

21  child welfare agency does not even track how long families have been waiting for those

22  services.

23      240.  The state child welfare agency further impairs family relationships by

24  routinely failing to comply with its obligation to make monthly contact with the biological

25  parents of children in state foster care.  During the six-month period from April 1, 2014

26  through September 30, 2014, 1,213 out of 2,528 (48.0% of) parents of children in foster

27  care with a case plan goal of reunification did not receive required visits from a state child

28  welfare caseworker.

241.   Likewise, during the six-month period from October 1, 2013 through March 31, 2014, 1,152 out of 2,496 (46.2% of) parents of children in foster care with a case plan goal of reunification did not receive required visits from a state caseworker.

242.   DCS recently reported that during 2013, caseworkers made concerted efforts to have adequate contact with mothers in only 36% of cases reviewed, and with fathers in only 18% of cases reviewed.

243.   Not surprisingly, given the state child welfare agency's failure to make adequate contact with the biological parents of children in foster care, the agency also systematically fails to involve those parents in their children's case planning.  During 2013, the state child welfare agency made concerted efforts to actively involve the child's mother in case planning in only slightly more than half (54%) of cases reviewed, and to involve the father in little more than a third (36%) of cases.  According to DCS, "[c]ase plans are not consistently developed and reassessed within required timeframes."

244.   An all too predictable result of the state child welfare agency's failure to preserve family relationships is that far too few members of the Reunification Subclass are reunified with their families.  Moreover, when reunification does occur, it takes far too long.

245.   The amount of time that members of the Reunification Class spend in out-of-home care before being reunified with their families has also increased over time.  According to data prepared for the state child welfare agency, the percentage of children who reunified within 90 days decreased from 30% for children who entered state foster care in 2008 to 18% for children who entered such care in 2012; the percentage of children who reunified within six months fell from 35% for the 2008 entry group to 23% for the 2012 entry group; and the percentage of children who reunified within one year fell from 44% for the 2008 entry group to 37% for the 2012 entry group.

246.   DCS is aware of its poor performance.  According to a 2014 agency report, "[c]ompared to prior years, children are now less likely to exit to reunification, and they experience longer lengths of stay before reunifying."

247.   The foregoing DCS practices interfere with the right to family integrity held by members of the Reunification Subclass, and subject them to emotional harm and an unreasonable risk of emotional harm.

248.   Defendant McKay directly and indirectly controls and is responsible for the policies and practices of DCS.  The foregoing policies and practices fail to satisfy DCS's affirmative duty to protect the welfare of the Reunification Subclass, which failure is a substantial factor leading to, and a proximate cause of, the violation of the constitutionally protected liberty interests, privacy interests and associational rights of all members of the Reunification Subclass.

249.   The foregoing policies and practices of DCS amount to a policy, pattern, custom and/or practice that is outside the exercise of any professional judgment and amounts to deliberate indifference to the Reunification Subclass's constitutional rights. As a result, all members of the Reunification Subclass are being deprived, or are at unreasonable risk of being deprived, of their liberty interests, privacy interests and associational rights conferred on them by the First, Ninth, and Fourteenth Amendment to the United States Constitution not to be deprived of child-parent or child-sibling family relationships.

250.   The Reunification Subclass has thousands of members and is therefore sufficiently numerous to make individual joinder impracticable.

251.   Named Plaintiffs' Fifth Cause of Action raises questions of fact and law that are common to, and typical of, all members of the Reunification Subclass.  Such common questions of fact include:

    a.   Whether DCS engages in a practice of placing members of the Reunification Subclass far from their home communities;

    b.   Whether DCS engages in a practice of failing to place members of the Reunification Subclass in trial home reunification settings;

    c.   Whether DCS engages in a practice of failing to coordinate contact between members of the Reunification Class and their biological families;

d.       Whether DCS engages in a practice of failing to make required monthly contact with the biological parents of members of the Reunification Subclass; and

e.       Whether DCS engages in a practice of failing to involve the biological parents of members of the Reunification Subclass in the case planning of those children.

252.    Such common questions of law include whether DCS's actions and inactions violate the Reunification Subclass's rights to family integrity, guaranteed by the First, Ninth, and Fourteenth Amendments to the United States Constitution.

253.    Named Plaintiffs will fairly and adequately protect the interests of the Reunification Subclass they seek to represent.

254.    Named Plaintiffs and the putative Reunification Subclass are represented by:

a.       Attorneys employed by Perkins Coie LLP, an international law firm with an office in Phoenix, Arizona, whose attorneys have extensive experience in complex civil and public interest litigation, including class action litigation;

b.       Attorneys employed by the Arizona Center for Law in the Public Interest, a nonprofit legal organization based in Phoenix whose attorneys also have extensive experience in complex civil and public interest litigation, including class action litigation; and

c.       Attorneys employed by Children's Rights, Inc., a nonprofit legal organization whose attorneys have substantial experience and expertise in child welfare class actions nationally.

