1
2
3
4
5
6

**IN THE UNITED STATES DISTRICT COURT**

7

**FOR THE DISTRICT OF ARIZONA**

8

Margaret Tinsley, et al.,

No. CV-15-00185-PHX-ROS

9

Plaintiffs,

**ORDER**

10

v.

11

Gregory McKay, et al.,

12

Defendants.

13

14       Plaintiffs, minors in the custody of the Arizona foster care system, allege

15  widespread systemic failures in state child welfare agencies "expos[e] them to . . .

16  physical and emotional harm and unreasonable risk of harm" in violation of their

17  constitutional rights. (Doc. 37 at 2). Defendants moved the Court abstain and dismiss the

18  second amended complaint (the "complaint") pursuant to Federal Rule of Civil Procedure

19  12(b)(1) and the *Younger* and *O'Shea* abstention doctrines. (Doc. 41).

20                                    **BACKGROUND**

21       According to the complaint, the number of children involved in foster care in

22  Arizona has substantially increased since 2003. Consequently, as of September 30, 2014,

23  16,990 children were receiving out-of-home care through Arizona's foster care system.

24  The complaint alleges the increases were precipitated by budget cuts affecting programs

25  which provide in-home services to children and support services for families.

26       The complaint recounts in detail the experiences of the ten named Plaintiffs,

27  children ranging from three to fourteen years of age in foster care custody. There are

28  several common threads in their statements. All named Plaintiffs allegedly failed to

receive necessary physical and/or mental healthcare, were separated from siblings who were also in the foster care system, and experienced frequent relocations and school transfers. Many allegedly suffered ill-prepared, neglectful, and abusive foster parents and inattentive caseworkers. As a result, Plaintiffs allegedly became suicidal, including a 9-year-old child, suffered physical and mental trauma, and experienced significant educational disruption.

Plaintiffs claim their experiences were caused by a number of "structural and operational failures [which] continue to plague the state's child welfare system." (Doc. 37). These failures include: 1) a shortage of and inaccessibility to physical, mental, and behavioral health services; 2) widespread failure to conduct timely investigations of reports that children have been maltreated while in state foster care; 3) a shortage of family foster homes; and 4) widespread failure to engage in basic child welfare practices aimed at maintaining family relationships, such as placing siblings together, placing children with their biological parents on a trial reunification basis, coordinating visits between children in state foster care and their biological families, and having caseworkers make regular visits with the biological parents of children to monitor progress toward family reunification.

Defendants are the directors of three state agencies: Defendant Gregory McKay is Director of the Department of Child Safety ("DCS"), which is responsible for managing the state's child welfare system; Defendant Cara M. Christ is Director of the Department of Health Services ("DHS"), which provides mental and behavioral health services to children in the state foster care system; and Defendant Thomas J. Betlach is Director of the Arizona Health Care Cost Containment System ("AHCCCS"), which administers and supervises the state's Medicaid program. Plaintiffs maintain these individuals are responsible for administering the foster care system and they have been aware of but have failed to address the problems outlined in the complaint. Plaintiffs seek declaratory and injunctive relief for alleged violations of substantive due process rights under the

Fourteenth Amendment;[1] rights under the Medicaid Act;[2] and the right to family integrity under the First, Ninth, and Fourteenth Amendments.[3] The prayer for relief requests a permanent injunction barring Defendants from violating their rights, the establishment and implementation of policies and practices addressing each of the alleged violations, and appointment of a neutral expert to monitor progress and compliance.

Defendants move to dismiss the complaint because the Court allegedly lacks subject matter jurisdiction under Rule 12(b)(1), arguing the *Younger* and *O'Shea* abstention doctrines apply. Defendants maintain the foster children's ongoing dependency proceedings in the Arizona juvenile courts preclude the relief sought by Plaintiffs. However, Plaintiffs argue their claims rest solely on actions of the child welfare agencies and they are not challenging any aspect of any particular dependency proceeding. Preliminary background regarding Arizona juvenile courts and agencies is required.

**I. Role of Juvenile Courts**

In Arizona, "[a]ny interested party may file a petition to commence proceedings in the juvenile court alleging that a child is dependent." A.R.S. § 8-841. Typically, such a petition is filed by DCS after an investigation into the child's living conditions and removal of the child from the home. *See* A.R.S. §§ 8-222; 8-223. After a child is removed, the juvenile court holds a preliminary protective hearing to decide whether the child should remain in DCS's temporary custody pending a determination of dependency. A.R.S. § 8-824. The juvenile court then holds a dependency hearing to determine whether the child is in need of assistance or placement either because the child has no guardian

---

[1] Including, but not limited to, the right to protection from harm and unreasonable risk of harm while in state custody as a result of lack of medical care, failure to investigate mistreatment, and failure to provide adequate foster homes. (*See* Doc. 37 at 29).

[2] Specifically, the early and periodic screening, diagnostic, and treatment provisions. 42 U.S.C. § 1396a, *et seq.*

[3] Plaintiffs define the right to family integrity as including Plaintiffs' liberty interests, privacy interests, and associational rights under these amendments.

responsible for care or the guardian is unable to provide the necessary care. *See* A.R.S. § 8-844. If the child is determined dependent, the juvenile court "may enter orders awarding a dependent child," subject to the supervision of DCS, to the care of the parents or to another member of the child's family, or to an institution, association, agency (such as DCS), a school, an independent living program, or to a "reputable citizen of good moral character." A.R.S. § 8-845(A). In deciding where to place the child, the juvenile court must consider the goals of the placement and appropriateness of the case plan. A.R.S. § 8-845(B). The juvenile court is required to seek to reunite families, where possible, and order a permanency plan that maximizes the child's contact with siblings, either through co-placement or frequent visitation, unless doing so would not be in the child's best interest. A.R.S. § 8-845(C).[4] "[I]f the child has been removed from the home, the court shall order [DCS] to make reasonable efforts to provide services to the child and the child's parent." A.R.S. § 8-846(A).

After the dependency hearing, the juvenile court reviews the child's case every six months. A.R.S. § 8-447(A). The periodic review hearings are an opportunity for the juvenile court to reassess the well-being of the child, monitor progress toward the child's goals, and determine if the child continues to be dependent. A.R.S. § 8-847(D)-(E) ("At [the] periodic review hearing, the [juvenile] court shall consider the health and safety of the child as a paramount concern. . . . [and] shall determine[] [w]hether [DCS] has identified and assessed placement of the child with a relative or person who has a significant relationship with the child. . . . [and] [w]hether the [child's] guardian has complied with the court order . . . ").

At each six-month review, the court also determines whether the child's guardian has complied with court orders and whether the child is still dependent. A.R.S. § 8-447(D), (E).  And the court has the authority to "punish a person for contempt of court for wilfully [sic] violating, neglecting or refusing to obey or perform any lawful order of

---

[4] Although the juvenile court ultimately approves and issues the permanency plan in the form of a court order, it appears the plan is created and presented to the court by DCS. *See* A.R.S. § 8-845(C).

- 4 -

the juvenile court or for obstructing or interfering with the proceedings of the juvenile court or the enforcement of its orders." A.R.S. § 8-247. Within twelve months of removal of a child older than three years, the juvenile court must hold a permanency hearing to determine the "most appropriate plan" for the child's permanent guardianship. A.R.S. § 8-862.

The six-month reviews are based on progress reports prepared and submitted by DCS, which must include:

> 1. An assessment of the extent to which the division or agency is accomplishing the purpose of foster care for the child as described in the case plan.
> 2. An assessment of the appropriateness of the case plan.
> 3. The length of time the child has been in foster care.
> 4. The number of foster home placements the child has experienced while in foster care and the length of each placement.

