Joseph Mais (005470)
Shane Swindle (011738)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
T: (602) 351-8000
F: (602) 648-7000
jmais@perkinscoie.com
sswindle@perkinscoie.com

Anne C. Ronan (006041)
Timothy M. Hogan (004567)
**ARIZONA CENTER FOR LAW IN THE**
**PUBLIC INTEREST**
514 West Roosevelt Street
Phoenix, Arizona 85003
T: (602) 258-8850
F: (602) 258-8757
aronan@aclpi.org
thogan@aclpi.org

Harry Frischer (admitted *pro hac vice*)
Aaron Finch (admitted *pro hac vice*)
**CHILDREN'S RIGHTS, INC.**
88 Pine Street, Suite 800
New York, New York 10005
T: (212) 683-2210
F: (212) 683-4015
hfrischer@childrensrights.org
afinch@childrensrights.org

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| B.K. by her next friend Margaret Tinsley, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Gregory McKay, in his official capacity as Director of the Arizona Department of Child Safety, et al.,<br><br>Defendants. | No. 2:15-cv-00185-PHX-ROS<br><br>**Plaintiffs' Opposition to Defendants' Joint Motion To Stay All Proceedings Pursuant to Fed. R. Civ. P. 23(f) and Request for an Order Enforcing the Current Scheduling Order and the Court's Order of January 5, 2018**<br><br>(Assigned to the Honorable Roslyn O. Silver) |

**PRELIMINARY STATEMENT**

The indefinite stay requested by Defendants—which could easily remain in effect for more than a year—would have a devastating effect on children in foster care, and cause them to suffer substantial, irreparable harm. The expert reports that Plaintiffs submitted on December 5, 2017—based on the most current data and information that Defendants produced during fact discovery—demonstrate that Arizona has not come close to addressing its systemic failure to provide for the health and safety of more than 16,000 children in foster care, as alleged in the Complaint. The expert reports demonstrate that children in foster care are still not receiving the physical, dental, and behavioral health care that they need, that they are still being placed in inappropriate institutional settings at alarming rates, and that they are still being unnecessarily separated from their siblings and placed far from their families. These children will remain at substantial risk of serious harm until this Court grants injunctive relief. Resolution of this matter should not be delayed by a stay.

Overwhelming evidence also demonstrates that, for years, Defendants have been deliberately indifferent to the needs of children in foster care and are unwilling to remedy these failures themselves, underscoring the pressing need for injunctive relief. Since at least 2014, children in foster care have been at risk of substantial harm; Defendants have been aware of that risk and have failed to act in a reasonable manner to mitigate that risk. Such conduct constitutes deliberate indifference under Ninth Circuit precedent, entitling Plaintiffs to the remedies they seek, which should not be delayed.

Defendants, by contrast, have not made a "strong showing" that they will prevail

on the merits and that they will suffer irreparable injury in the absence of a stay, both of which are required before a stay can be granted. Nor have Defendants shown that the remaining trial preparation work will be unnecessary. The merits of this case are not at issue on appeal, and the resolution of the appeal will not result in any final disposition of the litigation. Even in the unlikely event that the Court of Appeals overrules its recent precedent in *Parsons* and articulates a new standard for class certification, Plaintiffs will show that the common questions here meet the requirements for certification under any applicable standard, and the case will go forward to trial.

In addition to denying the motion for a stay, Plaintiffs also request that the Court address Defendants' unilateral effort to circumvent the existing scheduling order, in violation of the Order issued by the Court on January 5, 2018 requiring that the parties "continue to comply with all applicable deadlines while the motion to stay is being briefed." In particular, Defendants have failed to produce all the expert disclosures that they were required to produce on January 5, 2018, and the Court should require Defendants to produce these disclosures forthwith.

