**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Margaret Tinsley, et al., | No. CV-15-00185-PHX-ROS |
| Plaintiffs, | **ORDER** |
| v. | |
| Michael Faust, et al., | |
| Defendants. | |

In 2016, Named Plaintiff B.K. ("Plaintiff" or "B.K."), a minor in the custody of the Arizona foster care system, sought certification of this matter as a class action with subclasses under Rule 23(b)(2). This Court granted certification of the General Class, the Non-Kinship Subclass, and the Medicaid Subclass. The Ninth Circuit affirmed the certification of the General Class and the Non-Kinship Subclass, but vacated the certification of the Medicaid Subclass and remanded to this Court for further consideration of the commonality requirement under Rule 23(a). Plaintiff then filed a motion to certify the Medicaid Subclass under Rules 23(a) and 23(b)(2). (Doc. 430.) Defendants opposed. (Doc. 435.) For reasons that follow, the Court will grant the motion for certification of the Medicaid Subclass.

## BACKGROUND

Plaintiff filed this civil rights class action on behalf of children in the custody of the Arizona foster care system, claiming the Arizona foster care system violates the U.S. Constitution and the Medicaid Act. (Doc. 37.) She alleges Arizona's uniform, statewide

policies and practices in the foster care system exposed her and all other foster children to harm or unreasonable risk of harm while in the state's care, in violation of federal rights. (*Id.*) Of particular relevance here, she alleges the policies and practices of the Arizona Department of Child Safety ("DCS") and the Arizona Health Care Cost Containment System ("AHCCCS") subject foster children to a significant risk of denial of medically necessary health care. (*Id.*)

In 2017, this Court originally granted Plaintiff's motion for class certification and certified three groups of children: (1) all children who are or will be in the legal custody of DCS due to a report or suspicion of abuse or neglect (the "General Class"); (2) all members in the General Class who are not placed in the care of an adult relative or person who has a significant relationship with the child (the "Non-Kinship Subclass"); and (3) all members of the General Class who are entitled to early and periodic screening, diagnostic, and treatment services under the federal Medicaid statute (the "Medicaid Subclass"). (Doc. 363.) Plaintiff asserted constitutional due process claims for the General Class and the Non-Kinship Subclass. Specifically, Plaintiff claimed that DCS violated substantive due process rights under the Fourteenth Amendment by failing to care adequately for the General Class, and by placing the Non-Kinship Subclass at substantial risk of harm. For the Medicaid Subclass, Plaintiff asserted only a Medicaid Act claim.

Defendants appealed the class certification to the Ninth Circuit. (Docs. 365; 366.) On April 26, 2019, the Ninth Circuit issued its opinion affirming the certification of the General Class, holding this Court "properly grounded its commonality determination in the constitutionality of statewide policies and practices," which "are the 'glue' that holds the class together." *B.K., by next friend Tinsley v. Snyder*, 922 F.3d 957, 969 (9th Cir. 2019) (citing *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014)).[1] The Ninth Circuit

---

[1] The nine statewide practices affecting the General Class are: (1) failure to provide timely access to health care, including comprehensive evaluations, timely annual visits, semi-annual preventative dental health care, adequate health assessments, and immunizations; (2) failure to coordinate physical and dental care service delivery; (3) ineffective coordination and monitoring of DCS physical and dental services; (4) overuse of congregate care for children with unmet mental needs; (5) excessive caseworker

also affirmed the certification of the Non-Kinship Subclass, holding that "[a]s with the General Class, commonality, typicality, and uniformity of injunctive relief were satisfied by identifying [three statewide] practices because the district court will be able to determine whether [Defendants] have an unconstitutional practice of placing children in substantial risk of harm by evaluating these practices as a whole, rather than as to each individual class member."[2] *Id.* at 973.

The Ninth Circuit reversed the certification of the Medicaid Subclass because certification of the Medicaid Subclass was "based on an apparent misconception of the legal framework for such a claim." *Id.* at 975. The Ninth Circuit formulated two distinct legal theories that could justify certifying the Medicaid Subclass. First, "whether every child in the Medicaid Subclass is subjected to the same state-wide policy or practice that violates the Medicaid Act." *Id.* at 976–77. Second, whether a state-wide "policy or practice could expose every child in the subclass to a significant risk of an imminent future Medicaid violation." *Id.* at 977. The Ninth Circuit held "[u]nder this [second] theory, the plaintiffs . . . may challenge the Medicaid violation before it has taken place, so long as the requisite 'significant risk' exists, so commonality may exist based on a finding that all class members are subjected to the same risk." *Id.*

Certification of the Medicaid Subclass was remanded to this Court for further proceedings based on the Ninth Circuit's proposed commonality standard, specifically on the question of whether "every subclass member was subject to an identical 'significant risk' of a future Medicaid violation that would support injunctive relief." *Id.* Judge Adelman dissented from the vacatur of the Medicaid Subclass certification order, finding this Court did not err in applying Rule 23 standards, and noting that, at the class certification stage, Plaintiff did not have to prove "that the defendants' policies are in fact

---

caseloads; (6) failure to investigate reports of abuse timely; (7) failure to document "safety assessments"; (8) failure to close investigations timely; and (9) investigation delays.
[2] The three statewide practices affecting the Non-Kinship Subclass are: (1) excessive use of emergency shelters and group homes; (2) unnecessary separation of siblings; and (3) placement of children far from home.

deficient," but simply "that the question of whether the policies are deficient can be resolved on a class-wide basis." *Id.* at 982 (Adelman, J., concurring in part and dissenting in part).

On remand, Plaintiff sought leave to seek certification of the Medicaid Subclass "not because Defendants violated the Medicaid Act but because each class member is subject to a significant risk that Defendants will violate the Medicaid Act." (Doc. 425 at 2.)[3] The Court granted Plaintiff's request to file this motion. (Doc. 425.)

## ANALYSIS

Plaintiff seeks to certify the Medicaid Subclass under Federal Rule of Civil Procedure 23. Under Rule 23(a), a party seeking certification of a subclass must satisfy four prerequisite requirements: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Fed. R. Civ. P. 23(a)(1)-(4). If the initial requirements are met, Plaintiff's proposed subclass must also satisfy the requirements of one of the subsections of Rule 23(b), "which defines three different types of classes." *See Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 512 (9th Cir. 2013). Here, Plaintiff seeks to certify the Medicaid Subclass pursuant to Rule 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *See* Fed. R. Civ. P. 23(b)(2).

District courts must conduct a rigorous analysis of whether the prerequisites of Rule 23(a) are satisfied, an analysis which may "touch[] aspects of the merits." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). However, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, 568 U.S. 455, 466 (2013) (citing *Wal-Mart*, 564 U.S. at 351 n.6).

Defendants oppose Plaintiff's motion for alleged failure to adequately demonstrate

---

[3] All page numbers on electronically filed documents refer to the ECF-generated page numbers.

imminent Medicaid violations, and failure to meet the commonality, typicality, and Rule 23(b)(2) requirements. (Doc. 435 at 2.)

The Court will address the requirements of the Medicaid statute and what constitutes a Medicaid violation. The Court will then turn to class certification and address each of Defendants' arguments in turn.

## I.     The Medicaid Statute

The parties disagree on what the Medicaid Act requires regarding early and periodic screening, diagnostic, and treatment services ("EPSDT"), and what would establish a violation. This fundamental question underlies resolution of all other issues in the class certification motion.

