**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| B.K. by next friend Margaret Tinsley, et al., | No. CV-15-00185-PHX-ROS |
| Plaintiffs, | **ORDER** |
| v. | |
| Michael Faust, et al., | |
| Defendants. | |

This lawsuit was initiated by Plaintiffs on behalf of children in Arizona state foster care custody over five years ago against the Director of the Arizona Department of Child Safety ("DCS")[1] and the Director of the Arizona Health Care Cost Containment System ("AHCCCS")[2] (collectively, "Defendants"). Plaintiffs, alleging that a flawed system causes serious harm to foster children, claimed violations of substantive due process and the Medicaid Act on behalf of a general class and several subclasses.

A General Class and two subclasses (the Medicaid Subclass and the Non-Kinship Subclass) have been certified. The Ninth Circuit affirmed the certification of the General Class and the Non-Kinship Subclass, and denied permission to appeal the certification of the Medicaid Subclass. Discovery, which was stayed by the Ninth Circuit for over 15 months at Defendants' request, is now closed. Defendants updated their discovery only after the Court explicitly ordered Defendants to "produc[e] up-to-date information so Plaintiffs can litigate their claims using accurate information." (Doc. 433.) After five years,

---

[1] The current Director of DCS is Michael Faust, a Defendant in his official capacity.
[2] The current Director of AHCCCS is Jami Snyder, a Defendant in her official capacity.

this matter is ripe for resolution.

**I.      Governing Law**

The following overview of the law governing Plaintiffs' substantive due process[3] and Medicaid Act[4] claims is intended to ensure the parties understand what the Court expects at trial.

*A. Substantive Due Process*

Although a state is under no affirmative obligation to protect the general public from private harm, the "special relationship" exception requires a state with a custodial relationship to a person to "assume some responsibility for [the person's] safety and general well-being." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197–200 (1989). The Ninth Circuit has recognized that when a special relationship exists, "a state's omission or failure to protect may give rise to a § 1983 claim." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 972 (9th Cir. 2011).

In the Ninth Circuit, the "special relationship doctrine applies to children in foster care," and "foster children have 'a federal constitutional right to state protection' while they remain in the care of the State." *Henry A. v. Willden*, 678 F.3d 991, 1000 (9th Cir. 2012). Here, the Ninth Circuit recognized Plaintiffs' right to bring an action based on the claim that Defendants failed "to provide children in [their] care 'reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child.'" *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 968 (9th Cir. 2019) (quoting *Lipscomb By & Through DeFehr v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992)).

The "proper standard" for determining whether a foster child's due process rights have been violated is deliberate indifference, which requires both objective risk of harm and subjective awareness of the harm. *Henry A.*, 678 F.3d at 1000–01. Specifically, a claim for a substantive due process violation under 42 U.S.C. § 1983 on behalf of foster children requires a showing of: 1) "an objectively substantial risk of harm"; and that 2) "officials were subjectively aware of facts from which an inference could be drawn that a substantial

---

[3] Counts I, III, and IV of the Second Amended Complaint. (Doc. 37.)
[4] Count II of the Second Amended Complaint. (Doc. 37.)

risk of serious harm existed." *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 845 (9th Cir. 2010). "The second part may be proven by showing (1) that the official was aware of facts from which an inference of risk may be drawn and that the official made that inference, (2) that the official was aware of facts from which an inference of risk may be drawn and that any reasonable official would have been compelled to draw that inference, or (3) that the risk of harm is obvious." *Tinsley*, 922 F.3d at 968 (9th Cir. 2019) (citing *Tamas*, 630 F.3d at 845).[5]

Defendants place undue emphasis on the phrase "conscience-shocking" in arguing that their actions or inactions do not violate the Constitution. (Docs. 480 at 3, 481 at 4, 482 at 2, 483 at 2.) True, *Tamas* provides that "[t]o violate due process, state officials must act with such deliberate indifference to the liberty interest" that their actions "shock the conscience." 630 F.3d at 844 (citing *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006)). But *Tamas* continues "[c]onduct that 'shocks the conscience' is 'deliberate indifference to a known or … obvious … danger,'" then follows with the two-pronged objective and subjective inquiry articulated above. *Id.* (quoting *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1064 (9th Cir. 2006)). In short, if the standard for deliberate indifference is met, it shocks the conscience and therefore violates due process.