255.    The attorneys and organizations listed above have investigated all claims in this action and have committed sufficient resources to represent the Reunification Subclass.

256.    Each Named Plaintiff appears by a next friend, and each next friend is sufficiently familiar with the facts of the child's situation to fairly and adequately represent the child's interests in this litigation.

257.    Defendant McKay has acted or failed to act on grounds generally applicable to the Reunification Subclass, necessitating declaratory and injunctive relief.  Plaintiffs' counsel know of no conflicts between or among members of the Reunification Subclass.

## PRAYER FOR RELIEF

WHEREFORE, the Named Plaintiffs respectfully request that this Court:

A.    Assert jurisdiction over this action;

B.    Order that this action be maintained as a class action pursuant to Rule 23(b)(2), Fed. R. Civ. P.;

C.    Declare unconstitutional and unlawful pursuant to Rule 57, Fed. R. Civ. P.:

1.    DCS's and DHS's violation of plaintiffs' substantive rights to be free from harm and unreasonable risk of harm under the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

2.    DCS's violation of the Reunification Subclass's rights to family integrity under the First, Ninth, and Fourteenth Amendments to the United States Constitution;

3.    DCS's and DHS's violation of plaintiffs' rights under 42 U.S.C. §§ 1396a(a)(8), 1396a(a)(10)(A)(i)(I), 1396a(a)(43)(C), 1396d(a)(4)(B) and 1396d(r);

D.    Permanently enjoin DCS and DHS from subjecting plaintiffs to practices that violate their rights;

E.    Order appropriate remedial relief to ensure DCS's and DHS's future compliance with their legal obligations to plaintiffs, including, but not limited to, the following:

**1.    Health Care Services Provided to Children in State Foster Care.**
DCS and DHS shall establish and implement practices to ensure that all members of the General Class receive the physical, mental and behavioral health services to which they are entitled under the federal substantive Due Process Clause.  Likewise, DCS and DHS shall establish and implement practices to ensure that all members of

the Medicaid Subclass receive the physical, mental and behavioral health services to which they are entitled under the EPSDT provisions of the federal Medicaid Act.

**2.    Availability of Necessary Resources for the Placement of Children.**  DCS shall establish and implement practices to ensure a minimally adequate capacity and array of placements to meet the placement needs of the Non-Kinship Class, including foster and HCTC homes.

**3.    Family Contact and Visitation.**  DCS shall establish and implement practices providing for minimally adequate visitation between members of the Reunification Subclass and their biological parents and siblings. DCS shall also establish and implement practices to adequately provide for siblings in the Reunification Subclass to be placed together in foster care.

**4.    Caseworker Investigations.** DCS shall establish and implement practices providing for minimally adequate investigations into reports that members of the General Class have been abused or neglected.

**5.    Parent-Caseworker Contacts.**  DCS shall establish and implement practices providing for minimally adequate caseworker visits with the biological parents of members of the Reunification Subclass and for the involvement of such parents in the case planning of members of the Reunification Subclass.

**6.    Monitoring/Enforcement.**  The provisions of the Court order entered pursuant to Fed. R. Civ. P. 65(d) shall be monitored by a neutral expert monitor appointed by the Court.  In addition, the Court shall have continuing jurisdiction to oversee compliance with that order;

F.    Award to the Named Plaintiffs the reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees, pursuant to 28 U.S.C. § 1920 and 42 U.S.C. § 1988, and Fed. R. of Civ. P. 23(e) and (h); and

G.    Grant such other and further equitable relief as the Court deems just, necessary and proper to protect Named Plaintiffs, the General Class, the Medicaid

1   Subclass, the Non-Kinship Subclass and the Reunification Subclass from further harm and

2   unreasonable risk of harm by DCS and DHS.

3

4            Respectfully submitted this 20th day of April, 2015.

5                                        PERKINS COIE LLP

6                                            Joseph Mais
                                             Shane Swindle
7                                            2901 N. Central Avenue, Suite 2000
                                             Phoenix, Arizona  85012-2788
8

9                                        ARIZONA CENTER FOR LAW IN THE
                                             PUBLIC INTEREST
10

11                                           Anne C. Ronan
                                             Timothy M. Hogan
12                                           514 West Roosevelt Street
                                             Phoenix, Arizona  85003
13

14                                       CHILDREN'S RIGHTS, INC.

                                         By /s/William Kapell
15                                       _____

16                                           William Kapell
                                             Julia L. Davis
17                                           330 Seventh Avenue, Fourth Floor
                                             New York, New York 10001
18

19                                       *Attorneys for Plaintiffs*

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of April, 2015, I electronically transmitted the attached document to the Clerk's Office using the ECF System for filing.

/s/William Kapell