A.R.S. § 8-516(E). At each six-month review, the juvenile court also receives findings and recommendations from a local foster care review board; and the court must address these findings and recommendations on the record.[5] A.R.S. § 8-515.03.

## II. Role of Child Welfare Agencies

DCS's "primary purpose . . . is to protect children." A.R.S. § 8-451(B). It is charged with placing children in safe living environments and coordinating with DHS, AHCCCS, and others to provide children with court-ordered healthcare and other services aimed at promoting the safety and well-being of all children. *See* A.R.S. §§ 8-451(B)(2), (4); 8-457; 8-512.

If the juvenile court assigns custody of a removed child to DCS, the agency may

---

[5] The local foster care review board consists of at least five members appointed by the presiding judge of the juvenile court in each county. A.R.S. § 8-515.01(A) ("Each board shall, to the maximum extent feasible, represent the various socioeconomic, racial and ethnic groups of the county in which it serves."). These boards also report to the court the progress of DCS and child welfare agencies in carrying out orders of the court and "[p]romote and encourage" the agencies to "maximize stability and family continuity for children in foster care by discouraging unnecessary changes in the placement of foster children and by recruiting foster parents who may be suitable and eligible as adoptive parents." A.R.S. § 8-515.03.

subsequently place the child with a parent or relative, in a licensed foster home, therapeutic foster care, group home, or a residential treatment facility. A.R.S. § 8-514(A), (B). DCS and its subdivisions determine the eligibility and licensing procedures for foster parents and foster homes and maintain responsibility for providing training and supervision of such homes. A.R.S. §§ 8-503(4)(b)-(h); 8-509; 8-516. DCS is responsible for investigating all allegations and risks of harm involving children, including those in foster homes. *See* A.R.S. §§ 8-503(4)(h)(i); 8-453(A)(19); 8-456. And DCS may deny an application, suspend, or revoke a foster parent's license for violations of state statutes governing child welfare. A.R.S. § 8-506. If the agency decides to extend a child's stay in a foster home for more than three weeks, it must obtain the approval of the juvenile court. A.R.S. § 8-515(A).

DCS may remove a child from a foster home without prior court approval. A.R.S. § 8-515.05(A). *See also* A.R.S. § 8-517 ("The division or agency that placed the child may withdraw a child from a foster home [] when the division or agency determines that withdrawal is according to written, specific standards and is clearly necessary for the child's interests and welfare."). If a foster parent disagrees with the removal, the parent can challenge it at a case conference before the juvenile court and members of a foster care review board. A.R.S. § 8-515.05(B), (C). If, at the conclusion of the case conference, both sides still disagree and the child is currently in the physical custody of the foster parent, a member of the foster care review board is required to make a recommendation to the court and the court then decides whether the physical custody should change. A.R.S. § 8-515.05(D).

If a child has been removed from the home, DCS must "make reasonable efforts to place that child with the child's siblings or, if that is not possible, to maintain frequent visitation or other ongoing contact between the child and the child's siblings unless a court determines . . . [either] would be contrary to the child's or a sibling's safety or well-being." A.R.S. § 8-513(D). A child in foster care also has a "right to maintain contact with friends and other relatives unless the court has determined that contact is not in the

1  child's best interests." A.R.S. § 8-513(C).

2      For all children in voluntary placement, DCS custody, or custody of the probation

3  department, DCS collaborates with DHS and AHCCCS to "provide comprehensive

4  medical and dental care," A.R.S. § 8-512(A), and to "determine the most efficient and

5  effective way to provide [that care]." A.R.S. § 8-512(B).

**ANALYSIS**

6

7  **I. Legal Standard for Rule 12(b)(1) Motion and Request to Abstain**

8      Plaintiffs describe Defendants' motion as presenting a "facial" rather than

9  "factual" challenge to the Court's jurisdiction. *Courthouse News Serv. v. Planet*, 750 F.3d

10  776, 780 (9th Cir. 2014). Defendants do not contest this characterization. Assuming it is

11  accurate, the Court must accept the allegations in the complaint "as true and draw[] all

12  reasonable inferences in [Plaintiffs'] favor." *Leite v. Crane Co.*, 749 F.d 1117, 1121 (9th

13  Cir. 2014). "Once challenged, the party asserting subject matter jurisdiction has the

14  burden of proving its existence." *Rattlesnake Coal. v. E.P.A.*, 509 F.3d 1095, 1102 n. 1

15  (9th Cir. 2007). Therefore, accepting Defendants' motion as framed by Plaintiffs, it is

16  Plaintiffs' burden to establish abstention is not required or should not be granted.

17      Though not raised by the parties, the Court notes that there is debate about

18  whether invoking abstention is a challenge to federal jurisdiction.[6] Typically this matters

19  because the party bearing the burden may differ depending on how the challenge is

20  categorized. For example, unlike a challenge to jurisdiction, the Second Circuit has noted

21

_____

22      [6] The Ninth Circuit, like the Supreme Court, has alternatively described abstention
as jurisdictional and not jurisdictional. *Compare Canatella v. California*, 404 F.3d 1106,
23  1113 (9th Cir. 2005) ("*Younger* abstention is essentially a jurisdictional doctrine.") *with
Benavidez v. Eu*, 34 F.3d 825, 829 (9th Cir. 1994) ("*Younger* abstention is *not*
24  jurisdictional, but reflects a court's prudential decision not to exercise jurisdiction which
it in fact possesses . . . ."). *Compare Ohio Civil Rights Comm'n v. Dayton Christian Sch.,
25  Inc.*, 477 U.S. 619, 626 (1986) (explaining *Younger* abstention "does not arise from lack
of jurisdiction in the District Court, but from strong policies counseling against the
26  exercise of such jurisdiction where particular kinds of state proceedings have already
been commenced") *with Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 100 n.3
27  (1998) (noting Supreme Court has treated *Younger* abstention as "jurisdictional"). *See
also* Erwin Chemerinsky, *Federal Jurisdiction* § 13.2, at 828-829 (5th ed. 2007) (noting
28  lack of clarity regarding whether *Younger* "announce[d] a constitutional bar to federal
court relief" or a prudential one).

a defendant bears the burden of establishing one of the prerequisites for abstention. *Philip Morris, Inc. v. Blumenthal*, 123 F.3d 103, 106 (2d Cir. 1997) (placing burden on the state to establish *Younger* abstention). In this case, however, determining precisely who bears the burden of proof is unnecessary because the result is the same even assuming the burden of proof rests solely with Plaintiffs.

## II. *Younger* and *O'Shea* Abstentions

The motion to dismiss invokes two closely related abstention doctrines: abstention under *Younger v. Harris*, 401 U.S. 37 (1971), and abstention under *O'Shea v. Littleton*, 414 U.S. 488 (1974). These two doctrines will be analyzed separately, but the background for both begins with the recognition that federal courts have a "virtually unflagging" obligation to exercise the jurisdiction given to them by Congress and the Constitution. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) ("Abstention from the exercise of federal jurisdiction is the exception, not the rule."). Only in unusual instances do principles of comity in relation to state courts warrant federal court abstention. *See generally Younger v. Harris*, 401 U.S. 37 (1971).

### A. Background of *Younger* and Its Progeny

In *Younger v. Harris*, the Supreme Court held a federal court could not enjoin a pending state court criminal prosecution absent extraordinary circumstances, namely bad faith or harassment. 401 U.S. 37, 41, 54 (1971) ("[N]ational policy forbid[s] federal courts [from] stay[ing] or enjoin[ing] pending state court proceedings *except under special circumstances*.") (emphasis added). The "underlying reason" for the ruling was:

> [T]he notion of "comity," that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.

*Id.* at 44.