## ARGUMENT

Stays during the pendency of Rule 23(f) appeals should be "infrequent." *Blair v. Equifax Check Services, Inc.*, 181 F.3d 832, 835 (7th Cir. 1999); *see Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1180 (9th Cir. 2017) (citing *Blair*); *M.D. v. Perry*, No. C-11-84, 2011 WL 7047039, at *1 (S.D. Tex. July 21, 2011) (denying to stay the case and explaining that stays are "extremely rare" (citation omitted)). The Rule was specifically "drafted to avoid delay." *Blair*, 181 F.3d at 835; *accord Lambert*, 870 F.3d at

2

1180. It requires that the case proceed unless the district or circuit court intervenes. Fed. R. Civ. P. 23(f). Thus, a stay is never granted as "a matter of right, even if irreparable injury might otherwise result." *Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017) (quoting *Nken v. Holder*, 556 U.S. 418, 433 (2009)). And the parties requesting the stay always bear the burden of showing that a stay is justified in a particular case. *Washington*, 847 F.3d at 1164 (quoting *Nken*, 556 U.S. at 433-34).

In determining whether a stay pending appeal is appropriate, courts in the Ninth Circuit balance four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Washington*, 847 F.3d at 1164 (quoting *Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012)).

Here, consideration of the relevant factors shows that the stay should be denied. A stay would cause extensive harm to children in foster care, contrary to an important public interest, and Defendants have not made a "strong showing" that they are likely to succeed on the merits, or that they will suffer irreparable injury.

**I.   A Stay Would Subject Foster Children to Substantial, Irreparable Harm by Delaying Necessary Injunctive Relief**

The ongoing harm to children in foster care—including the harm the children would continue to suffer if a stay is granted—is well documented in the five expert reports that Plaintiffs submitted on December 5, 2017, attached as Exhibits 1 – 5 to this opposition brief.

For example, the expert reports of Lenette Azzi-Lessing and Marci White

3

document the substantial harm to children from Defendants' failure to maintain a sufficient array of placement and treatment alternatives to meet the behavioral health needs of children in foster care, and Defendants' systemic failure to coordinate the delivery of behavioral health services to these children. These reports document the "appalling, inexcusable treatment" of Named Plaintiffs B.K. and B.T. Ex. 1, Expert Report of Marci White, MSW, Dec. 5, 2017 at 43 (citing Ex. 2, Expert Report of Lenette Azzi-Lessing, MSW, PhD, Dec. 5, 2017, 1-61) and, as Marci White concludes, "***the systemic failures that so adversely affected B.K. and B.T. still exist***." Ex. 1, White Rep., at 44.

In particular, B.K. and B.T. had significant, documented behavioral health conditions since entering DCS custody "requiring urgent, effective treatment," but, as a result of systemic problems that still have not been remedied, these children "did not get the behavioral health services that their records indicated they needed." Ex. 1, White Rep., at 43. As Marci White explains:

> For example, therapeutic placements were repeatedly recommended for these children, but, repeatedly, no therapeutic placements were available. Dr. Azzi-Lessing's report documents multiple instances where [therapeutic foster] homes were recommended, but none was available. Her report documents recurring instances where the children needed intensive services in residential treatment centers, but here too, no beds were available and/or services were unavailable or inappropriately denied. Dr. Azzi-Lessing also shows that Defendants failed to provide short-term psychiatric diagnostic and stabilization centers and intensive effective home-based services needed by these children. Her report cites repeated instances of long, indefensible delays and waiting lists for medically necessary services; multiple instances where the two children failed to get the therapeutic treatment they needed; and instances where necessary treatments were provided only sporadically or terminated as a result of Defendants' ongoing failure to coordinate the delivery of services.

4

Ex. 1, White Rep., at 43 (citing to Ex. 2 Azzi-Lessing Rep., 1-61).

In addition, because no appropriate therapeutic placements were available, B.T. and B.K. "were repeatedly placed in inappropriate settings, such as emergency shelters, offices, and non-therapeutic group homes, and with families who had no training or ability to provide for a child with such significant behavioral health needs." Ex. 1, White Rep., at 43. These placements "not surprisingly" failed, and the expert reports document "in painful detail, how the mental health of these children deteriorated in the absence of necessary behavioral health treatment." Ex. 1, White Rep., at 43-44; Ex. 2, Azzi-Lessing Rep., 1-61.