### A. The Relevant Medicaid Statutes

EPSDT services are defined in the Medicaid Act. The statute defines the term "early and periodic screening, diagnostic, and treatment services" to mean five items and services: (1) screening services[4]; (2) vision services; (3) dental services; (4) hearing services; and (5) "Such other necessary health care, diagnostic services, treatment, and other measures" as are necessary to "correct or ameliorate defects and physical and

---

[4] Screening services are services:
    **(A)** which are provided—
        **(i)** at intervals which meet reasonable standards of medical and dental practice, as determined by the State after consultation with recognized medical and dental organizations involved in child health care and, with respect to immunizations under subparagraph (B)(iii), in accordance with the schedule referred to in section 1396s(c)(2)(B)(i) of this title for pediatric vaccines, and
        **(ii)** at such other intervals, indicated as medically necessary, to determine the existence of certain physical or mental illnesses or conditions; and
    **(B)** which shall at a minimum include—
        **(i)** a comprehensive health and developmental history (including assessment of both physical and mental health development),
        **(ii)** a comprehensive unclothed physical exam,
        **(iii)** appropriate immunizations (according to the schedule referred to in section 1396s(c)(2)(B)(i) of this title for pediatric vaccines) according to age and health history,
        **(iv)** laboratory tests (including lead blood level assessment appropriate for age and risk factors), and
        **(v)** health education (including anticipatory guidance).
42 U.S.C. § 1396d(r)(1).

mental illnesses and conditions."[5] 42 U.S.C. § 1396d(r)(1)–(5). Providers of EPSDT services are instructed to read their duties broadly.[6]

The duties of the State of Arizona are laid out in Section 1396a, "State plans for medical assistance." Any state's plan for medical assistance (i.e. Medicaid) must apply universally within the state, 42 U.S.C. § 1396a(a)(1), and must provide for: (A) informing eligible children of the availability of EPSDT services; (B) "providing or arranging for the provision" of EPSDT services; (C) arranging for corrective treatment if necessary; and (D) providing annual reports of how many children were screened, treated, and received services, as well as reporting whether the state met the requirements of 42 U.S.C. § 1396d(r).[7] 42 U.S.C. § 1396a(a)(43).

---

[5] The "other measures" include "any medical or remedial services . . . for the maximum reduction of physical or mental disability and restoration of an individual to the best possible functional level." 42 U.S.C. § 1396d(a)(13)(C).

[6] The statute notes in concluding subsection (r) that "Nothing in this subchapter shall be construed as limiting providers of early and periodic screening, diagnostic, and treatment services to providers who are qualified to provide all of the items and services described in the previous sentence or as preventing a provider that is qualified under the plan to furnish one or more (but not all) of such items or services from being qualified to provide such items and services as part of early and periodic screening, diagnostic, and treatment services." 42 U.S.C. § 1396d(r). *See also Rosie D. v. Romney*, 410 F. Supp. 2d 18, 26 (D. Mass. 2006) ("Because the only limit placed on the provision of EPSDT services is the requirement that they be 'medically necessary,' the scope of the EPSDT program is broad.")

[7] A state plan for medical assistance must provide for—

**(A)** informing all persons in the State who are under the age of 21 and who have been determined to be eligible for medical assistance including services described in section 1396d(a)(4)(B) of this title, of the availability of early and periodic screening, diagnostic, and treatment services as described in section 1396d(r) of this title and the need for age-appropriate immunizations against vaccine-preventable diseases,

**(B)** providing or arranging for the provision of such screening services in all cases where they are requested,

**(C)** arranging for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services, and

**(D)** reporting to the Secretary (in a uniform form and manner established by the Secretary, by age group and by basis of eligibility for medical assistance, and by not later than April 1 after the end of each fiscal year, beginning with fiscal year 1990) the following information relating to early and periodic screening, diagnostic, and treatment services provided under the plan during each fiscal year:

**(i)** the number of children provided child health screening services,

**(ii)** the number of children referred for corrective treatment (the need for which is disclosed by such child health screening services),

**(iii)** the number of children receiving dental services, and other information relating to the provision of dental services to such

The Code of Federal Regulations also lays out relevant regulatory guidance, defining EPSDT as "(1) Screening and diagnostic services to determine physical or mental defects in beneficiaries under age 21; and (2) Health care, treatment, and other measures to correct or ameliorate any defects and chronic conditions discovered." 42 C.F.R. § 440.40(b). State Medicaid plans must "provide that the Medicaid agency meets the requirements of §§ 441.56-441.62, with respect to EPSDT services." 42 C.F.R. § 441.55. Those sections describe: (1) required activities (§ 441.56); (2) discretionary services (§ 441.57); (3) the periodicity schedule (§ 441.58); (4) treatment of requests for EPSDT screening services (§ 441.59); (5) continuing care (§ 441.60); (6) utilization of providers and coordination with related programs (§ 441.61); and (7) transportation and scheduling assistance (§ 441.62). Sections 441.56, the required activities, and 441.58, the periodicity schedule, are particularly important to the resolution of the class certification motion.

The required activities include: (a) informing all EPSDT eligible individuals and their families about the program's details (§ 441.56(a))[8]; (b) screening, or "periodic comprehensive child health assessments," which "must be provided in accordance with reasonable standards of medical and dental practice" (§ 441.56(b))[9]; (c) diagnosis and treatment, including immunizations and treatment for vision, hearing, and dental problems which would not otherwise be covered by Medicaid if the screening indicates a need (§ 441.56(c))[10]; (d) accountability (§ 441.56(d)); and (e) timeliness (§ 441.56(e)).[11]

---

children described in section 1397hh(e) of this title and
**(iv)** the State's results in attaining the participation goals set for the State under section 1396d(r) of this title.
42 U.S.C. § 1396a(a)(43) (footnote omitted).
[8] Recipients of EPSDT services must be informed, among other things, "That necessary transportation and scheduling assistance described in § 441.62 of this subpart is available to the EPSDT eligible individual upon request." § 441.56(a)(2)(iv).
[9] Periodic comprehensive child health assessments are "regularly scheduled examinations and evaluations of the general physical and mental health, growth, development, and nutritional status of infants, children, and youth." 42 C.F.R. § 441.56(b)(1).
[10] "In addition to any diagnostic and treatment services included in the plan, the agency must provide to eligible EPSDT beneficiaries, the following services, the need for which is indicated by screening, even if the services are not included in the plan": "(1) Diagnosis of and treatment for defects in vision and hearing, including eyeglasses and hearing aids; (2) Dental care, at as early an age as necessary, needed for relief of pain and

The periodicity schedule must meet "reasonable standards of medical and dental practice" and specify "screening services applicable at each stage of the beneficiary's life." 42 C.F.R. § 441.58. Arizona publishes its periodicity schedule for EPSDT services in the AHCCCS Medical Policy Manual ("AMPM"). For children ages 3–20, Arizona requires that every child receive an annual well-child physical examination, at which their blood pressure is taken, their social-emotional health is assessed, they are weighed and measured, and other procedures are conducted.[12] AMPM Policy 430, Exhibit 430-1. The parties refer to this physical examination somewhat interchangeably as "well-child exams," "Well-Child Visits," "Well-Care Visits," and "EPSDT Exams." (Docs. 430 at 10, 435 at 9, 392-4 at 19.) In addition, every child must see a dentist every six months, and receive immunizations and vision and hearing screenings if indicated for their age. AMPM Policy 430, Exhibit 430-1. The AMPM concludes "<u>These are minimum requirements.</u> If at any time other procedures, tests, etc. are medically indicated, the physician is obligated to perform them. If a child comes under care for the first time at any point on the schedule, or if any items are not accomplished at the suggested age, the schedule should be brought up to date at the earliest possible time."[13] *Id.* (emphasis in original).

---

infections, restoration of teeth and maintenance of dental health; and (3) Appropriate immunizations. (If it is determined at the time of screening that immunization is needed and appropriate to provide at the time of screening, then immunization treatment must be provided at that time.)" 42. C.F.R § 441.56(c).

[11] "[T]he agency must set standards for the timely provision of EPSDT services which meet reasonable standards of medical and dental practice, as determined by the agency after consultation with recognized medical and dental organizations involved in child health care, and must employ processes to ensure timely initiation of treatment, if required, generally within an outer limit of 6 months after the request for screening services." 42 C.F.R. § 441.56(e).