B. *Medicaid Act*

As the Ninth Circuit previously noted, "[o]nce a state joins the Medicaid system, it must comply with federal statutory and regulatory requirements to ensure that its plan provides all required healthcare services. These requirements may be court-enforced through a private claim by eligible Medicaid beneficiaries." *Tinsley*, 922 F.3d at 963–964 (citations omitted). In certifying the Medicaid Subclass, the Court held "the Medicaid Act requires Defendants to proactively ensure that each child eligible for [early and periodic screening, diagnostic, and treatment] services actually receives such services in a timely manner." (Doc. 461 at 14.) And it was held that "a violation of the Medicaid Act occurs

---

[5] It has been held when both prongs are met, and officials are aware of systemic deficiencies over a period of years but fail to take "reasonable steps to cure the problems," deliberate indifference has been established. *See M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 267 (5th Cir. 2018).

1 when a child in the Medicaid Subclass does not receive EPSDT services at all, or does not receive them in a timely manner," but recognized that some foster families might fail to take the children in their care to medical appointments. (Doc. 461 at 14 & n.17.) Therefore, in order to prevail on the Medicaid Act claim, Plaintiffs must show that Defendants have failed to make all reasonable efforts to ensure that the children in the Medicaid Subclass receive the necessary care and services in a timely manner. Defendants are responsible for ensuring the children actually receive care and services.

*C. Injunctive Relief*

The General Class, Non-Kinship Subclass, and Medicaid Subclass have been certified under Federal Rule of Civil Procedure 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *See* Fed. R. Civ. P. 23(b)(2). With respect to the substantive due process claims, Plaintiffs are "entitled to injunctive relief if such relief is necessary to redress the constitutional violations they actually prove at trial." *Tinsley*, 922 F.3d at 971 (9th Cir. 2019). With respect to the Medicaid claims, Plaintiffs must show that every member of the Medicaid Subclass is exposed to a significant risk of an imminent future Medicaid violation. (Doc. 461.)

**II.   The *Daubert* Motions**

At a status conference on December 20, 2019, the Court heard argument regarding whether there are genuine disputes of material fact regarding the substantive due process and Medicaid Act claims. Plaintiffs argued that "there are certainly disputed questions of fact that preclude summary judgment." (Doc. 479 at 24.) Defendants argued that DCS had improved "in timeliness of investigations, caseloads, shelter care, and other areas that are critical to the allegations in the lawsuit," and that "these unrefuted facts . . . defy a claim of deliberate, conscience-shocking indifference." (Doc. 479 at 43–44.) The Court determined to first consider Defendants' motions to preclude the opinions of Plaintiffs' experts.

Defendants followed with motions to exclude, in their entirety, the opinions of all

of Plaintiffs' experts, who Defendants referred to as "armchair expert[s]" whose reports were "just not helpful to a fact-finder." (Doc. 479 at 51, Docs. 480-484.) Before expert testimony may be admitted, the Court serves as a gatekeeper to ensure "that the testimony is both 'relevant' and 'reliable' under Rule 702." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)). But that gatekeeping function is principally "designed to protect juries" from being inappropriately swayed by problematic testimony, and "is largely irrelevant in the context of a bench trial." *United States v. Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018) (quoting *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004)).[6] During a bench trial, "where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702." *Id.* (quoting *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006)).

Defendants rely heavily on the Court's decades-old decision in *Diviero v. Uniroyal Goodrich Tire Co.*, 919 F. Supp. 1353 (D. Ariz. 1996) to argue that "orderly, focused" proceedings require the exclusion of Plaintiff's experts before trial because their expertise "does not 'fit' the facts of this case." (*See, e.g.*, Doc. 480 at 2, Doc. 490 at 6.) But in *Diviero* the Court considered the reliability and admissibility of complex scientific expert witness testimony: "An expert's experience is given significant weight in determining the witness' qualifications as an expert if only technical knowledge is required. If, however, scientific knowledge is necessary the expertise must be coextensive with the particular scientific discipline." 919 F. Supp. at 1357. In this case, where no scientific knowledge is necessary and the witnesses' expertise is based on "personal knowledge or experience," *Diviero* is