*Younger* doctrine has both expanded and contracted over the years. In *Huffman v. Pursue, Ltd.*, the Supreme Court extended *Younger* doctrine to a state civil enforcement

proceeding. 420 U.S. 592 (1975). The decision was based, in part, on the Court's finding that the state proceedings were "in important respects [] more akin to a criminal prosecution than are most civil cases" because the state was a party to the action and the nuisance statute involved was closely related to criminal statutes on obscenity.[7] *Id.* at 604-605 ("[W]hile in this case the District Court's injunction has not directly disrupted Ohio's criminal justice system, it has disrupted that State's efforts to protect the very interests which underlie its criminal laws and to obtain compliance with precisely the standards which are embodied in its criminal laws.").[8]

The Supreme Court has also classified "the temporary removal of a child *in a child-abuse context*" as a state proceeding "in aid of and closely related to criminal statutes." *Moore v. Sims*, 442 U.S. 415, 423 (1979) (citing *Huffman*, 420 U.S. at 604) (emphasis added). In *Moore*, the Court characterized *Huffman* as standing for the proposition that *Younger* applied to "civil proceedings in which important state interests are involved." *Id.* at 423. The importance of a state's interest in a particular proceeding may be due to the state's presence as a party; the statute or executive action involved is "in aid of and closely related to [state] criminal statutes"; "the presence of such other vital concerns as enforcement of contempt proceedings"; "or the vindication of 'important state policies such as safeguarding the fiscal integrity of [public assistance] programs.'" *Id.* Even if one of these factors applies, however, the Supreme Court held abstention is only proper if the plaintiff will be able "to press his claim in the state courts." *Id.* at 432.

In *Juidice v. Vail*, the Supreme Court once again clarified and expanded *Younger*,

---

[7] The civil statute in question provided for the closure of any place which exhibited obscene films pursuant to nuisance law, while other state criminal statutes prohibited the dissemination of obscene materials. *Id.* at 596, 604.

[8] The Supreme Court clarified that *Younger* abstention applies both to pre- and post-trial state court proceedings where a litigant has not yet exhausted state appellate remedies. *Id.* at 609 ("Federal post-trial intervention, in a fashion designed to annul the results of a state trial, also deprives the States of a function which quite legitimately is left to them, that of overseeing trial court dispositions of constitutional issues which arise in civil litigation over which they have jurisdiction.").

holding the "principles . . . [were] not confined solely to the types of state actions which were sought to be enjoined in [*Younger* and *Huffman*], . . . [but that] the 'more vital consideration' . . . [lay] in 'the notion of 'comity,' . . . [and that] [t]hese principles apply to a case in which the State's contempt process is involved." 430 U.S. 327, 334-335 (1977). The plaintiffs in *Juidice* had been held in contempt by state court judges for disobeying subpoenas to appear at proceedings brought by their creditors in an attempt to collect a judgment. The debtors brought a class action in federal court seeking to enjoin enforcement of the statutes granting state courts the power of contempt, arguing the statutes violated the Fourteenth Amendment. *Id.* at 329-330. In holding *Younger* precluded the injunction, the Court reasoned:

> A State's interest in the contempt process, through which it vindicates the regular operation of its judicial system, so long as that system itself affords the opportunity to pursue federal claims within it, is surely an important interest. Perhaps it is not quite as important as is the State's interest in the enforcement of its criminal laws, *Younger*, [] or even its interest in the maintenance of a quasi-criminal proceeding such as was involved in *Huffman*[]. But we think it is of sufficiently great import to require application of the principles of those cases. The contempt power lies at the core of the administration of a State's judicial system.

*Id.* at 335.

The Supreme Court later summarized *Younger* jurisprudence as applying to three types of cases: 1) criminal proceedings; 2) quasi-criminal proceedings; and 3) "proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989) *(NOPSI)*.

But in *NOPSI*, the Supreme Court emphasized a limitation of the *Younger* doctrine material to this case: It does not "require[] abstention in deference to a state judicial proceeding reviewing legislative or executive action. [As] [s]uch a broad abstention requirement would make a mockery of the rule that only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States." *Id.*

1          Not long after *NOPSI*, in *Middlesex County Ethics Committee v. Garden State Bar*

2    *Association*, the Court further identified three factors that together warrant abstention: 1)

3    "an ongoing state judicial proceeding"; 2) which "implicate[s] important state interests";

4    and 3) in which "there [is] an adequate opportunity . . . to raise constitutional challenges."

5    457 U.S. 423, 432 (1982). For many years, lower courts treated these factors as the

6    established test for *Younger* abstention. However very recently, in *Sprint*

7    *Communications Inc. v. Jacobs*, the Supreme Court made clear that the three factors

8    enumerated in *Middlesex* are actually *additional* factors to be considered once a court

9    establishes the ongoing state proceeding is quasi-criminal in nature. 134 S. Ct. 584, 593

10   (2013) ("Divorced from their quasi-criminal context, the three *Middlesex* conditions

11   would extend *Younger* to virtually all parallel state and federal proceedings, at least

12   where a party could identify a plausibly important state interest.").

13         Thus, *Sprint* arguably narrowed the application of *Younger* abstention. In doing so,

14   the Supreme Court emphasized *Younger* is "exceptional," that federal courts have an

15   overarching duty to "entertain and resolve on the merits [actions] within the scope of a

16   jurisdictional grant," and the "general rule" that "[t]he pendency of an action in [a] state

17   court is no bar to proceedings concerning the same matter in the Federal court having

18   jurisdiction." 134 S. Ct. 584, 588 (2013) (citations and internal quotation marks omitted).

19   Once again, the Supreme Court established "*Younger* extends [only] to [] three

20   'exceptional circumstances'": 1) ongoing state criminal prosecutions; 2) ongoing state

21   civil enforcement proceedings; and 3) ongoing state civil proceedings involving certain

22   orders uniquely in furtherance of state courts' ability to perform judicial functions. *Id.* at

23   594.

24         Following *Sprint*, the Ninth Circuit held *Younger* abstention is appropriate in civil

25   cases "only when the state proceedings: (1) are ongoing, (2) are quasi-criminal

26   enforcement actions or involve a state's interest in enforcing the orders and judgments of

27   its courts, (3) implicate an important state interest, and (4) allow litigants to raise federal

28   challenges." *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 759

(9th Cir. 2014). Once these threshold requirements are met, the Ninth Circuit considers a fifth issue involving abstention; that is, whether "[t]he requested relief [] seek[s] to enjoin—or ha[s] the practical effect of enjoining—ongoing state proceedings." *Id.* at 758. Accordingly, while the test for invoking *Younger* abstention has varied over time, it is now clearly established that analysis of each factor in relation to the facts alleged in the complaint is required.

## B. Whether *Younger* Applies to the Present Case

Defendants contend *Younger* requires abstention in this case pursuant to the two categories of civil cases to which the doctrine applies. They argue the injunctive relief Plaintiffs seek would interfere with the state juvenile court's ability to perform its judicial functions *and* that the case is related to ongoing proceedings in the state juvenile court which are quasi-criminal in nature. Plaintiffs maintain *Younger* abstention is not required because the relief sought is "systemic" in nature and targets state agencies, not the juvenile court.

### i. There are ongoing state court proceedings.

In order for *Younger* to apply, Plaintiffs must be involved in an ongoing state court proceeding. Defendants argue each named Plaintiff and putative class member is presently involved in an ongoing, individual juvenile court proceeding. Plaintiffs do not appear to dispute they are *subject* to the ongoing oversight of the juvenile courts. This Court then will assume the juvenile courts ongoing jurisdiction over dependent children and case-by-case periodic review hearings satisfy the first prong of *Younger*. *See* A.R.S. §§ 8-202(G); 8-447.

### ii. The ongoing state court proceedings are not quasi-criminal nor do they involve Arizona's interest in enforcing orders of its courts.