Here again, all children in foster care remain at risk of not getting the behavioral health services that they need. For example, after reviewing the most current behavioral health logs produced by Defendant McKay during discovery, Ms. White observed that "virtually every page of the dozens of logs I reviewed," contained entries "indicating that needed services were unavailable, that necessary coordination was not occurring, and that there were substantial delays in receiving services." Ex. 1, White Rep., at 36. Based on her review of the substantial factual record outlined in her report, Ms. White concluded that, "Defendants do not maintain the structure and systems essential to ensure that children in foster care receive the services they need when they need them. Defendants do not maintain a sufficient array of behavioral health services for these children. Defendants do not coordinate the provision of services. Children in foster care simply do not get the behavioral health services they need. As a result of these ongoing systemic failures, all children in foster care remain at substantial risk of harm." Ex. 1, White Rep.,

at 44.

Defendants, likewise, are still failing to provide basic physical health services to large numbers of children in foster care. The expert report of Dr. Steven Blatt confirms that alarming numbers of children in foster care still do not receive the well-child physical examinations, immunizations, dental examinations, and other preventive services required by the Medicaid statute. For example, DCS's own reports indicate that for the first two quarters of 2017, the most recent data produced by DCS during discovery, only 27% of eligible two-year-olds received their required immunizations. Ex. 3, Expert Report of Steven D. Blatt, MD, Dec. 5, 2017, at 9.

Defendants' continuing failure to provide basic physical health services to children in foster care is confirmed by an additional expert, Paul Zurek, who conducted an independent analysis of data maintained by DCS regarding physical health services provided to foster children in Arizona. Ex. 4, Expert Report of Paul Zurek, Dec. 5, 2017. DCS data reflect that more than 46% of children who entered foster care in 2016 and 2017 failed to receive a well-child examination in accordance with DCS policies. Ex. 4, Zurek Rep., at 5 (describing data) & *Id.* at Zurek Exhibit 2 (data). More than 31% of the children in foster care received fewer than half of the Medicaid-required Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") tests that they should have. Ex. 4, Zurek Rep., at 8, & *Id.* at Zurek Exhibit 4. In 2016 and 2017, more than one-third of the required EPSDT tests were ***not*** provided. Ex. 4, Zurek Rep., at 8, & *Id.* at Zurek Exhibit 10. Dr. Zurek's analysis of DCS data also reflects that DCS is substantially undercounting the numbers of children who have not received their required well-child

6

examination. Ex. 4, Zurek Rep., at 10-11, & *Id.* at Zurek Exhibit 12 and 13.

The expert report of Arlene Happach confirms that DCS is still failing to place large numbers of children in appropriate family-like settings, and far too many children are languishing in shelters, group homes, and other forms of congregate care. Ex. 5, Expert Report of Arlene Happach, December 7, 2017, at 4-12. Indeed, Ms. Happach demonstrates that DCS's improper use of congregate care has actually ***increased*** since 2014, when Arizona's Auditor General excoriated the child welfare agency for excessive placements of children into congregate care. Ex. 5, Happach Rep., at 6-8. In March 2014, at about the time of the Auditor General report, there were 2,176 children in congregate care, representing about 13.8% of all children in foster care. Ex. 5, Happach Rep., at 9. As of March 2017, the number of children in foster care had increased to 2,543, representing 15.1% of all children in foster care. Ex. 5, Happach Rep., at 9. Yet DCS itself acknowledges that placing children in a family-like setting, rather than in congregate care is "imperative for a child's healthy brain and social development throughout life" and that "children placed in congregate care placements [are] more likely to test below children placed in a family-like placement setting, to drop out of high school, and less likely to graduate from high school." Ex. 5, Happach Rep., at 7.