[12] The ten procedures which must be conducted at an annual well-child examination, according to the AHCCCS periodicity schedule, are: "History Initial/Interval"; "Length/Height & Weight"; "Body Mass Index (BMI)"; "Blood Pressure"; "Nutritional Assessment"; "Developmental Surveillance"; "Psychosocial/Behavioral Assessment (Social-Emotional Health)"; "Physical Examination"; "Oral Health Screening by PCP"; and "Anticipatory Guidance." AMPM Policy 430, Exhibit 430-1.

[13] However, AHCCCS need not provide redundant services. If an eligible beneficiary requests EPSDT services, AHCCCS "must provide the screening services" unless "written verification exists that the most recent age-appropriate screening services, due under the agency's periodicity schedule, have already been provided to the eligible." 42 C.F.R. § 441.59.

The required services and periodicity schedule are best illustrated by way of example—for instance, a 5-year-old child in the continuous custody of the Arizona foster care system *must* receive 1 well-child physical exam, 1 vision exam, 1 hearing exam, and 2 dental exams over the course of the year, for a total of five exams between their fifth and sixth birthdays. *Id.*; Doc. 392-4 at 19. A 7-year-old child *must* receive 1 well-child physical exam and 2 dental exams, for a total of three exams between their seventh and eighth birthdays. AMPM Policy 430, Exhibit 430-1; Doc. 392-4 at 19.

Arizona has legislated that DCS "shall provide comprehensive medical and dental care . . . for each child who is: (1) In a voluntary placement . . . [or] (2) In the custody of the department in an out-of-home placement." A.R.S. § 8-512(A). Comprehensive medical and dental care "consists of those benefits provided by the [AHCCCS] benefit as prescribed in title 36, chapter 29, article 1 [et seq.] and as set forth in the approved medicaid state plan." A.R.S. § 8-512(B).

The benefits provided by AHCCCS include "the following medically necessary health and medical services: . . . Early and periodic health screening and diagnostic services as required by section 1905(r) of title XIX of the social security act for members who are under twenty-one years of age." A.R.S. § 36-2907(A)(7).

In sum, Defendants must provide EPSDT services, as that term is defined in 42 U.S.C. § 1396d(r), to all children in the custody of the Arizona foster care system who are eligible. To be clear, every eligible child must receive a well-child physical examination each year, a dental examination every six months, and immunizations, visual, and hearing screening based on their age. Evidence that any eligible child did not receive EPSDT services is evidence of a Medicaid violation.

### B. The Parties' Positions

Plaintiff's position is that the word "provide" in the relevant statutes means Defendants are responsible for ensuring that each and every Medicaid-eligible child in the custody of the Arizona foster care system *actually receives* EPSDT services, and moreover receives those services *with reasonable promptness*. (Doc. 430 at 7, citing the

EPSDT Guide at 32.[14]) This position is summarized as: "In short, the EPSDT provisions of Medicaid require that eligible children 'get the health care they need when they need it – the right care to the right child at the right time in the right setting,' which is 'the goal of the EPSDT provision.'" (*Id.*, citing the EPSDT Guide at 1.) Plaintiff provided evidence, through expert reports, that "many foster children have not received mandated physical and dental EPSDT examinations," and alleges that the causes of the problem are Defendants' state-wide policies and practices. (*Id.* at 9.)

Defendants' position is that Arizona is not required to ensure that the children receive EPSDT services; rather, Arizona must ensure only that EPSDT services are *available*. (Doc. 435 at 7, 13). Furthermore, Defendants state that if EPSDT services result in a recommendation for treatment, such treatment is timely if it occurs within six months. (*Id.* at 9.) Defendants summarize their position as: "Neither the statute, the rules, CMS, nor CMS's EPSDT Guide tasks the states with guaranteeing that children receive the services that Defendants make available." (*Id.* at 13.) Defendants attempt to controvert Plaintiff's expert reports by arguing the experts do not explicitly cite the Medicaid standards. (*Id.* at 7.)

## C. Violations of the Medicaid Act

In interpreting the EPSDT requirements of the Medicaid Act, the Court is guided by *Katie A., ex rel. Ludin v. Los Angeles County*, 481 F.3d 1150 (9th Cir. 2007) and the canons of statutory construction. "A primary canon of statutory interpretation is that the plain language of a statute should be enforced according to its terms, in light of its context." *Wadler v. Bio-Rad Labs., Inc.*, 916 F.3d 1176, 1186 (9th Cir. 2019) (quoting *ASARCO, LLC v. Celanese Chem. Co.*, 792 F.3d 1203, 1210 (9th Cir. 2015)).

States that have chosen to provide Medicaid to their citizens "have an obligation to cover every type of health care or service necessary for EPSDT corrective or ameliorative

---

[14] Centers for Medicare & Medicaid Services, U.S. Dep't of Health & Human Services., EPSDT – A Guide for States: Coverage in the Medicaid Benefit for Children and Adolescents (June 2014), https://www.medicaid.gov/medicaid/benefits/downloads/epsdt_coverage_guide.pdf (hereinafter "EPSDT Guide").

purposes," and "an obligation to see that the services are provided when screening reveals that they are medically necessary for a child." *Katie A.*, 482 F.3d at 1158 (citing 42 U.S.C. §§ 1396a(a)(43)(C), 1396d(a)). In a highly analogous case in the District of Massachusetts addressing the provision of EPSDT services, the court made clear that under Medicaid, children are owed greater benefits than adults. *Rosie D. v. Romney*, 410 F. Supp. 2d 18, 25 (D. Mass. 2006) ("As broad as the overall Medicaid umbrella is generally, the initiatives aimed at children are far more expansive."). This obligation is active, not passive, and may require the state to be proactive in arranging for services, since "the ultimate responsibility to ensure treatment remains with the state." *Katie A.*, 482 F.3d at 1158–59 (collecting cases); *see Rosie D.*, 410 F. Supp. 2d at 27 ("[T]he [Medicaid] Act requires a proactive approach."). "[S]tates do have broader Medicaid obligations to children than to other populations of Medicaid recipients." *Alvarez v. Betlach*, No. CV 09-558 TUC AWT, 2012 WL 10861543, at *6 (D. Ariz. May 21, 2012), *aff'd in part, vacated in part*, 572 F. App'x 519 (9th Cir. 2014).

A closer look at previous Ninth Circuit caselaw establishes Defendants' interpretation of their own obligations is incorrect. The district court in *Katie A.* held that state agencies were required to "*provide* services to class members, rather than simply make such services available." *Katie A.*, 481 F.3d at 1162 (emphasis added). On appeal, the Ninth Circuit affirmed this interpretation of the Medicaid Act, holding that "[r]equiring the State *actually to provide* EPSDT services that have been found to be medically necessary is consistent with the language of the Medicaid Act, which requires that each state plan 'provide for . . . arranging for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services.'" *Id.* (quoting 42 U.S.C. § 1396a(a)(43)) (emphasis added); *see also Rosie D.*, 410 F. Supp. 2d at 26 ("Congress' firm intent to ensure that Medicaid-eligible children *actually receive services* is powerfully underlined by provisions in the statute that place explicit duties on states to" inform children of the availability of EPSDT services, "provide or arrange for" services

every time they are requested, and "arrange for whatever corrective treatments are discovered to be needed.") (citing 42 U.S.C. § 1396a(a)(43; 42 C.F.R. §§ 441.56(a)(1), 441.61, 441.62) (emphasis added).

The Ninth Circuit's approach in *Katie A.* comports with the plain language of the statute and regulations, which requires the *provision* of EPSDT services, not the availability of services. *See* 42 U.S.C. § 1396a(a)(43) (state Medicaid plans "must provide for—. . . such screening services"); 42 C.F.R. § 441.56(b)(1) (AHCCCS "must provide . . . screening"); 42 C.F.R. § 441.56(c) (AHCCCS "must provide" dental, vision, and hearing services, and immunizations); 42 C.F.R. § 441.59 (AHCCCS "must provide the screening services"); and A.R.S. § 8-512(A) (DCS "shall provide comprehensive medical and dental care").