---

[6] The *Flores* court found further support in the Eighth and Eleventh Circuits. *See id.* ("*Daubert* is meant to protect *juries* from being swayed by dubious scientific testimony. When the district court sits as the finder of fact, there is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.") (quoting *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012) (quotations omitted) (emphasis in original); *see id.* ("*Daubert* 'barriers are even more relaxed in a bench trial situation.'") (quoting *United States v. Brown*, 415 F.3d 1257, 1268–69 (11th Cir. 2005)); *see also FTC v. BurnLounge, Inc.*, 753 F.3d 878, 888 (9th Cir. 2014) ("When we consider the admissibility of expert testimony, we are mindful that there is less danger that a trial court will be unduly impressed by the expert's testimony or opinion in a bench trial.").

inapposite. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999); Fed. R. Evid. 702 (permitting experts to testify if the expert has "technical[] or other specialized [helpful] knowledge" and the expert's testimony is the "product of reliable principles and methods").[7]

After review of the motions, responses, and replies, and the accompanying records, the Court finds all experts to be at least minimally qualified and the disputed opinions sufficiently relevant reliable to consider at trial, where all evidence will be presented to, and considered by, the Court. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987) (holding the evidentiary standard for admissibility determinations "is unrelated to the burden of proof on the substantive issues"). The Court will be aided at trial by the testimony of the experts under oath on direct, cross examination, and likely questioning by the Court. The Court will not risk trying this case twice by considering the testimony of experts at a pretrial hearing with the likelihood of hearing it again at trial.[8] Genuine disputes of material fact preclude a grant of summary judgment in favor of either party, particularly where Plaintiffs' experts and Defendants' experts appear in part to have reviewed the same data, using the same methodology, but reached differing conclusions. *See* Doc. 489 at 38 (arguing Plaintiff's expert's analysis "was based on the same data, and used the same methodology … that Defendants and their … expert … used to assess Defendants' health care system"); *see also Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1052–1053 (9th Cir. 2003) (discussing "a classic battle of the experts"). Therefore, the motions to exclude the experts will be denied without prejudice. But a brief discussion follows regarding issues the parties are to address regarding the reliability and relevance of each witness' expert opinions.

---

[7] Rule 702 was amended substantively in 2000, after *Diviero*, in response to the *Daubert* line of cases. Fed. R. Evid. 702 Advisory Committee Notes. "Consequently, the admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." *Id.* (citing *Bourjaily v. United States*, 483 U.S. 171 (1987)).

[8] In another foster care case in Massachusetts, the district judge permitted partial summary judgment briefing but denied the motion without prejudice "as a matter of judicial economy" after determining that a trial was necessary on the remaining claims. *Connor B. ex rel. Vigurs v. Patrick*, 985 F. Supp. 2d 129, 134 (D. Mass. 2013).

Plaintiffs provided five experts to "assist the Court in understanding the evidence": Marci White ("White"), Dr. Steven Blatt ("Blatt"), Paul Zurek, Ph.D. ("Zurek"), Arlene Happach ("Happach"), and Lenette Azzi-Lessing, Ph.D. ("Azzi-Lessing"). (Doc. 489 at 9–10.)[9]

White's testimony involves behavioral health care, specifically "whether Arizona children in foster care have been—and remain—at an inappropriate risk of harm resulting from a lack of necessary behavioral health care" and "whether Arizona's failure to provide necessary behavioral health care violates the Medicaid Act, and whether children in foster care are at risk of not receiving behavioral health services required by the statute." (Doc. 489 at 9.) White has decades of experience with the design, implementation, management, and monitoring of behavioral health service systems for children involved in foster care, mental health, and juvenile justice systems, and the Court finds that she is qualified to provide opinion testimony on at least behavioral health service systems for children in foster care. (Doc. 489 at 20–22.)[10]

Defendants raise concerns about White's methodology, particularly her failure to conduct case reviews and visit facilities. (Doc. 483 at 5–6.) Defendants also challenge White's exclusion of Provider Type 77 data in reaching conclusions about the timeliness of behavioral health service delivery. (Doc. 483 at 11–13.) The Court notes that White excluded Provider Type 77 data in some of her analyses[11] but included it in others.[12] The Court finds these alleged deficiencies preliminarily go to the weight and not the admissibility of her opinion. At trial, Plaintiffs should be prepared to address in detail