The next step is to determine whether the proceedings are either quasi-criminal or involve the state's interest in enforcing the orders of its courts. If the state court proceedings do not fall into either one of these two categories, *Younger* abstention is not appropriate. Defendants argue the juvenile court proceedings satisfy both categories

1     while Plaintiffs argue they satisfy neither.

2                              **a. Quasi-Criminal**

3              Defendants argue the proceedings are quasi-criminal because the juvenile court

4     has "substantial and continuous *exclusive* authority in *all* aspects of child dependency

5     cases," including those involving child abuse. (Doc 49 at 5). Plaintiffs argue the ongoing

6     state court proceedings are not quasi-criminal because their purpose is to review

7     executive action and not enforce criminal laws.

8              Defendants primarily rely on *Moore v. Sims*, in which the Supreme Court held

9     proceedings ordering the temporary removal of children in the context of alleged child-

10    abuse were quasi-criminal. 442 U.S. 415, 423 (1979). The *Moore* Court did not clarify

11    the reasoning behind this decision other than to state: "the State [] was a party . . . [and]

12    the temporary removal of a child in the child-abuse context is, like the public nuisance

13    statute involved in *Huffman*, 'in aid of and closely related to criminal statutes.'" *Id.*

14             But in a class action on behalf of Massachusetts' foster children, *Connor B. ex rel.*

15    *Vigurs v. Patrick*, a district court distinguished *Moore*, holding:

16             Defendants' argument fails to appreciate that Plaintiffs' claims relate only
               to alleged injuries suffered while in [Massachusetts' Department of
17             Children and Families ("DCF")] custody. [P]roceedings [whereby juvenile
               courts place children in state custody due to abuse or neglect by their
18             parents] are the means by which Plaintiffs enter DCF custody, and
               Plaintiffs expressly state that they are not challenging any aspect of those
19             proceedings in this case.
20

21    771 F. Supp. 2d 142, 154 (D. Mass. 2011).

22             Like the Massachusetts case, this case does not concern temporary removal

23    proceedings but rather involves, to some extent, periodic review hearings which take

24    place once a child is determined dependent and placed in state custody. In Arizona,

25    proceedings to remove a child from the familial home and periodic reviews while in state

26    custody are distinct. They are governed by different provisions of state law.[9] And the

27    _____

28             [9] Removal proceedings are governed by Chapter 9 and periodic reviews by
      Chapter 10 of Title 8, Article 4 of the Arizona Revised Statutes.

procedures for affecting the temporary removal of a child in Arizona do not involve a finding of dependency.[10] *See* A.R.S. § 8-821. While the six-month status reviews only take place if a child has been determined dependent by the juvenile court. *See* A.R.S. § 8-841 *et seq.*

Although many of the children in the putative class may have entered the foster care system amid circumstances of abuse and neglect prohibited by the criminal law, as in the Massachusetts case, the complaint addresses the experiences children have after they are determined dependent and placed in state custody, not the proceedings which led to that custody. In *Moore*, by contrast, the state court proceeding was an emergency removal of children due to allegations of abuse. The proceedings had been and were ongoing because the children had only been removed on a temporary basis, pending further findings. The state court proceedings in *Moore* were not those described here.

The animating purpose of the ongoing dependency proceedings in this case is to plan for and monitor the development and well-being of children, not to investigate or penalize those who might have contributed to their dependency. A.R.S. § 8-847(D) ("At any periodic review hearing, the court shall consider the health and safety of the child as a paramount concern"). The type of proceedings here employs a conciliatory approach. In addition to representatives from state child welfare agencies, parents,[11] relatives, foster parents, shelter care facility personnel, and others are invited to participate in the review proceedings and share their views on the child's best interest. A.R.S. § 8-847(B).

---

[10] In Arizona, the temporary removal of a child may be affected in one of two ways. First, an interested person may petition the juvenile court for an order by stating, under oath, "reasonable grounds exist to believe that temporary custody is clearly necessary to protect the child from suffering abuse or neglect." A.R.S. § 8-821(A). Second, a peace officer, a child welfare investigator, or a child safety worker may take a child into temporary custody without an order from the juvenile court "if temporary custody is clearly necessary to protect the child because probable cause exists to believe that the child is: 1. A victim or will imminently become a victim of abuse or neglect[; or] 2. Suffering serious physical or emotional injury that can only be diagnosed by a medical doctor or psychologist[; or] 3. Physically injured as a result of living on premises where dangerous drugs or narcotic drugs are being manufactured[;] . . . [or] 4. Reported by the department to be a missing child at risk of serious harm." A.R.S. § 8-821(B). Children may not remain in temporary custody for more than 72 hours. A.R.S. § 8-821(F).

[11] As long as they have not relinquished or had their parental rights terminated.

- 14 -

Although the state is a party in the proceedings and is responsible for investigating children's circumstances and is required to produce a report for the court, the state's investigations and reports are not prepared for the primary or secondary purpose of enforcing criminal laws. *See* A.R.S. § 8-516(E). In sum, periodic reviews differ from emergency removals like the one at issue in *Moore*, where an immediate threat of criminal harm warranted the removal of children from the custody of the parents without a hearing. Rather, the juvenile court reviews here have an indirect relationship to the enforcement of criminal laws. They do not qualify as quasi-criminal for purposes of *Younger*.

### b. State Interest in Enforcing State Court Orders and Judgments

Even if the state court proceedings satisfactorily establish they are not quasi-criminal in nature, *Younger* abstention may apply if the proceedings involve the state's interest in enforcing the orders and judgments of its courts. Defendants argue the equitable relief Plaintiffs seek would interfere with the juvenile courts' determinations of foster children's placements, visitation, and health care services, as well as its power to enforce its own orders through contempt proceedings. Defendants cite references in the complaint to instances in which state agencies have allegedly failed to comply with juvenile court orders and Defendants maintain: "[T]he remedy for non-compliance with a *state* court judgment is contempt of *state* court, not a statewide class action in federal court." (Doc. 41 at 21) (emphasis in original). Plaintiffs argue this suit does not implicate orders uniquely in furtherance of the state court's ability to perform its judicial functions because reversal or challenge of court orders is not sought here.

In order to determine whether this action implicates or would interfere with the ability of state courts to perform judicial functions, the Court looks to the specific relief sought in the complaint. *See generally Gilbertson v. Albright*, 381 F.3d 965 (9th Cir. 2004) (discussing development of *Younger* from suits involving equitable relief to those involving declaratory and monetary relief). Plaintiffs seek an order directing Defendants

to establish and implement broad and comprehensive practices to ensure:

1.  "[Foster children] receive the physical, mental and behavioral health services to which they are entitled" pursuant to substantive due process and the Medicaid Act;

2.  "[A] minimally adequate capacity and array of [foster care] placements";

3.  "[M]inimally adequate visitation between [family] members";

4.  "[M]inimally adequate investigation into reports . . . [of] abuse[] or neglect[]";

5.  "[M]inimally adequate caseworker visits with the biological parents . . . and for involvement of such parents in the case planning. . . ."

(Doc. 37 at 51-52). Plaintiffs also seek the appointment of a neutral monitor and the Court's continued oversight over compliance with its order of enforcement.