Ms. Happach's report likewise demonstrates that DCS is still separating siblings unnecessarily at alarmingly high rates, and there has been no improvement in this regard between 2014 and 2017. Ex. 5, Happach Rep., at 13-14.[1] And DCS is still failing to

---

[1] In March 2014, only 38.5% of foster children in sibling groups were placed with all of their siblings. By March 2014, that figure had declined to 36.4%. In March 2014, 32.8%

conduct timely investigations of reports of abuse in care. Ex. 5, Happach Rep., at 18-21.

Finally, Ms. Happach also demonstrates that DCS is continuing to overburden caseworkers with excessive caseloads, substantially in excess of the caseload standards DCS reports to the federal government that it maintains. Ex. 5, Happach Rep., at 24-25. As a result of these excessive caseloads, DCS workers do not have sufficient time to perform the tasks required under DCS policies—including tasks associated with ensuring that children receive the physical, dental, and behavioral health care they are supposed to, and are placed in safe, appropriate settings—resulting in the many failures outlined above. Ex. 5, Happach Rep., at 24-25.

Plaintiffs here seek injunctive relief from the Court to remedy these serious problems, and a stay harms Plaintiffs "by delaying the proceedings and the benefits of the requested injunctive relief." *Reyes v. Educ. Credit Mgmt. Corp.*, No. 15-cv-00628-BAS-AGS, 2017 WL 4640418, at *4 (S.D. Cal. Oct. 17, 2017) (denying a stay in an injunctive case); *M.D.*, 2011 WL 7047039, at *2 (denying a stay where "any benefit that Defendants may gain through a stay would appear to be at least equally injurious to Plaintiffs, who seek a timely resolution to their constitutional claims, and meaningful improvement to the state foster care system").

There is also substantial evidence that the Arizona officials responsible for the health and safety of children in foster care have known of the substantial harm resulting from their practices since 2014, if not earlier, but have not taken appropriate remedial

---

of foster children in sibling groups were not placed with *any* of their siblings. In March 2017, that figure still was 32.4%.

8

action.[2] This conduct constitutes "deliberate indifference" under Ninth Circuit authority.[3] It also demonstrates that Defendants are not going to fix these problems themselves, underscoring the need for injunctive relief from the Court and the irreparable harm that would result from a stay.

## II. Defendants Have Not Made a "Strong Showing" of Prevailing on Appeal and that the Remaining Trial Preparation Will Be Unnecessary

In the face of the overwhelming harm to children in foster care if this case is delayed, Defendants have not made a "strong showing," or any showing at all, that they will prevail on appeal and the work remaining to prepare for trial will be superfluous. *Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017). On the contrary, it is substantially more likely that this case will proceed as a class action under all circumstances, and none of the remaining pre-trial work will go to waste.

### A. Defendants Have Not Made a "Strong Showing" that this Court Incorrectly Applied *Wal-Mart*

This Court found after a "rigorous analysis" of more than 100 pages of briefing, more than 100 exhibits, and five expert reports that the proposed class and subclasses met the requirements of Rule 23(a) and (b)(2) because they each raise common questions that can be resolved in "one stroke" and remedied by class-wide injunctive relief. *Wal-Mart*

---

[2] Ex. 1, White Rep.; Ex. 2, Azzi-Lessing Rep.; Ex. 3, Blatt Rep.; Ex. 4, Zurek Rep.; Ex. 5, Happach Rep.; *see* Dkt. No. 238-1, Expert Report of Steven Blatt, MD, Sept. 15, 2016; Dkt. No. 238-2, Expert Report of Marci White, MSW, Sept. 15, 2016; Dkt. No. 238-3, Expert Report of Arlene Happach, Sept 15, 2016.

[3] *Henry A. v. Willden*, 678 F.3d 991, 1000 (9th Cir. 2012) (citing *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 844-45 (9th Cir. 2010)). *See also Farmer v. Brennan*, 511 U.S. 825, 838 (1994).

*Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011). In doing so, this Court joined the overwhelming majority of courts nationwide, both before and after *Wal-Mart*, that have certified similar classes with similar claims under Rule 23(b)(2). It is thus highly likely that this case will remain a class action. *See, e.g.*, *M.D. v. Perry*, 294 F.R.D. 7, 66-67 (S.D. Tex. 2013) (post-*Wal-Mart* order certifying pursuant to Rule 23(b)(2) one general class and three subclasses of Texas foster children); *Connor B. ex rel. Vigurs v. Patrick*, 278 F.R.D. 30, 35-36 (D. Mass. 2011) (post-*Wal-Mart* denial of motion to de-certify Rule 23(b)(2) class of Massachusetts foster children seeking injunctive and declaratory relief to reform state foster care system); *D.G. ex rel Strickland v. Yarbrough*, 278 F.R.D. 635, 638-39 (N.D. Okla. 2011) (post-Wal-Mart denial of motion to de-certify Rule 23(b)(2) class of Oklahoma foster children seeking injunctive and declaratory relief to reform state foster care system); *Hernandez v. Cty. of Monterey*, 305 F.R.D. 132, 153-59 (N.D. Cal. 2015) (holding that "systemic and centralized policies or practices" that expose all class members "to a substantial risk of serious future harm" adequate for federal statutory claim).[4]

---

[4] *See also*, *Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997) (affirming class certification of a class of Medicaid-eligible foster children alleging "central and systemic failures" of the child welfare system); *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 54, 56 (3d Cir. 1994) (finding it an abuse of discretion not to certify a Rule 23(b)(2) class of Philadelphia foster children seeking injunctive and declaratory relief to reform the foster care system); *N.B. v. Hamos*, 26 F. Supp. 3d 756, 772-73 (N.D. Ill. 2014) (certifying class of children bringing claims under EPSDT and holding that "whether there is system-wide failure to provide services" sets forth a common issue of law and fact that "is resolvable on a class-wide basis"); *O.B. v. Norwood*, 15 C 10463, 2016 WL 2866132, at *4 (N.D. Ill. May 17, 2016) (certifying a class of Medicaid-eligible children and finding that "'systemic failures' to provide approved EPSDT services" established "the potential for a common class question").

Defendants apparently contend that, in each of these cases, the court incorrectly certified the class, but Defendants have fallen far short of making a "strong showing" that this argument will succeed.

**B. Defendants Have Not Made a "Strong Showing" that the Court of Appeals Will Overrule Its 2014 Decision in *Parsons***

It appears that Defendants' appellate strategy is to convince the Ninth Circuit to overrule its 2014 decision in *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014). *See* Defs' Mot. 6, Jan. 3, 2018, Dkt. No. 387. In their motion for a stay, however, Defendants make no showing that it is likely that *Parsons* will be overruled. Such a ruling, in fact, is highly unlikely. Indeed, a three-judge panel does not even have the authority to overrule Ninth Circuit precedent like *Parsons*. To overrule *Parsons* the Ninth Circuit would have to agree to review that decision en banc. *Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001) ("Once a panel resolves an issue in a precedential opinion, the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the Supreme Court. . . . [A] later three-judge panel considering a case that is controlled by the rule announced in an earlier panel's opinion has no choice but to apply the earlier-adopted rule; it may not any more disregard the earlier panel's opinion than it may disregard a ruling of the Supreme Court.").

The Ninth Circuit has already refused to grant en banc review of *Parsons*, *Parsons v. Ryan*, 784 F.3d 571, 571 (9th Cir. 2015), and en banc review is always unlikely.[5] It is equally unlikely that the Ninth Circuit will disregard the principle of stare

---

[5] During the 12-month period ending September 30, 2016, the Ninth Circuit decided

decisis to overrule recent, settled precedent. *See Latta v. Otter*, 771 F.3d 496, 498-99 (9th Cir. 2014) (dissolving a stay in part because the panel's decision was "dictated" by a case that the court "voted not to rehear" en banc "only a short time ago"); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 286 F.R.D. 88, 93 (D.D.C. 2012) (denying a stay after finding defendants unlikely to prevail on appeal because "the law" did "not appear to be unsettled").