The State Medicaid Manual confirms this interpretation, describing the EPSDT program as "A Comprehensive Child Health Program" which "consists of two, mutually supportive, operational components: assuring the availability and accessibility of required health care resources and helping Medicaid recipients and their parents or guardians effectively use them." *State Medicaid Manual* § 5010(B).[15] The position taken by Defendants addresses only the first component.

Not only must the state ensure that EPSDT services are provided in the first place, it "also must ensure that the EPSDT services provided are reasonably effective." *Katie A.*, 481 F.3d at 1159. And as the Ninth Circuit held in this case, "[t]he most natural reading of the Act and our precedents is that a violation occurs when EPSDT services have failed to be provided in a timely manner." *Tinsley*, 922 F.3d at 976.

Defendants disagree that they are responsible for ensuring that children receive care, asserting generally that "there are many reasons, beyond Defendants' control" why children in the custody of Arizona's foster care system do not receive timely medical care according to AHCCCS's own periodicity schedule of screenings and treatments, including that "some children do not need services," "[n]ot everyone wants or requests

---

[15] Available for download at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021927.html.

help that is available," and many children "simply fail to show for their medical appointments." (Doc. 435 at 11.)

The Court does not find these arguments persuasive. The AHCCCS periodicity schedule requires an annual well-child physical examination, as well as a dental referral every six months, and concludes "<u>These are minimum requirements.</u>" AMPM Policy 430, Exhibit 430-1 (emphasis in original). Having complied with the Medicaid statute to determine the appropriate care intervals which "meet reasonable standards of medical and dental practice," 42 U.S.C. § 1396d(r)(1), Defendants cannot now baldly assert that "some children do not need services." (Doc. 435 at 11.) To the contrary, *every* child needs medical services at least once per year. An assertion that Medicaid-eligible children do not require any medical services is directly contrary to Congress' intent and the plain language of the Medicaid Act.

Nor does the burden lie on a *child* to request help. The Medicaid Act requires that state proactively "identify obstacles to the effective conveyance of information" and mitigate the negative impact of such obstacles; if Arizona's "scheme for informing children of their rights is ineffective . . . [Arizona] is not in compliance with the law." *Rosie D.*, 410 F. Supp. 2d at 26–27. Thus, Arizona may not simply shrug indifferently when children do not request help, but instead must first affirmatively determine what obstacles lie between the children and the "help that is available," and then mitigate those obstacles. (Doc. 435 at 11.)

Nor is it the child's fault if a child fails to show up for their medical appointment. The Court reminds Defendants once again that the members of the Medicaid Subclass are *children.*[16] The responsibility for ensuring that a minor child attends a medical

---

[16] Some members of the Medicaid Subclass are infants and toddlers. Many others are too young to take public transit, if public transit is even available to them. Children under the age of 15 years and six months may not operate motor vehicles in the state of Arizona. *See* Arizona Dep't of Transportation, https://azdot.gov/motor-vehicles/driver-services/driver-license-classes-and-types. And even those children who are old enough to drive might not have access to a car. Furthermore, it is simply common sense that children, particularly foster children, do not have the requisite skills or access to resources to make alternative transportation arrangements or negotiate the obstacles surrounding their medical care alone.

appointment rests not with the child, but with the guardian of the child. Furthermore, Defendants are required to inform children in the Medicaid Subclass "That necessary transportation and scheduling assistance described in § 441.62 of this subpart is available to the EPSDT eligible individual upon request" and Defendants must provide such assistance. 42 C.F.R. § 441.56(a)(2)(iv). Defendants cite studies which attribute medical appointment no-shows to a lack of transportation, but if a foster family fails to bring a child to their appointment because of a lack of transportation, the ultimate responsibility lies with Defendants for not informing the family that transportation assistance is available and then providing such necessary assistance.[17] (Doc. 435 at 11 n.8.) The Court notes with concern that Defendant's comparison between foster children missing pediatrician appointments and patients at substance use disorder outpatient clinics missing addiction treatment appointments is particularly inapposite. (*Id.*)

Defendants assert that "Plaintiffs' premise that Defendants violate the law whenever a child misses a service is false." (Doc. 435 at 12.) But it is Defendants' assertion that is false. The Court holds that the Medicaid Act requires Defendants to proactively ensure that each child eligible for EPSDT services actually receives such services in a timely manner. It is not sufficient for Defendants merely to make EPSDT services available. Therefore, a violation of the Medicaid Act occurs when a child in the Medicaid Subclass does not receive EPSDT services at all, or does not receive them in a timely manner. The timeliness of an EPSDT service is determined by whether the child received the service according to the schedule set forth in the AHCCCS Medicaid Policy Manual.[18] Consistent with 42 C.F.R. § 441.56(e), a child must begin treatment no later than six months after the screening that established the need for the treatment.

---

[17] The Court recognizes that even if Defendants provide transportation, some foster families might still miss the occasional medical appointment. In those instances, Defendants must make all reasonable efforts to ensure that the children receive the necessary care as soon as possible. Defendants may not abdicate their responsibility to ensure that the children actually receive care.

[18] The AHCCCS Medicaid Policy Manual must continue to meet reasonable standards of medical and dental practice.

## II.     Class Certification

The question remaining for the purpose of class certification is whether there is a common question of law or fact such that every member of the Medicaid Subclass is subject to an identical significant risk of an imminent future Medicaid violation that would support injunctive relief; and if so, if the typicality and Rule 23(b)(2) requirements have also been met.

Plaintiff has identified five policies and practices which she alleges "create a significant uniform risk that Subclass members will not receive necessary physical, dental, and behavioral health services, in violation of the Medicaid statute." (Doc. 430 at 15.) These practices are: (1) Defendants' practice of failing to provide an adequate array of behavioral health and therapeutic services for members of the Medicaid Subclass; (2) Defendants' practice of failing to coordinate behavioral health services for members of the Medicaid Subclass; (3) Defendants' practice of failing to provide Medicaid Subclass members with timely mental health services; (4) Defendants' practice of failing to provide members of the Medicaid Subclass with timely well-child visits and immunizations; and (5) Defendants' practice of ineffectively coordinating and monitoring physical and dental health care. (*Id.*)

Defendants argue that Plaintiff has failed to prove that "what [Plaintiff] call[s] 'practices' actually exist," and that Plaintiff "do[es] not demonstrate that these practices violate the Medicaid laws that apply to these allegations" or that "all children in foster care are exposed to an identical risk of imminent violation of those laws." (Doc. 435 at 4.)

The Court will first analyze each practice, and determine whether there is sufficient factual support for the purposes of class certification to support Plaintiff's allegations each practice exists and violates the Medicaid Act. The Court will then analyze whether there is commonality such that each member of the Medicaid Subclass is subject to an identical significant risk of future Medicaid violations, and whether the typicality and Rule 23(b)(2) requirements have been met.

## A. Defendants' Alleged Practices

### i. Array of Services

Plaintiff alleges that Defendants have a practice of failing to provide an adequate array of behavioral health and therapeutic services for members of the Medicaid Subclass. (Doc. 430 at 15.) Plaintiff cites the report of her expert Marci White, who asserts that one necessary element in this array is the therapeutic foster home. (Doc. 430 at 11.) A therapeutic foster home is one that, after receiving its initial license as a professional foster home, receives specialized training to provide both a home and care to children with such critical behavioral health needs that the only other options are more restrictive (such as a hospital, a residential treatment center, or a therapeutic group home). (Doc. 238-2 at 277–278.) Ms. White examined the availability of therapeutic foster homes and the waitlists for behavioral health services. (Doc. 392-1 at 26–34.) Ms. White states that in 2013, there were 425 therapeutic foster homes for approximately 15,000 children, which was characterized at the time by the Arizona Foster Family-based Treatment Association as a shortage. (*Id.* at 26–27.) According to Ms. White, the numbers of therapeutic foster homes continued to drop, from 310 in February 2016 (with over 19,000 children in care) to fewer than 300 in August 2016 (with 18,287 children in care), even though more than 1,000 "emotionally disturbed adolescents" may need such homes. (*Id.* at 27.) Ms. White noted that Defendants' deposition testimony "confirms that there are '[n]ot enough [therapeutic foster home] providers and too many children needing that level of care.'" (*Id.* at 29.) She concluded that "there are too few therapeutic foster" homes, and the "shortage of therapeutic foster care in Arizona creates a serious gap in the array of services available for children in DCS custody." (*Id.* at 27–28.) Defendants, who did not offer their own expert, do not contest these figures.