---

[9] As a preliminary note, the Court reminds Defendants the legal question of whether Defendants have violated Plaintiffs' substantive due process rights and/or the Medicaid Act is one for the Court, so questioning of experts on whether the ultimate legal standard has been violated is prohibited. *See* Doc. 483 at 7, arguing White's analysis is "unhelpful and inadmissible" because she "*refused* to say whether a given circumstance was conscience-shocking" (emphasis in original).

[10] Because not every opinion offered in the expert reports relates to the current state of affairs, in the Joint Proposed Pretrial Order Plaintiffs should set forth seriatim each and every opinion each witness will offer. Plaintiffs are not to incorporate the expert reports in their entirety.

[11] For example, Table 2 in her initial expert report. (Doc. 483-1 at 12.)

[12] For example, the Cenpatico Integrated Care column in Table 3 in her initial expert report. (Doc. 483-1 at 13.)

- 7 -

White's methodology, including why she conducted no case reviews, especially after discovering the issues with Provider Type 77 data, and how she adapted her methodology to respond to Defendants' changing reporting metrics. Plaintiffs should also be prepared to elaborate on White's qualifications as a Medicaid expert.

Blatt, a pediatrician, will testify about physical and dental health care, specifically "whether Arizona children in foster care face an inappropriate risk of serious harm resulting from a lack of appropriate medical care" and "whether Arizona's failure to provide appropriate medical care violates the Medicaid Act, and whether children in foster care are at risk of statutory violations." (Doc. 489 at 9–10.) Blatt regularly treats foster children, provides training to foster parents on best practices for providing medical care for children in foster care, and was a member of the expert committee that authored health care practice standards for foster children. The Court finds that he is qualified to provide testimony on at least health care practice standards for foster children. (Doc. 489 at 33–34.)

Defendants challenge Blatt's expertise "in the field of managing and operating a State child welfare agency that must comply with Medicaid laws and regulations," and argue that Blatt misused and misunderstood the data. (Doc. 480 at 2, 5–7.) Defendants particularly challenge Blatt's reliance "on data extracted from small sample sizes and extrapolate[d] … to the entire foster care population." (Doc. 480 at 8.) At this stage, these issues go to the weight rather than the admissibility of his opinion. At trial, Plaintiffs should be prepared to address Blatt's fit as an expert, and the reliability of Blatt's methodology with respect to differing approaches to small sample sizes.

Zurek, an economist, "review[ed], analyze[d], and synthesize[d] databases of medical and investigations data," and will testify regarding his summaries and analyses to establish that "Arizona children in foster care are at substantial risk of harm resulting from the failure to receive necessary medical services and at substantial risk of not receiving services required by the Medicaid Act." (Doc. 489 at 10.) Zurek is an applied economist with a Ph.D. that included "extensive research in econometrics." (Doc. 489 at 43–44.) The Court finds that he is qualified to apply statistical methods to data.

1  Defendants submit that Zurek's "experience as an expert has been almost
2  exclusively limited to securities matters, valuations of financial options, trading volumes,
3  foreign exchange transactions, financial product risk assessment, and securities damage
4  valuations," and he has only "collected and summarized data" on one other occasion. (Doc.
5  484 at 6.) Defendants argue Zurek's lack of knowledge and experience with "child welfare
6  systems data [and] Medicaid performance metrics" resulted in unreliable analyses. (Doc.
7  484 at 6.) At this point, this argument goes to the weight rather than the admissibility of
8  his opinions. At trial, Plaintiffs should address Defendants' position that Zurek "does not
9  recognize relevant data and variables and is unqualified" to understand the limitations of
10 the data. (Doc. 490 at 52.) And Plaintiffs have indicated a desire to admit Zurek's exhibits
11 as Rule 1006 summaries, but they must be prepared to lay the required foundation for Rule
12 1006 summaries and underlying documents.