Plaintiffs argue the complaint targets only executive functions of Defendants' agencies, not the judicial functions of the juvenile courts. Therefore, abstention is not required relying on *NOPSI*. In *NOPSI*, the Supreme Court held *Younger* does not "require[] abstention in deference to a state judicial proceeding reviewing legislative or executive action." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans (NOPSI)*, 491 U.S. 350, 368 (1989). Several district courts addressing the issue of whether a federal foster care class action interferes with ongoing state court dependency proceedings have similarly relied on *NOPSI*. *See, e.g.*, *M.D. v. Perry*, 799 F. Supp. 2d 712, 718 (S.D. Tex. 2011). Those courts have generally held complaints seeking relief from systemic problems in state foster care agencies "aid the ongoing state proceedings [in juvenile court], [and do] not interfere with them." *Id.* at 720. *See also Kenny A. ex rel. Winn v. Perdue*, 218 F.R.D. 277, 286 (N.D. Ga. 2003) ("Although plaintiffs all have periodic reviews before the state juvenile courts, the declaratory and injunctive relief plaintiffs seek is not directed at their review hearings, or at Georgia's juvenile courts, juvenile court judges, or juvenile court personnel. Rather, plaintiffs seek relief directed solely at *executive* branch defendants to remedy their alleged failures as plaintiffs' custodians.") (emphasis in original); *Dwayne B. v. Granholm*, No. 06-13548, 2007 WL 1140920, at *6 (E.D. Mich. Apr. 17, 2007) ("While it is true that Michigan has in place a

juvenile court system that sets out procedures for bringing and maintaining a child under that court's jurisdiction and there may be some ongoing juvenile court proceedings for individual foster care children, this lawsuit does not seek to interfere with any such proceedings. The relief sought here is not directed at the juvenile courts. It is directed at the executive branch.").[12]

In fact, the Ninth Circuit has specifically recognized the absence of inherent interference from a federal class action brought against the director of Arizona's executive agency in charge of foster care and proceedings before the Arizona juvenile court. In *L. H. v. Jamieson*, a class of juveniles "adjudged dependent, neglected or delinquent by Arizona state courts . . . [and] placed in private, child-caring facilities" sought declaratory and injunctive relief seeking additional funding for the private agencies caring for them while in state custody. 643 F.2d 1351 (9th Cir. 1981). Reversing the district court's decision to abstain under *Younger*, the court held "an order that would require Arizona to spend more money to fund dispositional alternatives for juveniles in state custody" may "affect pending and ongoing state juvenile proceedings" to the extent of "enrich[ing the variety of dispositional alternatives available to a juvenile court judge" but it would not "have the wholly disruptive consequences associated with enjoining a state judicial proceeding." *Id.* at 1354.[13]

Defendants also claim the prayer for relief is "artful pleading." They insist the allegations in the complaint tell a different story about the aims of the requested relief

---

[12] Although these cases were decided before *Sprint*, in applying the *Middlesex* factors, the courts essentially addressed the question the Supreme Court articulated in *Sprint*: whether the federal suit would interfere "with pending civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id.* at 586 (internal quotation marks and citation omitted). These rulings are relevant and consistent with *Sprint* because their analysis of interference involves many of the same factors considered in determining whether state court proceedings involve the state's interest in and ability to enforce the orders of courts.

[13] The Court is cognizant the question under this prong of *Younger* is not whether the federal case would "have the wholly disruptive consequences associated with enjoining [the] state judicial proceeding" but whether the federal suit would interfere with the functioning of the state court.

and ask the Court to use those allegations as the basis for an examination under *Younger*. Defendants argue Plaintiffs claims of harm coupled with allegations of frequent transfers between foster homes, placements far from family members, lack of visitation between children and family members, and more demonstrate the ultimate goal of interfering with the juvenile courts' power over placements, visitation, and health services through a federal court order. But this argument ignores the standard articulated in *31 Foster Children v. Bush*, a case Defendants otherwise cite as authority. 329 F.3d 1255 (11th Cir. 2003). Again, there the court held a court must "look to the relief requested and the effect it would have on the state proceedings," not the allegations in the complaint, to determine whether the federal action would interfere with the state court's proceedings. *Id.* at 1276 (citing *O'Shea v. Littleton,* 414 U.S. 488, 499–502 (1974)) (plaintiffs in *Foster Children* sought a district court-appointed panel with "authority to implement a systemwide plan to revamp and reform dependency proceedings in Florida, as well as the appointment of a permanent children's advocate to oversee that plan."). Furthermore, although the complaint includes anecdotal evidence from individual children's cases, these are examples of the alleged broader phenomena the complaint describes and for which its relief is requested.

Defendants also argue the juvenile court system of today bears no resemblance to the system in 1981, the year *Jamieson* was decided. It is alleged the legislature has since greatly expanded the juvenile courts' role in deciding children's placement, visitation, and health services. But even under today's statutes, although the juvenile courts can and do order DCS, its subdivisions, and related agencies to provide children with placements, visitation, and healthcare services, they do not have jurisdiction to monitor, or, more important, control how the agencies are organized to provide these services. In other words, the juvenile courts rule on individual cases, not how to remedy deficiencies in the overall administration of foster care. As such, the requested relief would not interfere with the functioning of the juvenile courts. *See M.D. v. Perry*, 799 F. Supp. 2d 712, 719 (S.D. Tex. 2011) ("Plaintiffs seek broad injunctive and declaratory relief aimed at

improving the Texas foster care system as a whole, not to interrupt, alter, or in any other manner change a particular state court placement review decision.").

The Court will examine each aspect of Plaintiffs' requested relief to ensure it concerns *systemic* problems not individual cases.[14]

*Placement:* Defendants claim "Arizona law mandates that juvenile courts make all placement decisions for dependent children." (Doc. 41 at 8, 16). However, though the juvenile court "may" order the placement of a child following a determination of dependency, Arizona law permits DCS under some circumstances to place children in foster homes subject only to ratification by the juvenile court. *See* A.R.S. § 8-514 ("[DCS] or a licensed child welfare agency if so authorized in its license may place a child in a licensed foster home for care or for adoption."); *Antonio P. v. Arizona Dep't of Econ. Sec.*, 218 Ariz. 402, 404 (Ct. App. 2008) (discussing the authority of the juvenile court to ratify or alter a foster placement). DCS does not need prior court approval to change a placement unless the change is challenged by a third party. *See* A.R.S. § 8-515.05 (statute governing challenges by foster parents to removal of foster children from their care). DCS also determines the eligibility and licensing procedures for foster homes and is responsible for supervising those homes. A.R.S. §§ 8-503(4)(b)-(h); 8-509; 8-516. DCS may deny an application, suspend, or revoke a foster parent's license for violations of state statutes governing child welfare. A.R.S. § 8-506.

The request by Plaintiffs for "practices to ensure a minimally adequate capacity and array of placements" by DCS does not interfere with the juvenile courts' authority or

---

[14] Defendants' reliance on *Peterson v. Babbitt*, decided two years after *Jamieson*, is misplaced. 708 F.2d 465 (9th Cir. 1983). In *Peterson*, a father brought suit in federal court alleging state child welfare agencies violated his constitutional rights by depriving him of visitation with his children. *Id.* Thus, the father was requesting relief from a single decision of the child welfare agencies expressly subject to the juvenile court's jurisdiction and review. By contrast, Plaintiffs are not challenging particular decisions directly applicable in the juvenile court. The executive practices Plaintiffs challenge, for example, include not having effective systems in place to provide children with necessary care. Although one could, in the course of a dependency proceeding, ask a juvenile court to review a *specific* agency decision regarding an individual child, the role of the court in that specific instance would be to evaluate the constitutionality of the decision but not the constitutionality of the agency's overall operating procedures, which affect all children in state custody.

1    ability to order initial child placements or to review the adequacy of placements. (Doc.