The fact that the Ninth Circuit granted permission to appeal does not meet the requirement that Defendants make a "strong showing" of the likelihood of success. Defendants must do more than demonstrate a "mere possibility" that the Ninth Circuit will rule in their favor. *Lair v. Bullock*, 697 F.3d 1200, 1204 (9th Cir. 2012). Federal courts generally reject Defendants' contention that permission to appeal alone demonstrates a likelihood of success. *E.g.*, *Monaco v. Bear Stearns Companies, Inc.*, No. CV 09-05438 SJO (JCx), 2012 WL 12506860, at *2 (C.D. Cal. Dec. 5, 2012) (explaining that the district court must consider both the likelihood of the 23(f) petition being granted and the likelihood of Defendants' ultimate success on appeal); *Gray v. Golden Gate Nat'l Recreation Area*, No. C 08-00722 EDL, 2011 WL 6934433, at *1 (N.D. Cal. Dec. 29, 2011) (same); *Strougo v. Barclays PLC*, 194 F. Supp. 3d 230, 233 (S.D.N.Y. 2016) (finding the defendants failed to meet the standard where they argued that they were

---

6,709 cases on the merits after briefing or oral argument. Only 21 of those cases were heard en banc. United States Courts, Judicial Business, *U.S. Courts of Appeals—Cases Terminated on the Merits After Oral Arguments or Submission on Briefs, by Circuit, During the 12-Month Period Ending September 30, 2016*, http://www.uscourts.gov/sites/default/files/data_tables/jb_b10_0930.2016.pdf

likely to succeed merely because the Second Circuit granted leave to appeal).[6]

### C.  Defendants Have Not Made a "Strong Showing" that a Reversal of *Parsons* Will End the Litigation or Render the Remaining Pretrial Work Superfluous

Even in the unlikely event that the Court of Appeals overrules *Parsons* and articulates some new standard for class certification, Defendants make no showing that such a ruling would end the case or Plaintiffs' ability to proceed as a class. To the contrary, Plaintiffs' extensive evidence that Defendants' class-wide practices result in class-wide risk of harm, which can be remedied by class-wide relief, demonstrates certification would be appropriate under any applicable standard. As shown above, federal courts throughout the United States have overwhelmingly certified classes of children in foster care that assert claims similar to those asserted here. *See* p.10 & p.10 n.4 above.

If *Parsons* is overruled, however remote a possibility that may be, the Court of Appeals will likely remand the case for this Court to apply the newly-announced standard, which Plaintiffs likely will meet. The Court should be in a position to make that determination on the basis of a fully-developed, trial-ready record. *See Reyes v. Educ. Credit Management Corp.*, 2017 WL 4640418, at *4 (S.D. Cal. Oct. 17, 2017) (refusing to stay the case because "the Court fails to see how this case will not proceed as a class action whether on the current certified class or a modified one").

---

[6] Defendants' reliance on *Pena v. Taylor Farms Pac., Inc.*, No. 2:13-cv-01282-KJM-AC, 2015 WL 5103757 (E.D. Cal. Aug. 31, 2015) is misplaced. Here, unlike in *Pena*, the Court's certification decision is supported by settled, binding precedent. *See Id.* at *4 (finding a "substantial case for relief" in part because there was a "lack of binding authority" on the applicable evidentiary standard).

Even more, no matter how the Court of Appeals rules on the class certification issues, none of the remaining pretrial work will be wasted. The ruling on the standard for class certification will not affect the liability standard at trial. *See Wal-Mart Stores*, 564 U.S. at 367 (2011) (noting that the application of Rule 23 cannot "modify any substantive right" (citation omitted)).[7] The same expert testimony and the same evidence will likely be relevant at summary judgment and at trial, regardless of whether the Ninth Circuit modifies the standard for certification. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 286 F.R.D. at 93 (denying a stay in part because "some, perhaps most, of the parties' work in preparing expert discovery, *Daubert* motions, and summary judgment briefs will be of use even if the defendants prevail on their appeal").