Defendants respond that allegations regarding practices of providing inadequate foster home placements and behavioral health services were made with respect to the General Class and the Non-Kinship Subclass, but that no such allegations were made with respect to the Medicaid Subclass in the Second Amended Complaint. (Doc. 435 at

7.) The Court finds that consideration of these practices with respect to the Medicaid Subclass is not foreclosed at the class certification stage because Defendants were put on notice that those specific practices were being challenged, Plaintiff alleged broadly that Defendants "have a practice of failing to provide members of the Medicaid Subclass with the screening, diagnostic and treatment services required under the EPSDT provisions of the Medicaid Act," and Defendants have not established prejudice. Doc. 37 at 33–34; *see Golden Grain Macaroni Co. v. FTC*, 472 F.2d 882, 886 (9th Cir. 1972) (complaint put defendant "on notice that the specific practices as well as the alleged over-all scheme . . . were being challenged").

Defendants also respond that 42 C.F.R. § 441.61 requires them only to make providers available, and that *Katie A.* does not require services to be provided in any particular form. (Doc. 435 at 7–8.) But Defendants misunderstand the law. While 42 C.F.R. § 441.61(b) relates to availability, § 441.61(c) orders AHCCCS to "make appropriate use of State health agencies" and "other public health [and] mental health [programs] . . . *to ensure an effective child health program*." 42 C.F.R. § 441.61(c) (emphasis added). And while the specific sentence of *Katie A.* cited by Defendants referred to the Ninth Circuit's decision that it was not necessary to bundle necessary services as long as a state provided *all* necessary services separately, the footnote to that sentence concluded that "if the State fails adequately to provide the component services, and the effectiveness of those services requires their coordinated delivery, it may be appropriate to require the State to provide services packaged together in a particular form." *Katie A.*, 482 F.3d at 1157 n.15. Finally, it is obvious that Arizona cannot ensure an effective child health program if children cannot access healthcare.

As established in section I.C, *supra*, the Medicaid Act requires Defendants to *ensure* that children *actually receive* medically necessary services. The Court credits Ms. White's decades of experience "with the design, implementation, management, and monitoring of behavioral health service systems for children involved in the foster care, mental health, and juvenile justice systems," and finds her conclusion that "[t]he shortage

of therapeutic foster care in Arizona creates a serious gap in the array of services available for children in DCS custody" to be credible. (Doc. 392-1 at 5, 28.) Accordingly, the Court finds sufficient uncontroverted factual support for purposes of class certification for Plaintiff's allegation that Defendants have a practice of failing to provide an adequate array of behavioral health and therapeutic services for members of the Medicaid Subclass.

### ii. *Coordination of Services*

Plaintiff also alleges that Defendants have two practices related to coordination: a practice of failing to coordinate behavioral health services for members of the Medicaid Subclass; and a practice of ineffectively coordinating and monitoring physical and dental health care. (Doc. 430 at 15.) Defendants respond that while Plaintiff alleged a failure to coordinate as a violation of due process, Plaintiff did not explicitly allege that Defendants violated 42 C.F.R. § 441.61(c). (Doc. 435 at 8.)

As discussed in Section II.A.i, *supra*, the Court finds that consideration of these practices with respect to the Medicaid Subclass is not foreclosed at the class certification stage because Defendants were put on notice that those specific practices were being challenged, Plaintiff alleged that Defendants have a practice of "failing to provide members of the Medicaid Subclass with medically necessary diagnostic and treatment services," and Defendants have not shown prejudice. Doc. 37 at 34; *see Golden Grain*, 472 F.2d at 886.

Courts have recognized the essentiality of "centralized, knowledgeable, and painstaking service coordination" in ensuring that children, particularly children with complex behavioral health needs, actually receive all of the treatment to which they are entitled under the Medicaid Act. *Rosie D.*, 410 F. Supp. 2d at 31; *id.* at 32 (noting that children with complex problems are at risk "that a lack of coordination among the service providers will undermine the effectiveness of the treatment that they do receive"); *see G. v. Hawaii*, 676 F. Supp. 2d 1006, 1017 (D. Haw. 2009) (stating a program intended to better coordinate services "further[ed] the objectives of the Medicaid Act").

Plaintiff cites to reports from their experts Ms. White and Arlene Happach regarding the essential role DCS case managers (also known as caseworkers) play in coordinating care. (Doc. 430 at 11–13.) Specifically, Ms. White stated that the Child and Family Team (CFT) process (wherein the primary caregiver, a DCS case manager familiar with a child's needs and treatment history, and other individuals knowledgeable about a child's life develop a "behavioral services plan 'to address the behavioral health treatment needs of the child'") "remains broken in Arizona and, as a result, children in foster care do not get the behavioral health services they need." (Doc. 392-1 at 36–37.) Ms. White noted several contributing factors, including the failure of case managers to regularly participate in CFTs; "evidence of insufficient clinical oversight and involvement in CFTs"; inadequately trained CFT facilitators; service plans generated based not on *necessary* services but on *available* ones; and a lack of systematic monitoring of the process. (*Id.* at 37.) The regular absence of case managers from the CFT process was confirmed through discovery, an absence which might delay all behavioral health services requiring DCS consent (including "inpatient psychiatric care services, residential treatment services, therapeutic group homes," and therapeutic foster homes). (*Id.* at 38.)

Ms. Happach asserted that "the majority of tasks related to placement and permanency are handled by the case manager." (Doc. 392-5 at 23.) She listed ten responsibilities assigned to each case manager by DCS policy, including developing and monitoring the case plan; "[e]nsuring that a child's medical needs are met by arranging for each child to have" medical examinations, immunizations, and all necessary follow-ups and referrals; "[e]nsuring that a child's mental health needs are met" by taking a child to intake and assessment appointments, and "[e]nsuring that appropriate services are received in a timely manner"; and attending CFT meetings. (*Id.* at 23–25.) Ms. Happach stated that in order for a case manager to complete all tasks for all of the children they are responsible for, the caseload must be manageable. (*Id.* at 25.) National guidelines promulgated by The Child Welfare League of America recommend a caseload of no

1   more that 12-15 children in out-of-home placements at one time, while Arizona

2   established a "caseload standard" of 20 children based on an aggregate time study's

3   finding that a case manager must spend "120 minutes on placing a child, 120 minutes on

4   planning and case management, and 360 minutes on court-mandated activities." (*Id.* at

5   26.) Ms. Happach states that in the first quarter of 2018, "about half of DCS's offices had

6   average out-of-home caseloads of 30 or more." (*Id.* at 27.)

7       Despite a significant reduction in the number of children in out-of-home care from

8   16,471 in Q1FY18 to 14,299 in Q4FY19, as of June 2019 many DCS offices continued to

9   have extremely high caseloads. Department of Child Safety, Quarterly Benchmark

10  Progress Report Q4 FY2019 at 5–6 (Sept. 30, 2019).[19] For example, out of seven sections

11  in the Maricopa-East Region with at least one out-of-home child per worker, one section

12  had a caseload of 22 children per worker and the other six sections had caseloads of 25 or

13  more (as high as 38 children per worker). *Id.* at 6. Similarly, in the Maricopa-West

14  Region, out of eight sections with at least one out-of-home child per worker, seven

15  sections had caseloads over 20 children, including six sections with caseloads of 25 or

16  more, and as high as 32 children per worker. *Id.* In fact, of the 34 Arizona sections with at

17  least one out-of-home child per worker, nine sections had caseloads of between one and

18  20 children, in accordance with Arizona's standards; eight sections had caseloads of 21-

19  24 children; 12 sections had caseloads of 25-29 children; and five sections had caseloads

20  of over 30 children per worker. *Id.* This means that 74% of DCS case managers have

21  caseloads that are not manageable under DCS's own standard.