13 Happach will testify about "DCS's placement practices," specifically "whether
14 foster children in Arizona are at an inappropriate risk of harm resulting from excessive
15 caseloads, failure to conduct timely investigations of abuse and neglect in care, and
16 improper placement practices such as inappropriate use of congregate care, unnecessary
17 separation of siblings, and placement far from their home communities." (Doc. 489 at 10–
18 11.) Happach has decades of hands-on and supervisory experience in child welfare
19 programs, and the Court finds she is qualified to provide testimony on at least caseloads
20 and placement practices. (Doc. 489 at 57–58.)

21 Defendants challenge Happach's experience, because it is not from Arizona, and
22 her methodology, because she did not speak directly to any Arizona foster children or
23 parents, or visit a DCS congregate facility. (Doc. 482 at 2–3.) At trial, Plaintiffs are to point
24 to what information is reasonably relied upon by experts in the field to determine how
25 many children are in detention, hospitals, or therapeutic congregate care and how that
26 information is collected, and whether Happach sought out this information.

27 Finally, Azzi-Lessing reviewed the case files of named plaintiffs B.K. and B.T., and
28 will testify that they are appropriate class representatives. (Doc. 489 at 11.) Azzi-Lessing

1    has decades of social work and child welfare experience, and the Court finds that she is
2    qualified to provide testimony on at least the care received by B.K. and B.T. while in the
3    Arizona child welfare system, and whether that care meets standards of professional
4    practice. (Doc. 489 at 70–73, 80.) Defendants argue Azzi-Lessing's summary of thousands
5    of pages of case files is inadmissible because it is unnecessary, and she is not qualified to
6    offer an opinion on causes of harm to B.K. (Doc. 481 at 8, 14–15.)

7           Defendants, who repeatedly challenged the data Plaintiffs' experts relied on as
8    inaccurate, unreliable, and stale,[13] are to be prepared to explain what data they propose is
9    accurate, reliable, and current with regard to "Defendants' *actual* performance," Doc. 483
10   at 11 n.9; and, if that data is not collected, why it has not been collected.

11          The Court is particularly interested in caseloads. Defendants challenge Happach's
12   opinion that the Arizona caseload standard is 20 children, arguing that the 2013 time study
13   of CPS caseloads does not constitute a reliable basis on which to opine on DCS caseloads,
14   and that Happach does not understand the "current workload [of DCS caseworkers] and
15   ability to perform their job tasks as they exist in 2020." (Doc. 482 at 16–18, Doc. 490 at
16   20.) The Court previously took judicial notice of the Q4 FY2019 Quarterly Benchmark
17   Progress Report, which noted that of the 34 Arizona sections with at least one out-of-home
18   child per worker, nine sections had caseloads of out-of-home children per worker of
19   between one and 20 children; eight sections had caseloads of 21-24 children; 12 sections
20   had caseloads of 25-29 children; and five sections had caseloads of over 30 children per
21   worker. (Doc. 461 at 20 & n.19.) The Court noted then that "74% of DCS case managers
22   have caseloads that are not manageable under DCS's own standard." (Doc. 461 at 20.)

23          The Court now takes judicial notice for the purpose of trial of the Q2 SFY2020
24   Quarterly Benchmark Progress Report, which notes that between the first and second
25   quarters of 2020, out of 32 Arizona sections with at least one out-of-home child per worker,
26   the number of sections with caseloads of between one and 20 out-of-home children per

---

[13] Defendants used the word "stale" eleven times to attack the validity of Plaintiffs' experts' conclusions. (Doc. 480 at 3, Doc. 482 at 13, Doc. 483 at 2, 6, 14, 15, and 18, and Doc. 484 at 15.)

worker rose from eight to 12; the number of sections with caseloads of 21-24 children fell from 12 to two; the number of sections with caseloads of 25-29 children rose from five to 11; and the number of sections with caseloads of over 30 children per worker remained at seven, although the highest caseload declined from 39 to 37. This means that in the first quarter of 2020, 75% of DCS case managers had caseloads of over 20, and in the second quarter of 2020, approximately 63% of DCS case managers had caseloads of over 20. Defendants are clearly capable of tracking caseloads with precision, and referring to the concept interchangeably as both "caseload" and "workload," and should be prepared to explain at trial how DCS determines reliably if a caseworker is overburdened and what a current time study of case work would reveal about caseloads.