2    37). As such, the requested injunctive relief is not aimed at controlling the ultimate

3    placement of individual children in a foster home. Those individual decisions are within

4    the sole purview and oversight of the juvenile courts. This case focuses on DCS's

5    processes for acquiring, screening, and licensing foster homes and its provision of enough

6    foster homes to house children entrusted to its care. The decision of the Court will not

7    disrupt individual placements or specific foster homes. *See Sam M. ex rel. Elliott v.*

8    *Chafee*, 800 F. Supp. 2d 363, 380 (D.R.I. 2011) (holding "increase[ing] the array and

9    types of available placements, are not within the province of the Family Court, although

10   they would assist in implementing the Family Court's orders. [And] [w]ith respect to

11   those measures, 'the mere possibility of inconsistent results in the future is insufficient to

12   justify *Younger* abstention.'").

13       *Visitation:* Defendants argue because the juvenile courts have "broad discretion"

14   to hear and decide issues of visitation, abstention is required. (Doc. 41 at 9, 17). The

15   relief requested by Plaintiffs is for "DCS [to] establish . . . practices providing for

16   minimally adequate visitation between [family] members." (Doc. 37).

17       DCS has an obligation to facilitate visitation between children, their siblings, and

18   other family members, as long as the juvenile court has not declared it against the best

19   interest of the child. A.R.S. § 8-613(C)-(D). In keeping with this obligation, the

20   permanency plan ordered or approved by the juvenile court at the disposition hearing

21   must "take[] into consideration the placement of the child with siblings or [] provide[] for

22   frequent visitation or contact between siblings unless the court determines that either . . .

23   would be contrary to the child's or a sibling's safety or well-being." A.R.S. § 8-845(C).

24       The complaint does not allege Defendants or the juvenile courts fail to include

25   family visits in case plans. Rather, it discusses "poor performance in *coordinating* family

26   visits" and the "475 families waiting for such visitation services." (Doc. 37 at 46)

27   (emphasis added). Like systems for ensuring the availability of enough quality

28   placements for foster children, creating systems for effectively coordinating visitation for

1  foster children and their families does not require ordering visitation in individual cases.
2  An injunctive order addressing the broad-based issues described in the complaint would
3  focus on the resources available for facilitating visitation already deemed appropriate by
4  DCS and the juvenile courts.

5  *Healthcare Services:* Defendants likewise argue the juvenile courts have "day-to-
6  day oversight" over the health care of foster children and, as such, the request for relief
7  concerning health care services requires abstention. (Doc. 41 at 9, 17-18). Plaintiffs seek
8  an order directing DCS, DHS, and AHCCCS to "establish and implement practices to
9  ensure that all members of the [putative class] receive the physical, mental and behavioral
10  health services to which they are entitled" under substantive due process and the
11  Medicaid Act. (Doc. 37).

12  Defendants are presently obligated to provide foster children with a variety of
13  healthcare services. And the juvenile courts may order additional services not specifically
14  required by law, but which address the unique needs of a child serve the purpose of
15  providing for the safety and best interest of the child. Juvenile courts may, in their
16  discretion, order the parent, guardian or custodian of a child who "appears to be in need
17  of medical or surgical care" to provide treatment for a child. A.R.S. § 8-245(A). "If the
18  parent, guardian or custodian fails to provide the care as ordered, the juvenile court may
19  enter an order therefor." A.R.S. § 8-245(A). The juvenile courts are also responsible for
20  approving motions for psychiatric assessments and residential treatment services.  A.R.S.
21  § 8-272(F), (D); A.R.S. § 8-273(A). DCS, DHS, and AHCCCS are also responsible not
22  only for complying with orders from the juvenile courts, but also for independently
23  planning and providing programs and services to protect the health and safety of Arizona
24  children. *See* A.R.S. § 8-457. Specifically, DCS is obligated to provide "comprehensive
25  medical and dental care" for foster children and to collaborate with DHS and AHCCCS
26  to find the most effective way of delivering that care as well as behavioral health
27  services. A.R.S. § 8-512(A)-(C). The agencies are also responsible for creating a system
28  for identifying, licensing, and paying healthcare providers. A.R.S. § 8-512(D)-(K).

- 21 -

1    The requested relief concerns the systems for facilitating the provision of care

2    already deemed necessary by Defendants and the juvenile courts. DCS and its related

3    agencies are responsible for creating a system for effectively delivering care. This

4    includes licensing and funding quality healthcare providers in a way that is similar to

5    DCS's responsibilities regarding provision of foster homes. Defendants have presented

6    no evidence the juvenile courts play a specific role in directing or monitoring those

7    functions. An injunction directed towards the establishment and implementation of

8    practices to ensure children receive healthcare services to which they are entitled does not

9    require deciding an entitlement, but rather the delivering of entitled services.

10    *Investigating Abuse and Caseworker Contact:* Defendants make no claims

11    regarding the request for relief aimed at investigating abuse and neglect or providing

12    greater contact between caseworkers and biological parents, and these provisions involve

13    no clear conflict or interference with the juvenile courts.

14    *Power of Contempt:* Defendants claim the relief sought targets compliance with

15    juvenile court orders and as such interferes with the power of contempt and the ability of

16    the court to enforce its orders. Defendants refer to instances in the complaint in which a

17    juvenile court found lack of reasonable efforts to comply with orders as evidence that the

18    requested relief would impose oversight over compliance with juvenile court orders. But

19    the relief sought does not involve monitoring compliance with individual orders of the

20    juvenile courts. Rather, the goal of the proposed relief is to oversee macro-level systems,

21    which may involve overall rates of placement, visitation, and services. Furthermore, the

22    purpose of the oversight is not to pinpoint individual cases of noncompliance for federal

23    court intervention, but rather to implement system-wide remedial measures to help cure

24    alleged chronic, widespread failures.

25    Defendants have not pointed to instances in which the juvenile courts have been

26    involved with rooting out systemic causes of repeated agency failures. Nor do Defendants

27    cite statutes imposing a duty on the courts to engage in such agency intervention. This

28    type of federal oversight would not interfere with the functioning of the juvenile courts,

including the power of contempt. *See M.D. v. Perry*, 799 F. Supp. 2d 712, 720 (S.D. Tex. 2011) ("As this lawsuit focuses on systemic problems and seeks systemic solutions, it would not 'duplicate' the individualized reviews that occur in the state courts.").

It is worth noting *Juidice v. Vail*, the case in which the Supreme Court first spoke of the contempt power of a state court as grounds for *Younger* abstention, was a direct challenge to the power of contempt. 430 U.S. 327 (1977). The plaintiffs in *Juidice* sought specifically to invalidate a state statute which gave the state court the power of contempt. The plaintiffs also sought to enjoin pending contempt proceedings. *Id.* In contrast to *Juidice*, the potential interference Defendants posit with respect to the present lawsuit is hypothetical.[15]

*Retroactive Effect:* Defendants express concern that any finding of past constitutional violations by DCS, DHS, or AHCCCS could result in demands for reversals or modifications of specific juvenile court orders in 16,990 pending dependency proceedings. (Doc. 49 at 11). Defendants rely on *E.T. v. George*, 681 F. Supp. 2d 1151, 1172 (E.D. Cal. 2010). In *E.T.*, a class of dependent children brought an action alleging attorney and judicial caseloads in dependency courts were excessive and violated federal and state constitutional and statutory provisions by frustrating "the ability of the courts to adjudicate and provide children with a meaningful opportunity to be heard and the effective, adequate, and competent assistance of counsel." *Id.* The court concluded, "[t]he requested declaratory relief call[ed] into question the validity of every decision made in pending and future dependency court cases before the resolution of this litigation" and stated it "[could not] overlook the practical impact of the proposed declaratory relief on the *5,100 active dependency court cases*" in which the court predicted parties would seek

---

[15] In those instances in the complaint in which a juvenile court found noncompliance with an order, there is no indication the court exercised its power of contempt. (*See, e.g.*, Doc. 37 at 16-17). Rather, the complaint states, in some instances, the juvenile court merely re-ordered the same relief previously directed. (Doc. 37 at 16-17). The Court "cannot overlook the practical impact of the proposed [] relief," which, here, would not interfere with the functioning of the juvenile court. *Cf. E.T. v. George*, 681 F. Supp. 2d 1151, 1172 (E.D. Cal. 2010).