By allowing the parties to complete the current schedule, the Court will be ready to quickly move to trial after the Ninth Circuit returns its decision. The stay should thus be denied.

### III. Defendants Will Not Be Irreparably Injured in the Absence of a Stay

There are three important deadlines left before trial: the completion of expert discovery, dispositive motions, and motions in limine. Fourth Amend. Sched. Order, Oct. 20, 2017, Dkt. No. 367. This work is substantially less extensive than the tremendous effort the parties have already expended in this case, and Defendants' obligation to perform this remaining work does not constitute irreparable injury. *Fed. Trade Comm'n*

---

[7] This case is thus not like *Gray v. Golden Gate Nat'l Recreational Area,* relied on by Defendants. 2011 WL 6934433 (N.D. Cal. Dec. 29, 2011). In *Gray*, unlike here, the existence of the class was dispositive of whether the plaintiffs' claims against specific facilities survived at all. *Id.* *2. Not so here.

*v. Standard Oil Co.,* 449 U.S. 232, 244 (1980) ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." (citation omitted)); *Monaco v. Bear Stearns Companies, Inc.*, No. CV 09-05438 SJO (JCx), 2012 WL 12506860, at *4 (C.D. Cal. Dec. 5, 2012) ("[L]itigation costs in and themselves generally do not constitute irreparable injury"); *Astiana*, *et al.*, *v. Kashi Co.*, 2013 WL 12064548, at *3 (S.D. Cal. Sept. 18, 2013) (denying a stay where the defendants failed to show that the additional discovery would be "unusual or particularly onerous").

**IV.  The Court Should Enforce Its Order of January 5, 2018 and Require Defendants to Immediately Produce Expert Reports that Include the Opinions of All Their Experts**

Finally, Plaintiffs seek the assistance of the Court to remedy Defendants' efforts to circumvent the existing schedule and the Court's order that the parties comply with the existing schedule while Defendants' motion is being considered, Order, Jan. 5, 2018, Dkt. No. 390. In particular, Defendants failed to fully disclose their experts and all their opinions on January 5, as they should have.

As noted, Plaintiffs served the expert reports attached to this motion on December 5, 2017. Defendants then had 30 days to prepare their expert reports, which were due on January 5, 2018. Rebuttal reports are then due on February 5, 2018. Fourth Amend. Sched. Order, Dkt. 367, ¶ F.

Although Defendants had 30 days to consider and respond to Plaintiffs' experts, the expert reports submitted by Defendant McKay on January 5 did no such thing. Defendant McKay's reports did ***not*** address any of the opinions, comments, calculations, data, or other information presented by any of Plaintiffs' experts. The expert reports

15

submitted by Defendant McKay did not even *mention* Plaintiffs' experts. Instead, it appears that Defendant McKay has deliberately held back the most significant portions of his expert reports—*i.e.*, the experts' substantive response to our experts—and apparently intends to present his experts' substantive response only on February 5, the very same day that Plaintiffs are supposed to submit their rebuttal reports. In a document accompanying their January 5 expert reports, Defendant McKay states that the documents served that day pertain only to his "affirmative expert witnesses," whatever that term may mean, and that additional disclosures with respect to "rebuttal experts" will be made by February 5, 2018. Ex. 6, Def's Affirmative Expert Witness Disclosure, Jan. 5, 2018.

But Defendant McKay's attempt to withhold expert disclosures in this fashion violates the Federal Rules of Civil Procedure and the Scheduling Order and makes it impossible for Plaintiffs' experts to effectively consider and rebut all the opinions that Defendants' experts intend to offer. The Scheduling Order required Defendants to disclose on January 5 "the identity of **all** persons" who will present expert testimony. Fourth Amend. Sched. Order ¶ F (emphasis added). The Scheduling Order did not limit the disclosure to "affirmative experts," a term that does not even appear in the order.