22      Ms. Happach concluded that overburdened case managers put children at risk,

23  noting that 75% of the time, case managers "failed to update their continuous child safety

24  and risk assessment at the times required by policy," and "efforts to assess the physical

---

[19] *Available at* https://dcs.az.gov/news-reports/dcs-reports. The Court takes judicial notice of this progress report. *Daniels-Hall v. National Educ. Ass'n*, 629 F.3d 992, 999 (9th Cir. 2010) (holding courts may take judicial notice of information made publicly available by government entities on government websites). Each quarterly report "on the progress made in meeting the caseload standard and reducing the number of backlog cases and out-of-home children" "shall include the number of backlog cases, the number of open reports, the number of out-of-home children and the caseworker workload in comparison to the previous quarter." 2019 Ariz. Legis. Serv. Ch. 263 (H.B. 2747) (West).

health needs of children were inadequate in a third of the cases." (Doc. 392-5 at 29.)

The Court credits Plaintiff's uncontroverted expert opinions that caseworkers are essential to the proper coordination of physical, dental, and behavioral health care, and that an overloaded case manager with an unmanageable caseload is not properly coordinating the delivery of such care. The Court also takes judicial notice of the most recent DCS caseload progress report, which reported 74% of sections had unmanageable caseloads. Therefore, the Court finds sufficient factual support for purposes of class certification for Plaintiff's allegations that Defendants have a practice of failing to coordinate behavioral health services for members of the Medicaid Subclass, and a practice of ineffectively coordinating and monitoring physical and dental health care.

### iii.    *Timeliness of Mental Health Services*

Plaintiff alleges that Defendants have a practice of failing to provide Medicaid Subclass members with timely mental health services. (Doc. 430 at 15.) Defendants do not respond specifically to this allegation, but respond to the two "timeliness" allegations (regarding the provision of mental health services, and the provision of well-child visits and immunizations) collectively. (Doc. 435 at 8–12.)

To support this allegation, Plaintiff cites to Ms. White's expert report. (Doc. 430 at 11.) Ms. White devoted several pages of her expert report to her assertion that "Children Do Not Receive Timely Mental and Behavioral Health Services Required in Their First 30 Days in Care." (Doc. 392-1 at 14–17.) Ms. White states that after DCS brings a child into foster care, DCS refers that child to a community-based managed care organization (known as a Regional Behavioral Health Authority, or "RBHA") for a "'Rapid Response' to assess the mental and behavioral health needs of the child." (*Id.* at 14.) The RBHA must conduct the Rapid Response within 72 hours of receiving the referral and forward the assessment results to DCS. (*Id.* at 14–15.) If the Rapid Response assessment identifies a child as needing mental and behavioral health services, the child is then "referred for an 'intake appointment' or 'initial evaluation and assessment' with a RBHA, where the DCS case worker is supposed to accompany the child." (*Id.* at 15.) The initial assessment

should occur within 7 days of the Rapid Response referral and, if the initial assessment determines that services are required, the first service must be received within 21 days of the initial assessment. *Id.*; A.R.S. § 8-512.01.

Ms. White reviewed "updated data the RBHAs reported to AHCCCS," and concluded that in 2016 one of the three RBHAs met the timeliness requirements for under 10% of the foster children it serves, while the other two RBHAs also fell significantly below the standards. (Doc. 392-1 at 16–17.) Although Defendants chose not to cite to their own expert in their response to the class certification motion, their expert Dr. Robert M. Freidman confirmed the Rapid Response timeline, and concluded that the data, particularly for the seven-day and 21-day timelines, "shows a continuing need for improvement." (Doc. 393-1 at 16–17.) Dr. Friedman noted that encounter data from FY 2017 showed that only 56.39% of newly enrolled children received a behavioral health assessment within seven days, while 79.67% received a service within 21 days, concluding "This is clearly still a work in progress." (*Id.* at 17.)

Defendants broadly challenge all of Plaintiff's experts for failing to cite a Medicaid standard. Ms. White's failure to recite specific statutes does not affect the reliability of her facts and opinions. The Medicaid Act requires Defendants to provide screening services necessary "to determine the existence of certain physical or mental illnesses or conditions." 42 U.S.C. § 1396d(r)(1)(A)(ii). Arizona law requires these services to be provided on the schedule Ms. White described. A.R.S. § 8-512.01. If children do not *receive* necessary services in a timely manner, the ultimate responsibility lies with Defendants. Accordingly, the Court credits Ms. White's report and finds sufficient factual support for purposes of class certification for Plaintiff's allegation that Defendants have a practice of failing to provide Medicaid Subclass members with timely mental health services.

    *iv.*  <u>Timeliness of Well-Child Visits</u>

Finally, Plaintiff alleges Defendants have a practice of failing to provide members of the Medicaid Subclass with timely well-child visits and immunizations. (Doc. 430 at

15.) Defendants respond that "the great majority of foster care children get their services according to the periodicity schedules." (Doc. 435 at 11.)

Both parties have provided statistical figures illustrating what percentage of children in the custody of the Arizona foster care system received the mandated well-child physical examination in the years 2012 through 2016. An examination of these statistics supports the conclusion that, in the past, each year approximately one-quarter to one-third of foster children did not receive their well-child examination.

The AMPM requires that the well-child examination be performed at least one time per year. Defendants cite the 2015-2016 Annual Report for Acute Care and DES/CMDP, which calculated treatment figures based on a combination of administrative data collected from the automated managed care data system, and data collected by contractors from medical and/or case management records. (Doc. 435-2 at 79.) For 2012, 63.7% of children ages 3–6, and 63.8% of adolescents,[20] received their well-care visits. (*Id.*) Defendants' statistics necessarily imply that 36.3% of children ages 3–6 and 36.2% of adolescents did not receive their well-care visits. For 2013, 71.8% of children ages 3–6, and 68.3% of adolescents, received their well-care visits. (Doc. 435-2 at 79.) Again, this implies that in 2013 28.2% of children ages 3–6 and 31.7% of adolescents did not receive such care. The Court finds that 63.7%, 63.8%, 71.8%. or 68.3% is not an "overwhelming majority." (*See* Doc. 435 at 9.)

Plaintiff cites the expert report of Dr. Steven Blatt, who examined the quarterly CMDP EPSDT Adult and performance Measure Monitoring Reports from 2014–17. (Doc. 392-3 at 6–7.) Dr. Blatt concluded that in 2014, 24%–29.9% of children ages 3–6 and 32.2%–33.9% of adolescents ages 12–21 did not receive an annual well-child exam, depending on the quarter. (*Id.* at 7.) He concluded that the 2015 figures were 27.3%–29.9% for children and 32.5%–34.1% for adolescents; the 2016 figures were 27.5%–29.4% for children and 34.8%–35.5% for adolescents in Q1, Q3, and Q4 (the Court notes

---

[20] Defendants do not define the term "adolescents," but Plaintiff's expert Dr. Steven Blatt, citing a similar report, defines "Adolescent Well-Child Visits" to include the data of children between the ages of 12 and 21. (Doc. 392-3 at 7 n.22.)

that the statistic of 4.1% in Q2 2016 appears to be a typographical error); and the figures for the first two quarters of 2017 were 26%–27% for children and 32% for adolescents. (*Id.*) The Court notes that these figures change quarterly, and attributes that to the "churn in members" as some children are reunified or adopted, while other children are enrolled. (Doc. 238-1 at 128.)