Defendants should also be prepared to explain the changes in DCS reporting practices over the course of the litigation, including why certain performance measures are no longer tracked, and should be prepared to discuss the number of children in DCS care eligible to receive health care from the Indian Health Service and the number of children in DCS care placed in in-patient behavioral health facilities.

This case is fact intensive and heavily reliant on expert testimony. The standard for determining substantive due process violations in the foster care context is highly fact-dependent, and the time for Defendants to argue that Plaintiffs have not made an adequate showing is at the close of Plaintiffs' case. Trial is therefore set for **July 27, 2020**.

Since the initial suit was filed, changes have been made in the leadership and organization of DCS and AHCCCS, and apparently there have also been changes in services. Plaintiffs have frequently cited to the historical numbers, but the current facts are crucial to the decision in this case. Therefore, by no later than **July 7, 2020**, Plaintiffs shall submit a pretrial brief on the substantive due process claims. The brief, which may not exceed 15 pages, shall focus on the current facts and evidence Plaintiffs will offer to prove the current conditions establish constitutional violations warranting an injunction. The Court cautions Plaintiffs not to rely exclusively on the use of congregate care. Defendants shall file a response brief, not to exceed 15 pages, by no later than **July 14, 2020**, regarding

why current conditions establish no injunction is warranted. Plaintiffs shall file a reply brief by no later than **July 17, 2020**.

Accordingly,

**IT IS ORDERED** Defendants' Motions to Exclude Plaintiffs' Experts (Docs. 480, 481, 482, 483, and 484) are **DENIED**.

**IT IS FURTHER ORDERED** all Motions in Limine are due **June 29, 2020**. Responses are due ten days afterward. No replies are permitted unless ordered by the Court. Prior to filing any Motion in Limine, the parties must confer and discuss the contents of each planned motion. No Motion in Limine should be filed if the other party does not oppose the relief requested.

**IT IS FURTHER ORDERED** the Joint Proposed Pretrial Order is due **June 29, 2020**. In this Order Plaintiffs and Defendants are to set forth seriatim each and every opinion each expert witness will offer rather than attaching the expert reports in their entirety.

**IT IS FURTHER ORDERED** due to the COVID-19 pandemic, the Court will permit witnesses to appear by video. The parties are to indicate in the Joint Proposed Pretrial Order whether each witness will be appearing in person or by video. In addition, the parties are to provide additional information for each witness appearing by video to the Court by email, at Silver_Chambers@azd.uscourts.gov, no later than **June 29, 2020**. The parties must provide contact information for each witness, including where they will be appearing from and what program capabilities they have from their location, and indicate approximately what time and date the witness will be called.

**IT IS FURTHER ORDERED** no later than **June 29, 2020**, the parties shall deliver to chambers excerpts of the deposition testimony they propose to present at trial, in compliance with the procedures available on the Court's website (found in Deposition Designation Procedure for Judge Silver), including but not limited to: Plaintiffs highlighting in yellow the portions they wish to offer and Defendants highlighting in blue those portions they wish to offer. If either party objects to the proposed testimony, a

specific and concise objection (e.g., "Relevance, Rule 402") shall be placed in the margin adjacent to the proposed testimony. A response, if any, to the objection is also to be written on the deposition.

**IT IS FURTHER ORDERED** Plaintiffs shall submit a pretrial brief on the substantive due process claims no later than **July 7, 2020**. Defendants shall file a response brief no later than **July 14, 2020**. Plaintiffs shall file a reply brief no later than **July 17, 2020**.

**IT IS FURTHER ORDERED** a final pretrial conference is set for **July 24, 2020** at 2 p.m.

**IT IS FURTHER ORDERED** trial to the Court is set for **July 27, 2020**. Estimated length of trial is **15 days**.

**IT IS FURTHER ORDERED** the parties shall comply with the Exhibit Procedures found on the Court's website at www.azd.uscourts.gov / Judges' Information / Orders, Forms & Procedures for Hon. Roslyn O. Silver.

Dated this 21st day of May, 2020.

Honorable Roslyn O. Silver
Senior United States District Judge