1   to invalidate prior decisions by the juvenile court. *Id.*[16]

2      Unlike *E.T.*, the complaint and requested relief here do not call into question the

3   validity of orders previously issued by the juvenile courts, nor the fairness of past

4   juvenile court proceedings. Plaintiffs do not claim, nor do Defendants argue, the alleged

5   constitutional violations resulted from adherence to certain juvenile court orders.

6   Defendants have not shown how findings against them would have the effect of

7   retroactively invalidating past orders of the juvenile courts.

8      In sum, the relief sought in each of the areas outlined in the complaint does not

9   involve or interfere with the interest of the state in enforcing the orders and judgments of

10  state courts. The Court does note that although the suit clearly involves an important state

11  interest,[17] it does not appear Plaintiffs could raise their classwide claims or pursue the

12  systemic reforms they seek within the framework of the periodic review hearings in the

---

15  [16] The "practical impact" of such a declaration was not the primary reason for the
    decision to abstain under *Younger*. The decision primarily rested on a finding that "[the
    proposed] injunction directed to remedying [violations based upon the amount of time or
    resources spent on juvenile dependency court cases] would require the [federal] court to
    ensure that in *each* case the child was receiving certain services or procedures that the
    court has declared constitutional." *Id.* (emphasis added).

19  [17] *See Santosky v. Kramer*, 455 U.S. 745, 766 (1982) ("the State has an urgent
    interest in the welfare of [its resident children]"). *See also Moore v. Sims*, 442 U.S. 415,
    435, 99 S. Ct. 2371, 2383, 60 L. Ed. 2d 994 (1979) ("Family relations are a traditional
    area of state concern."); *Ginsberg v. State of New York*, 390 U.S. 629 (1968) ("State . . .
    has an independent interest in the well-being of its youth."); *Prince v. Commonwealth of
    Massachusetts*, 321 U.S. 158 (1944) (state acting to guard the interest in youth's well-
    being); *H.C. ex rel. Gordon v. Koppel*, 203 F.3d 610, 613 (9th Cir. 2000) (citing *Moore*
    on state's interest in family relations). Some courts have held a state's voluntary
    agreement to federal oversight of its foster care system under the Act *reduces* the comity
    concerns out of which this requirement of *Younger* arose. *M.D. v. Perry*, 799 F. Supp. 2d
    712, 725 (S.D. Tex. 2011) ("[G]eneral concerns about comity and federalism underlying
    *Younger* are lessened in light of the state's submission to federal oversight under the Title
    IV-E foster care program. . . . The voluntary submission to such federal oversight greatly
    lessens the force of any complaints regarding unwarranted federal intrusion on state
    sovereignty."). But the cases do not hold federal oversight negates the state's interest
    entirely. *Id.* at 721 ("The mere fact that federal oversight also exists does not lessen the
    importance of this state interest."). *Cf. Hudson v. Campbell*, 663 F.3d 985, 988 (8th Cir.
    2011) (holding state had important interest in administering Medicaid program because
    "[t]he Act 'confers broad discretion on the States to adopt standards for determining the
    extent of medical assistance, requiring only that such standards be "reasonable" and
    "consistent with the objectives" of the Act'" and program was partially funded by state).

- 24 -

1   juvenile courts.[18] Therefore, even if the relief sought could be construed to interfere with

2   some ongoing proceedings, *Younger* abstention is inappropriate given the inadequacy of

3   those proceedings to adjudicate the relief sought here.

4   **C. *O'Shea* Abstention**

5      In addition to *Younger* abstention, Defendants invoke *O'Shea* abstention. *O'Shea*

6   abstention is an outgrowth of *Younger*. Under *O'Shea v. Littleton*, a federal court may not

7   issue an injunction which would result in "an ongoing federal audit of state [court]

8   proceedings which would indirectly accomplish the kind of interference that *Younger v.*

9   *Harris* . . . and related cases sought to prevent." 414 U.S. 488, 500 (1974).

10     *O'Shea* involved an action by a group of residents against a county magistrate and

11  associate judge of the county circuit court in which the residents alleged a pattern and

12  practice of illegal bond setting, sentencing, and jury fee practices in criminal cases. 414

13  U.S. 488 (1974). The Supreme Court dismissed the case for lack of standing and want of

14  an actual case or controversy. The Court held none of the named plaintiffs had suffered

15  the injury specified and the claimed injury was outlined in far too general terms to be

16  cognizable. As an alternative holding, the Court stated that even if the complaint

17  presented a case or controversy,

18
19          [The requested] injunction [was] aimed at controlling or preventing the
            occurrence of specific events that might take place in the course of future
20          state trial criminal trials[,] . . . would contemplate interruption of state
            proceedings to adjudicate assertions of noncompliance by petitioners[, and
21          would result in] an ongoing federal audit of state criminal proceedings
22          which would indirectly accomplish the kind of interference that *Younger v.*

23  _____

24     [18] As discussed in the previous section, everything about dependency proceedings
    is tailored to the specific facts and circumstances of a particular child's life. Nothing in
25  the statutes governing the authority or procedures of the juvenile court envisions or
    authorizes the court's adjudication of class action cases. *See* A.R.S. §§ 8-841 *et seq*.; 8-
26  221. In fact, Defendants do not argue the *class* claims this case presents could be brought
    in the context of an ongoing juvenile dependency proceeding. Rather they argue the
27  Court does not need to analyze this case as a class action because no class has yet been
    certified. Crucially, Defendants and the cases on which they rely, *31 Foster Children v.*
28  *Bush*, 329 F.3d 1255, 1281 (11th Cir. 2003) and *Joseph A. ex rel. Corrine Wolfe v.*
    *Ingram*, 275 F.3d 1253, 1274 (10th Cir. 2002), do not embrace the unique and important
    functions of class actions and the relief they can afford.

*Harris* . . . and related cases sought to prevent. [And a] federal court should not intervene to establish the basis for future intervention that would be so intrusive and unworkable.

*Id.* at 500.

*O'Shea* abstention is an equitable abstention related to *Younger*. "If the equitable relief requested requires intrusive follow-up into state court proceedings, it constitutes 'a form of the monitoring of the operation of state court functions that is antipathetic to established principles of comity.'" *E.T. v. George*, 681 F. Supp. 2d 1151, 1162 (E.D. Cal. 2010) *aff'd sub nom. E.T. v. Cantil-Sakauye*, 682 F.3d 1121 (9th Cir. 2012) (quoting *O'Shea*, 441 U.S. at 500).

"[I]nstitutional reform injunctions often raise sensitive federalism concerns." *Horne v. Flores*, 557 U.S. 433, 448 (2009). Those concerns are "heightened when . . . a federal-court decree has the effect of dictating state or local budget priorities." *Id.* To fulfill their obligation of enforcing federal law without overly hamstringing state and local officials with "overbroad or outdated [federal injunctive orders]" the Supreme Court directed federal courts to take a "flexible approach" to such orders, ensuring the orders are "limited to reasonable and necessary implementations of federal law" and "responsibility for discharging the State's obligations is returned promptly to the State and its officials when the circumstances warrant." *Id.* at 450 (internal quotation marks and citation omitted).

Defendants claim the injunctive relief Plaintiffs seek "necessarily requires this Court to create and then monitor, for purposes of enforcement, measurable criteria for placements, visitation, permanency, health care, and other facets of foster care that juvenile court judges adjudicate," and would thus constitute an ongoing federal audit of juvenile court proceedings. (Doc. 49 at 18). Plaintiffs insist "Defendants can be ordered to address their harmful practices 'without an ongoing intrusion into the state's administration of justice,'" and "*O'Shea* does not give federal courts license to turn away from claims like those asserted in this action." (Doc. 42 at 28).