The Scheduling Order likewise required Defendants to provide on January 5 "all of the disclosures required by FRCP 26(a)(2)(B)." Fourth Amend. Sched. Order ¶ F. That rule requires a party to disclose "a **complete** statement of **all** opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B) (emphasis added). Here again, nothing in the Rule permits Defendant McKay to disclose just *some* of an expert's opinions at the time the report is due, with the remainder of the expert's

opinions to be disclosed sometime later. Yet that is exactly what Defendant McKay purports to do here. One of Defendant McKay's experts even admits that the report she submitted on January 5 may not contain all her opinions, and that she may submit an additional, subsequent report responding to Plaintiffs' experts.

Apparently, Defendant McKay contends that his stratagem to withhold expert disclosures is supposedly justified by language in the scheduling order stating that the "Parties" rather than the "Plaintiffs" may serve rebuttal reports by February 5. But nothing in this language indicates that Defendants had the right to delay providing expert disclosures that were due one month earlier. By requiring Plaintiffs to serve their expert reports first, and staggering Defendants' expert reports so that they would be due 30 days later, the Scheduling Order plainly contemplated that Defendants' experts would consider and comment upon the opinions offered by Plaintiffs. Defendants' stratagem violates Rule 26, disregards the scheduling order, and prejudices Plaintiffs. The Court should thus order Defendants to serve their complete expert reports without further delay.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion for a stay so that this case will be trial-ready when the Ninth Circuit issues its decision. The Court also should compel Defendants to comply with the existing scheduling order and produce complete reports for all their experts.

17

Dated: January 12, 2018

**CHILDREN'S RIGHTS, INC.**
By: s/ Aaron Finch
Harry Frischer
Aaron Finch
88 Pine Street, Suite 800
New York, New York 10005

**PERKINS COIE LLP**
Joseph Mais
Shane Swindle
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona  85012-2788

**ARIZONA CENTER FOR LAW IN THE PUBLIC INTEREST**
Anne C. Ronan
Timothy M. Hogan
514 West Roosevelt Street
Phoenix, Arizona  85003

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 12, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal to the following CM/ECF registrants:

David Weinzweig
ddw@ewlawaz.com
Robert Ellman
rle@ewlawaz.com
Ellman Weinzweig LLC
330 East Thomas Road
Phoenix, Arizona 85012

Daniel P. Quigley
dquigley@CDQLaw.com
Cindy C. Albracht-Crogan
ccrogan@CDQLaw.com
Stacey F. Gottlieb
sgottlieb@CDQLaw.com
Lauren M. Koloseike
lkoloseike@CDQLaw.com
COHEN DOWD QUIGLEY P.C.
2425 East Camelback Road, Ste. 1100
Phoenix, Arizona 85016

*Attorneys for Defendant Gregory McKay*

Logan T. Johnston
ltjohnston@live.com
JOHNSTON LAW OFFICES, P.L.C.
1402 E. Mescal Street
Phoenix, Arizona 85020

Daniel P. Struck
dstruck@strucklove.com
Nicholas D. Acedo
nacedo@strucklove.com
Dana M. Giallonardo
dgiallonardo@strucklove.com
Timothy J. Bojanowski
tbojanowski@strucklove.com
STRUCK LOVE BOJANOWSKI & ACEDO, P.L.C.
3100 W. Ray Road, Suite 300
Chandler, Arizona 85226-2473

Catherine D. Plumb
plumblawoffice@gmail.com
LAW OFFICES OF CATHERINE DODD PLUMB, P.L.C.
17225 N. 16th Place
Phoenix, Arizona 85022

*Attorneys for Defendant Thomas J. Betlach*


s/ Aaron Finch

19