The statistics provided by the parties regarding children who specifically did not receive well-child visits all fall within the range of 24% to 36.3%. However, the statistics for EPSDT participation more broadly differ significantly. The Court attributes a portion of this differential likely to inconsistent definitions. Defendants, who do not define the term, state that EPSDT participation was 100% in 2012 and 92.6% in 2013; in other words, 0% of children in 2012 and 7.4% of children in 2013 did not participate. (Doc. 435-2 at 79.) Plaintiff's expert Dr. Blatt defines the EPSDT Participation Rate as "the total number of children in CMDP who received at least one documented initial or periodic screen during the year, divided by the total number of children who should have received at least one initial or periodic screen, under the state's periodicity schedule." (Doc. 392-3 at 7 n.18.) Dr. Blatt calculated that the "Total Percent of Children who did not Participate in EPSDT Well-Child Exams" was 16.1%–18.4% in 2014; 17.2%–19.8% in 2015; and 22%–51.7% in 2016. (*Id.*)

Plaintiff's expert Dr. Paul Zurek performed an analysis of EPSDT participation using data only for children who were in foster care between January 1, 2015 and August 18, 2017. (Doc. 392-4 at 4.) That is, all children who were in foster care in 2012-2014, but were no longer in care on January 1, 2015, were included in Defendants' data and Dr. Blatt's data but not in Dr. Zurek's data. Accordingly, Dr. Zurek had only 1,345 observations for 2012, as opposed to 19,472 observations for 2016. (Doc. 392-4 at 26.) Dr. Zurek found the percentage of mandated EPSDT exams received to be 67.51% in 2012, 68.63% in 2013, 70.09% in 2014, 68.98% in 2015, and 70.81% in 2016. (*Id.*) This means that the percentages of children who did *not* receive EPSDT exams was 32.49% in 2012, 31.37% in 2013, 29.91% in 2014, 31.02% in 2015, and 29.19% in 2016.

The Court finds the statistics provided by both parties to be credible, and attributes the variations in the figures to the variations in the data sources and methods of analysis. Defendants and Dr. Blatt relied upon the regular reports produced by AHCCCS in accordance with 42 U.S.C. § 1396a(a)(43)(D), while Dr. Zurek relied on the raw data provided by DCS in discovery. Accordingly, the Court finds that in the past, each year approximately one-quarter to one-third of Medicaid-eligible children in the custody of Arizona's foster care system did not receive the EPSDT well-child examinations mandated by the Medicaid Act. In other words, the Court finds sufficient factual support for purposes of class certification for Plaintiff's allegation that Defendants have a policy or practice of failing to provide members of the Medicaid Subclass with timely well-child visits and immunizations.

In sum, the Court has reviewed the five policies and practices alleged by Plaintiff, namely failure to provide an adequate array of behavioral health and therapeutic services; failure to coordinate behavioral health services; ineffective coordination and monitoring of physical and dental health care; failure to timely provide mental health services; and failure to timely provide well-child visits and immunizations. In all instances, the Court finds sufficient factual support for the purposes of class certification for Plaintiff's allegations these policies and practices create a significant uniform risk that members of the Medicaid Subclass will not receive necessary physical, dental, and behavioral health services, in violation of the Medicaid statute.

**B. *Significance of risk and imminence of violation***

Having found that in the past, approximately one-quarter to one-third of Medicaid-eligible children in the custody of Arizona's foster care system did not receive the EPSDT well-child examinations mandated by the Medicaid Act, which constituted a violation of the Medicaid Act, the Court must determine whether every member of the Medicaid Subclass is subject to an identical significant risk of an imminent future Medicaid violation that would support injunctive relief. There is no directly applicable guidance in the Ninth Circuit as to what level of risk constitutes a significant risk of a

statutory violation, but the Ninth Circuit's findings in *Parsons* are instructive.

The *Parsons* court noted that every individual in the custody of a state agency "is necessarily subject to the same medical, mental health, and dental care policies and practices of [the agency]. And any one of them could easily fall ill, be injured, need to fill a prescription, require emergency or specialist care, crack a tooth, or require mental health treatment." *Parsons*, 754 F.3d at 678. Furthermore, the *Parsons* court found that a case involving both "uniform statewide practices created and overseen by two individuals who are charged by law with ultimate responsibility for health care" and thousands of individuals "in the custody of a single state agency," looking at the question of "whether current conditions . . . create a risk of future harm, was a case where "'the questions of law are applicable in the same manner to each potential class member.'" *Id.* at 681–682 (quoting *Hughes v. Judd*, No. 8:12-CV-568-T-23MAP, 2013 WL 1821077, at *23 (M.D. Fla. Mar. 27, 2013), *report and recommendation adopted as modified*, No. 8:12-CV-568-T-23MAP, 2013 WL 1810806 (M.D. Fla. Apr. 30, 2013)).

Similar logic applies to "suits challenging a state's provision of social services to children in its protection." *Id.* at 682. Simply by virtue of being in foster care, all Medicaid Subclass members are subject to the same purportedly deficient practices, and therefore all Medicaid Subclass members are allegedly exposed to the same risk of harm. *Id.* (citing *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1196 (10th Cir. 2010)). The only real dispute is the magnitude of that risk of harm.

The Ninth Circuit inquired into the imminence of harm when it determined whether Plaintiff had standing to bring a Medicaid Act claim in the first place, concluding that she did. *Tinsley*, 922 F.3d at 973–74. The Ninth Circuit held that an allegation "that the [Defendants] have 'a practice of failing to provide members of the Medicaid Subclass with the screening, diagnostic, and treatment services required under the EPSDT provisions of the Medicaid Act,' . . . if true, would demonstrate . . . 'a sufficient likelihood that [Plaintiff] will again be wronged in a similar way,' which would be redressable by an injunction ordering [Defendants] to abate the policies and/or

practices that caused the delivery failure." *Id.* at 974 (citing *Haro v. Sebelius*, 747 F.3d 1099, 1108 (9th Cir. 2014)). The Ninth Circuit further held that at the class certification stage, a plaintiff can meet their evidentiary burden if the plaintiff's "allegations are detailed and supported by additional materials." *Id.* (citing *Parsons*, 754 F.3d at 683).

In other cases, courts in the Ninth Circuit set the bar for what percentage of a chance of something occurring constitutes a significant risk to be very low. *See generally Ortiz ex rel. Ortiz v. United States*, No. CIV F03-6541 AWISMS, 2007 WL 404899, at *6 (E.D. Cal. Feb. 2, 2007) ("Plaintiff was at significant risk of cerebral palsy, meaning that there was a 20% chance of cerebral palsy and an 80% chance that Plaintiff was not going to have cerebral palsy. . ."); *see also Campbell v. Wood*, 18 F.3d 662, 712 (9th Cir. 1994) ("Although such a slow and painful death will occur in only a comparatively small percentage of cases, every single hanging involves a significant risk that it will occur."). Plaintiff's expert Dr. Zurek examined medical records dating back to 7/14/98 for children who were in foster care from 1/1/15 to 8/18/17, over 19 years of data. (Doc. 392-4 at 20.) Over that time, 31.52% of children received less than half of the mandated EPSDT examinations, including 16.26% who did not receive any EPSDT examinations at all. (*Id.*) These statistics, and the statistics discussed in Section II.A.iv, *supra*, are higher than the percentages courts in the Ninth Circuit have previously held to constitute a significant risk.

Considering the factual evidence, the caselaw on what constitutes a significant risk, and the Ninth Circuit's previous holding in this matter that factual support for the allegation that Defendants have a "practice of failing to provide members of the Medicaid Subclass with the screening, diagnostic, and treatment services required under the EPSDT provisions of the Medicaid Act" would demonstrate a likelihood of future harm that is appropriately redressable by an injunction, *Tinsley*, 922 F.3d at 974, the Court finds that the risk that a child in the Medicaid Subclass will not receive timely and adequate EPSDT services is significant, and that for purposes of class certification there is a common question whether every member of the Medicaid Subclass is exposed to a

significant risk of an imminent future Medicaid violation.