- 26 -

In *E.T. v. Cantil-Sakauye*, the Ninth Circuit affirmed an abstention decision under *O'Shea*. 682 F.3d 1121 (9th Cir. 2012). There, the district court was asked to declare attorney caseloads in juvenile courts unconstitutional and issue accompanying injunctive relief. The court concluded:

> [T]he court would [] have to consider a myriad of administrative matters that affect the efficiency of the system. Further, in order to enforce any method of injunctive relief, the court would be required to act as a receiver for the Sacramento dependency court system, ensuring that judges were giving adequate time *to each individualized case* pursuant to the constitutional and/or statutory dictates established through this proceeding. Such involvement in any state institutional system is daunting, but the problems accompanying plaintiffs' requested relief is increased exponentially when applied to a state judicial system.

*E.T. v. George*, 681 F. Supp. 2d 1151, 1165 (E.D. Cal. 2010) (emphasis added).

The Ninth Circuit distinguished *Los Angeles County Bar Association v. Eu*, 979 F.2d 697 (9th Cir. 1992), which involved a challenge to a California statute prescribing the number of judges in Los Angeles Superior Court. The plaintiffs in that case claimed the statute led to a shortage of state court judges, which in turn, caused inordinate delays in civil litigation and deprived litigants of access to the courts. The *E.T.* court held the question in *Los Angeles County Bar Association* was "whether the *average* time to resolution in a case violated [the plaintiff's] rights." *E.T.*, 681 F. Sup. 2d at 1166. By contrast, the court held the question presented in *E.T.* was whether each individual plaintiff's rights had been violated "based upon their specific, individual circumstances." *Id.*

But in *Melendres v. Maricopa County*, a district court did not abstain in a class action seeking federal monitoring and sweeping reforms of a state executive agency, the Maricopa County Sheriff's Office. No. CV-07-2513-PHX-GMS, 2009 WL 2707241, at *5 (D. Ariz. Aug. 24, 2009). The defendants moved for judgment on the pleadings, arguing in part, that the principles of comity and federalism made adjudication of the claims in federal court improper. The court referenced *O'Shea* but held:

- 27 -

> [P]rinciples of federalism counsel restraint in the granting of injunctive relief against state agencies. At this early stage in the litigation, however, principles of federalism do not dictate that the Court should terminate this case. Just as it is emphatically the province and duty of the judiciary to say what the law is, . . . so too is it emphatically the province and duty of the judiciary to vindicate the law where it has been violated. This principle requires enjoining constitutional violations that are likely to reoccur, even if the subject of the injunction is a state agency entitled to respect, deference, and latitude in conducting its own affairs. . . . Principles of federalism are not offended by a court performing this essential function—"to conclude otherwise would be to suggest that federal courts never ought to be concerned with the activities of state agencies under any circumstances."

*Id.* at *5 (citations omitted). *Melendres* did not involve ongoing state court proceedings, but the holding is relevant because it clearly outlines the tension between Supreme Court precedents which, on the one hand, impose a duty on federal courts to adjudicate claims arising under federal laws, and on the other hand, warn against excessive intrusion into the operation of state government. The Supreme Court also addressed that tension in *Horne* when it discussed the "flexible approach" federal courts should take to address widespread violations of federal law by state institutions. 557 U.S. at 450.

The primary question under *O'Shea* is whether the proposed injunctive relief would result in an ongoing federal audit of state court proceedings. The complaint here does not. It is directed towards state agencies. Defendants express concern the obligation of juvenile courts to oversee these agencies will result in a federal injunction which will indirectly accomplish the interference *Younger* aims to avoid. But as discussed, although the juvenile courts play a significant role in overseeing the care of children within the custody and care of the Arizona child welfare agencies, the courts are not involved in adjudicating and remedying the types of claims raised here.

The complaint and proposed relief are distinguishable from *E.T.* because they are not directly aimed at the functioning of the juvenile courts.[19] Plaintiffs here do not allege

---

[19] For this reason, the case is also distinguishable from *Laurie Q. v. Contra Costa County*, another case on which Defendants rely. In *Laurie Q.*, a class of special needs foster children sued the county for violations of the Adoption Assistance and Child

- 28 -

any statutory or constitutional violations in the procedure or administration of the juvenile courts. Nor is Plaintiffs' suit an indictment of the juvenile courts for failing to address these constitutional issues.

Further, the failures of child welfare agencies to comply with juvenile court orders are the result of the broader problems Plaintiffs wish to address. Plaintiffs contend the absence of proper agency organization and resources results in constitutional violations, signified by insufficient delivery of services to foster children, including instances of direct violations of juvenile court orders, and those children's mental and physical health problems. If appropriate, the success of the injunctive relief Plaintiffs seek in this case will be measured by composite statistics showing rates of placements and services, including those ordered by juvenile courts.

As the *Melendres* court held, principles of federalism and comity warrant restraint and respect when the target of a federal court injunction is a state agency. But this Court, like that one, is fully capable of practicing such restraint and hewing to the direction provided by the Supreme Court in *Horne* for managing the competing requirements of federal jurisdiction and state sovereignty.

### III. *Pullman* Abstention

Defendants also claim abstention is appropriate because Plaintiffs' claims could be resolved on state law grounds, thus avoiding unwarranted determinations of federal law. Plaintiffs argue there are no state grounds upon which to decide the issues they raise since they do not challenge the constitutionality or appropriateness of a state law or policy.

In *Railroad Commission of Texas v. Pullman Company*, the Supreme Court held

---

Welfare Act ("AACWA"), including failing to prepare compliant case plans. 304 F. Supp. 2d 1185 (N.D. Cal. 2004). Because the juvenile court held "ultimate authority over the formulation of the case plans . . . [at] which plaintiffs' prayer for injunctive relief [was] directed" . . . the court held *Younger* applied. *Id.* at 1203-08 ("[T]he allegations at issue here reach to the very heart of the Juvenile Court's responsibility and core competency, viz., determining the best program of services and placement for each individual child."). As discussed at length in this order, the relief Plaintiffs' seek is not aimed at a core competency of the juvenile court.

that when an unsettled question of state law could be dispositive of a federal constitutional claim, the federal court should abstain in order to give the state courts an opportunity to decide the underlying state law question, thus avoiding unnecessary adjudication of constitutional questions. 312 U.S. 496 (1941).

Plaintiffs do not raise state law claims in their complaint. Although it is not necessary for them to raise a state law claim in order to be subject to abstention under *Pullman*, Defendants have not provided the Court with a state law basis under which Plaintiffs' constitutional claims might be resolved. *Cf. Harris Cnty. Comm'rs Court v. Moore*, 420 U.S. 77, 81 (1975). Therefore, the Court cannot conclude *Pullman* abstention is appropriate.

**IV. Summary**

Obviously, as this Order demonstrates, the discussion and final decision of whether a federal court should entertain suits related to state judicial proceedings can never be marginalized. But in the end, if the Court abstained here, the effect would be that Plaintiffs would not be allowed to seek relief in federal court for alleged egregious broad and systemic federal constitutional violations. That would be a wrong result because based on the allegations in the complaint, this Court could fashion a remedy that would not impinge upon the decisions made by juvenile courts in specific individual cases. And of course, this Court will always eschew forays into state judicial proceedings.

Accordingly,

**IT IS ORDERED** the motion to abstain and dismiss, (Doc. 41), is **DENIED.**

Dated this 29th day of September, 2015.

Honorable Roslyn O. Silver
Senior United States District Judge