### C. Numerosity and Adequacy

Defendants do not dispute that Plaintiff meets the requirements of numerosity and adequacy of representation. (Doc. 435 at 20.) The Court agrees Plaintiff has satisfied that burden. (Doc. 363 at 12, 20.)

### D. Typicality

Having found commonality, numerosity, and adequacy, the court must analyze "whether B.K. is typical of those in the Medicaid Subclass" and "whether every other child had, like B.K., been denied adequate medical care or was subject to an imminent risk of a statutory violation." *Tinsley*, 922 F.3d at 976 n.4.

Defendants contend that "the evidence shows that the Defendants consistently provided EPSDT services to B.K. when the need arose and nothing suggests she will be harmed by an imminent Medicaid violation." (Doc. 435 at 18–19.) Defendants argue that "every class member's claim of inadequate, untimely, or ineffective service would be a fact-intensive dispute typical of no other class member's claim. Plaintiffs thus have not shown B.K.'s exposure to an identical, class-wide, imminent risk that is typical of other class members." (Doc. 435 at 19.)

The Medicaid Act requires that eligible children receive "Such other necessary health care, diagnostic services, treatment, and other measures described in subsection (a) to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan." 42 U.S.C. § 1396d(r)(5). Plaintiff alleges she failed to receive the treatment necessary to correct or ameliorate a physical condition that had been discovered by the screening services in a timely manner. Such an allegation, if true, would constitute a violation of the Medicaid Act.

In June 2013, notes from B.K's caseworkers indicate that B.K. was limping. (Doc. 392-2 at 13, 59.) In October 2014, over a year later, B.K.'s therapist noted that B.K.'s limp had not been addressed. (*Id.* at 59.) B.K.'s primary care doctor referred her to a

December, 2014 appointment with an orthopedist, but it appears that this appointment did not take place. (*Id.*) B.K.'s physical difficulties continued through the summer of 2015, when another orthopedist appointment was apparently scheduled, though it appears that appointment did not take place. (*Id.* at 59–60.) B.K. did not receive insoles until March, 2016. (*Id.* at 60.) Even if the first official request for screening services were October 2014, when B.K.'s primary care physician referred her to an orthopedist, rather than June 2013 when the need for healthcare was first identified, the Medicaid Act requires that B.K. have received treatment no later than April, 2015. Instead, B.K. suffered "difficulty walking, pain, and falls" for another 11 months until she finally received her insoles. (*Id.*) The confidential summary Defendants provided regarding the treatment of B.K.'s feet confirms she did not receive timely treatment of this condition. (Doc. 437 at 12.) In addition, Defendants' confidential summary of dental health services provided to B.K establishes she did not receive dental examinations as required under the schedule. (*Id.* at 10–11.)

The Medicaid Act's requirements for EPSDT services are broad, and cover everything from the annual well-child visits discussed in Section II.B.iv, *supra*, to treatment for a bad foot. The Court has found that in any given year, roughly a quarter to a third of the Medicaid Subclass does not receive timely and adequate EPSDT services; and the record supports a finding that Defendants did not "ensure timely initiation of treatment, if required, generally within an outer limit of 6 months after the request for screening services," in violation of 42 C.F.R. § 441.56(e), when B.K. did not receive treatment for her foot problems for over two and a half years. (Doc. 392-2 at 13.) The record also supports a finding that B.K. did not receive timely dental examinations. (Doc. 437 at 10–11.)

Accordingly, the Court finds that B.K. is typical of the class. In *Parsons*, the Ninth Circuit explicitly rejected arguments in this context about how named plaintiffs may have in the past suffered varying injuries or how they may currently have different health care needs. *Parsons*, 754 F.3d at 686. The Ninth Circuit held Rule 23(a)(3) requires only that

a named plaintiff's claims be "typical" of the class, not that the named plaintiff be identically positioned to each other or to every class member. *Id.* (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 n.9 (9th Cir. 2011) (finding that typicality is not defeated by different factual scenarios when they result in a claim of the same nature)). Thus, Plaintiff satisfies typicality, and has exposure to an identical, class-wide, imminent risk that is typical of other class members.

### E.  Rule 23(b)(2)

Certification under this rule requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Defendant argues that Plaintiff has not identified a practice by Defendants and shown how it causes denials of medically necessary health care, and therefore there is no "remediable class-wide Medicaid violation." (Doc. 435 at 20.)

As explored in detail above, Plaintiff has identified five practices which she alleges "create a significant uniform risk that Subclass members will not receive necessary physical, dental, and behavioral health services, in violation of the Medicaid statute." (Doc. 430 at 15.)

The Ninth Circuit, in addressing this argument by Defendants regarding the General Class, dismissed it:

> [Defendants] next argue that the district court erred because the plaintiffs failed to provide a specific injunction that could satisfy Rule 23(b)(2) and Rule 65(d). This argument has no basis in existing law, whether in the text of the Federal Rules or in our precedent. Plaintiffs do not need to specify the precise injunctive relief they will ultimately seek at the class certification stage. Instead, as we have explained before, Rule 23(b)(2) "ordinarily will be satisfied when plaintiffs have described the general contours of an injunction that would provide relief to the whole class, that is more specific than a bare injunction to follow the law, and that can be given greater substance and specificity at an appropriate stage in the litigation through fact-finding, negotiations, and expert testimony." *Parsons*, 754 F.3d at 689 n.35. . . . A more specific injunction will depend on further fact-finding and what claims the plaintiffs actually prove through further litigation.

Plaintiff "seek[s] an injunction on behalf of the Medicaid Subclass to 'develop and implement, as soon as practical, a plan to eliminate' the risk of violation of the Medicaid statute stemming from Defendants' inadequate policies and practices," and states that one aspect of such a plan might be increased hiring of caseworkers. (Doc. 430 at 22, quoting *Parsons*, 754 F.3d at 687.) Plaintiff has adequately described the general contours of an injunction that would provide relief to the whole class. Thus, this requirement is satisfied.

### F. Appointment of Counsel

The Court has previously appointed Perkins Coie LLP, Arizona Center for Law in the Public Interest, and Children's Rights, Inc. as class counsel for the General Class and the Non-Kinship Subclass. (Doc. 363 at 22.) Class counsel must fairly and adequately represent the interests of the class. Fed. R. Civ. P. 26(g)(4). The Court found in 2017 that Plaintiff's counsel satisfied the four requirements under Rule 26(g)(4), and the Court now finds that Plaintiff's counsel's diligent litigation over the past two years confirms that they satisfy the four requirements under Rule 26(g)(4) to represent the Medicaid Subclass as well. Thus, the Court will appoint Plaintiff's counsel as counsel for the Medicaid Subclass.

## CONCLUSION

The Court holds for purposes of class certification that there is a common question whether every member of the Medicaid Subclass is subject to an identical significant risk of a future Medicaid violation that would support injunctive relief. Because there is no dispute as to numerosity or adequacy, and the Court holds B.K. is typical, class certification is appropriate.

Accordingly,

**IT IS ORDERED** Plaintiff's motion to certify the Medicaid Subclass (Doc. 430) is **GRANTED**. The Court certifies the Medicaid Subclass as: All members of the General Class who are entitled to early and periodic screening, diagnostic, and treatment services under the federal Medicaid statute.

**IT IS FURTHER ORDERED** B.K., by her next friend Margaret Tinsley, is

1    appointed as Class Representative for the Medicaid Subclass.

2         **IT IS FURTHER ORDERED** Perkins Coie LLP, Arizona Center for Law in the

3    Public Interest, and Children's Rights, Inc. are appointed as Class Counsel for the

4    Medicaid Subclass.

5         Dated this 11th day of October, 2019.

_____
Honorable Roslyn O. Silver
Senior United States District Judge