| | |
|---|---|
| Joseph Mais (005470) | Harry Frischer (admitted *pro hac vice*) |
| Shane Swindle (011738) | Aaron Finch (admitted *pro hac vice*) |
| **PERKINS COIE LLP** | Daniele Gerard (admitted *pro hac vice*) |
| 2901 N. Central Avenue, Suite 2000 | **CHILDREN'S RIGHTS, INC.** |
| Phoenix, Arizona 85012-2788 | 88 Pine Street, Suite 800 |
| T: (602) 351-8000 | New York, New York 10005 |
| F: (602) 648-7000 | T: (212) 683-2210 |
| jmais@perkinscoie.com | F: (212) 683-4015 |
| sswindle@perkinscoie.com | hfrischer@childrensrights.org |
| | afinch@childrensrights.org |
| Daniel J. Adelman (011368) | dgerard@childrensrights.org |
| Anne C. Ronan (006041) | |
| **ARIZONA CENTER FOR LAW IN THE PUBLIC INTEREST** | |
| 514 West Roosevelt Street | |
| Phoenix, Arizona 85003 | |
| T: (602) 258-8850 | |
| F: (602) 258-8757 | |
| danny@aclpi.org | |
| aronan@aclpi.org | |

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| B.K. by her next friend Margaret Tinsley, et al.<br><br>Plaintiffs,<br>v.<br><br>Michael Faust, in his official capacity as Director of the Arizona Department of Child Safety, et al.<br><br>Defendants. | No. 2:15-cv-00185-PHX-ROS<br><br>**Joint Motion for Preliminary Approval of the Parties' Settlement Agreement**<br><br>(Assigned to the Honorable Roslyn O. Silver) |

## I. Motion for Preliminary Approval of the Parties' Settlement Agreement and for Approval of the Parties' Plan to Provide Notice of the Settlement to the Class

After five years of litigation, the parties have executed a proposed settlement agreement that addresses each of the areas that remained in dispute as the parties approached trial. Here, the parties request that the Court preliminarily approve the settlement under Fed. R. Civ. P. 23(e), (h) and 54(d)(2), approve the parties' plan to provide notice of the settlement to the Plaintiff classes, and set a schedule for a final approval hearing.

## II. Summary of the Litigation

This lawsuit was filed on February 3, 2015, by ten children placed in the custody of the Arizona Department of Child Safety ("DCS"). (Doc. 1.) Plaintiffs alleged systemic failures with respect to behavioral health services, physical and dental health services, the availability of appropriate family placements, and the timeliness of investigations of abuse and neglect exposed foster children to an unreasonable risk of harm and violated their federal statutory rights.[1]

In particular, Plaintiffs alleged that Defendants lacked an adequate array of appropriate behavioral health services and therapeutic placements, like therapeutic foster homes, necessary to meet the needs of foster children; Defendants failed to effectively coordinate the delivery of behavioral health services that did exist through, for example, adequate participation in Child and Family Teams; and, as a result, class members were not receiving timely behavioral health assessments and treatment services. Plaintiffs alleged these failures violated Plaintiffs' rights under the Constitution and the Medicaid Act. Plaintiffs further alleged that Defendants failed to adequately track and coordinate physical and dental health services for foster children and that as a result class members

---

[1] Plaintiffs' original complaint also included a claim for the failure to provide adequate family reunification services. (Doc. 37 ¶¶ 232-260.) That claim was dismissed before Plaintiffs moved for class certification. (Doc. 217.)

were not receiving timely physical and dental health services, in violation of the Constitution and the Medicaid Act. Plaintiffs alleged that Defendants failed to recruit and retain a sufficient number of family foster homes, resulting in the overuse of congregate care and the separation of children from their siblings and communities in violation of the Constitution. (Doc. 37 ¶¶ 156-183.) And Plaintiffs alleged that DCS also failed to timely investigate reports that children had been maltreated while in foster care custody. (Doc. 37 ¶¶ 184-202.)

To remedy these violations, Plaintiffs sought declaratory and injunctive relief under 42 U.S.C. § 1983 on behalf of a general class of children in foster care along with a subclass of children eligible for Medicaid, and a subclass of children who were not placed with an adult relative or person with whom they shared a significant relationship. (Doc. 37.)

On May 7, 2015, Thomas Betlach in his official capacity as director of the Arizona Health Care Cost Containment System (AHCCCS), Arizona's Medicaid Agency, moved to intervene. (Doc. 23.) That motion was subsequently granted. (Doc. 34). Both AHCCCS and DCS denied and continue to deny liability for any and all of Plaintiffs' claims.

The parties have diligently litigated this complex class action, investing thousands of hours of work over the course of five years of litigation. After initial rounds of discovery, this Court granted class certification for the General Class and two subclasses. (Doc. 363.) Plaintiffs subsequently defended that ruling on interlocutory appeal to the Ninth Circuit and then sought and received recertification of the Medicaid Subclass after the Circuit remanded that issue. (Doc. 461.)

Discovery itself involved the production and analysis of over 1.5 million documents.[2] A total of 40 depositions were conducted, during which 54 individuals were deposed. In addition, the case has necessitated the extensive use of expert witnesses.[3]

---

[2] *See* Ex. 3, Declaration of Harry Frischer, Aug. 31, 2020 ("Frischer Decl.") ¶ 10.
[3] Ex. 3, Frischer Decl. ¶ 10.

2

Over the course of the litigation, 48 separate expert reports were drafted and served over several rounds of expert discovery.[4]

While simultaneously preparing for a trial set to begin on August 25, the parties engaged in settlement negotiations, involving multiple negotiation sessions over a two-month period.[5] The parties reached agreement and promptly notified the court that a settlement had been reached on August 8, 2020. (Doc. 521.)

### III. Summary of the Settlement Agreement

The parties' settlement agreement resolves this action by addressing the concerns identified by Plaintiffs in a manner that will benefit the children and families served by DCS.[6] It contains requirements concerning each of the pending issues in this action: behavioral health, physical and dental health, placement array, and case manager workload. The agreement requires DCS to augment or adopt policies and practices in each of these areas, report on performance measures that will demonstrate whether foster children are receiving appropriate care, and meet specific outcome requirements before exiting from the settlement agreement. The agreement also provides for Plaintiffs to monitor DCS's performance, a mediator to mediate disputes, and reasonable attorneys' fees. The parties have engaged the Honorable Kenneth Fields (ret.), a retired Arizona superior court judge and professional mediator with significant experience in juvenile court, to mediate disputes under the agreement.[7]

The parties contemplate that when the settlement is granted final approval, the Court will issue an order dismissing Plaintiffs' claims while explicitly making the parties' compliance with the terms of the settlement agreement part of that dismissal order. The

---

[4] Ex. 3, Frischer Decl. ¶ 10.
[5] Ex. 3, Frischer Decl. ¶ 12.
[6] Ex. 1, Settlement Agreement, Aug. 26, 2020 ("Settlement Agreement").
[7] Ex. 2, Fields Engagement Letter, Aug. 28, 2020.

3

parties also contemplate that the dismissal order will explicitly preserve the Court's jurisdiction to enforce the terms of the settlement agreement.[8]

**Behavioral Health.** The settlement agreement addresses behavioral health by requiring DCS to make practice improvements focused on core elements of the behavioral health services provided to foster children, to improve monitoring and reporting on behavioral health service provision, to expand the array of services available to foster children, and to meet an outcome requirement that demonstrates improvement. The agreement requires DCS, for example, to implement practice improvements concerning the operation of Child and Family Teams (CFTs). A CFT consists of important stakeholders in a foster child's life. They identify the behavioral health services and settings that the child needs. Under the agreement, DCS must enhance its policies to require that a behavioral health professional participates in the process and the child's case manager or the case manager's supervisor must attend CFT meetings.[9] DCS must also incorporate measures into its behavioral health quality assurance program that demonstrate whether CFTs are being conducted timely and in accordance with policy.[10] These measures must include in-person reviews of a sample of CFT meetings.[11]

As another example, the agreement requires DCS to implement practice improvements concerning Therapeutic Foster Care (TFC). TFC is an essential service that allows children to remain in family settings when their behavioral health needs might otherwise result in a congregate or residential treatment setting. The practice improvements DCS will implement under the agreement include permitting children to be placed in a TFC home before the state determines whether the service is reimbursable under Medicaid, and permitting a child to remain there so long as it is in his or her best interest to do so.[12] The agreement also requires DCS to revise its TFC home recruitment

---

[8] Ex. 1, Settlement Agreement §§ 7.2 & 7.3.
[9] Ex. 1, Settlement Agreement §§ 1.4(a)(1)–(2), (4).
[10] Ex. 1, Settlement Agreement § 1.2(a)(3) & (b).
[11] Ex. 1, Settlement Agreement § 1.2(b).
[12] Ex. 1, Settlement Agreement § 1.4(b)(1).

strategy and implement a work plan to remove barriers to TFC placement.[13] And the agreement requires DCS to incorporate measures in its behavioral health quality assurance program that DCS will use to monitor and improve the utilization of TFC, including the number of foster children who have been authorized to live in a TFC home but have not been placed there and the time it takes to find and place a child in a TFC home.[14]

In addition to these practice improvements and performance monitoring requirements, the agreement requires DCS to implement an annual behavioral health case review program that identifies whether the behavioral health assessments and evaluations foster children receive comply with policy; whether children timely receive behavioral health services; and whether those services are effective.[15] To exit from the agreement and the Court's jurisdiction, DCS must demonstrate that 80% of children received an appropriate assessment *and* timely appropriate services over each of two consecutive years.[16]

**Physical Health.** The settlement agreement addresses physical health delivery by requiring DCS to implement practice improvements concerning the timely delivery of early periodic screening, diagnostic, and treatment services ("EPSDT services") required under Medicaid and the identification and treatment of foster children with developmental disabilities.[17] The agreement also requires DCS to report on the timeliness of EPSDT services including regular check-ups (often called "well-child exams") and necessary follow-up care.[18] To exit from the agreement and the Court's jurisdiction, DCS

---

[13] Ex. 1, Settlement Agreement §§ 1.4(b)(2) & (3).
[14] Ex. 1, Settlement Agreement § 1.2(c).
[15] Ex. 1, Settlement Agreement § 1.3.
[16] Ex. 1, Settlement Agreement §§ 1.5 & 5.4.
[17] Ex. 1, Settlement Agreement § 2.1.
[18] Ex. 1, Settlement Agreement § 2.2

must demonstrate that at least 85% of foster children received a timely well-child examination over each of two consecutive years.[19]

**Placement Array.** The settlement agreement addresses placement array by requiring DCS to develop and implement practice improvements designed to maximize the placement of children with families. To that end, the settlement agreement requires DCS to, among other things, augment its decision making regarding the placement of children and implement a long term program to reduce the use of congregate care.[20] Additionally, DCS must regularly report on performance measures that include: the number and percentage of children placed in congregate care because no appropriate family home is available, the rate that siblings are placed together, the rate that children are placed in their home communities, and whether the agency is meeting its foster home recruitment targets.[21] Finally, to exit from the agreement and Court jurisdiction, DCS must demonstrate a marked decrease in the proportion of children placed in DCS licensed congregate care.[22]

**Case Manager Workload.** In addition to the practice improvements and performance monitoring identified above, the agreement requires DCS to augment its monitoring and reporting of ongoing and investigative case manager workloads to ensure that case managers have sufficient time to ensure that children receive the services and interventions they need.[23]

Finally, the parties have addressed the definitions and consistency errors identified by the Court in its order of August 21, 2020. (*See* Doc. 528.) The parties have also agreed to additional language in sections 6.4-6.6 of the agreement to articulate specific remedies for violations of the agreement. (*See* Doc. 528, at 2.)

---

[19] Ex. 1, Settlement Agreement §§ 2.3 & 5.4.
[20] Ex. 1, Settlement Agreement §§ 4.2 & 4.3.
[21] Ex. 1, Settlement Agreement § 4.5.
[22] Ex. 1, Settlement Agreement § 4.6.
[23] Ex. 1, Settlement Agreement §§ 3.1–3.3.

**IV.     The Settlement Agreement is Fair and Reasonable and Should Be Approved**

The Court's task at the preliminary approval stage is to determine whether the settlement falls "within the range of possible approval." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) (citation omitted); *Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 WL 4207245, at *8 (N.D. Cal. Sept. 4, 2018). To do this, courts "must make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms and must direct the preparation of notice of the certification, proposed settlement, and date of the final fairness hearing." *Manual for Complex Litigation*, Fourth § 21.632 (2004); *See* Fed. R. Civ. P. 23(e)(2).

Under the amendments to the Rules of Civil Procedure adopted in 2018, to determine whether a settlement is appropriate a court must consider whether (1) "the class representatives and class counsel have adequately represented the class;" (2) "the proposal was negotiated at arm's length;" (3) "the relief provided for the class is adequate;" and (4) "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2); *see Hefler*, 2018 WL 4207245, at *8 (granting preliminary approval where "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class" (quoting *In re Tableware*, 484 F. Supp. 2d at 1079)).[24] The proposed settlement need not be ideal.

---

[24] The goal of the 2018 amendment was "not to displace any factor" currently used to evaluate approval of a settlement agreement, "but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23(e)(2) Committee Notes on Rules – 2018 Amendment. As such, "the numerous court decisions applying these factors prior to the 2018 amendments still remain good law." 7B Fed. Practice & Procedure Civ. § 1797.1 (3d ed. April 2020 Update). Courts in the Ninth Circuit have traditionally considered a non-exhaustive list of factors that align with the 2018 amendments including: "the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; . . . the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." *Class*

Settlement is the "offspring of compromise" and the relevant question "is not whether the final product could be prettier, smarter or snazzier." *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 945 (N.D. Cal. 2013), *aff'd sub nom. Fraley v. Batman*, 638 F. App'x 594 (9th Cir. 2016).

Preliminary approval of the settlement agreement in this case is warranted. Each of the factors identified above weighs in favor of approval.

### A. The Class Representatives and Class Counsel Have Adequately Represented the Class Throughout the Length of this Case

As the litigation history laid out above indicates, Class Counsel and the Class Representatives have adequately represented the classes throughout the five years that this case has been pending. Plaintiffs' counsel in this case has extensive experience in complex civil litigation, including in litigating class actions on behalf of children in foster care, and negotiating and implementing settlements in such cases.[25] Defendants too are represented by attorneys with significant experience in complex litigation and settlement negotiation. Plaintiffs have continuously labored over the course of the last five and a half years to bring this case to trial. These activities included digesting over 1.5 million documents produced by Defendants in discovery, taking 40 depositions, working with experts to prepare and serve multiple rounds of expert discovery, litigating a Ninth Circuit appeal and recertification of one of Plaintiffs' Subclasses, and opposing a request for a writ of certiorari to the Supreme Court. At the time of the proposed settlement, the parties were prepared to put on a trial potentially involving more than 30 witnesses[26] and more than 1,400 exhibits.[27] There thus can be no doubt that Plaintiffs have "aggressively litigated" this case in the classes' interest every step of the way. *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 627 (9th Cir. 1982)

---

*Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1291 (9th Cir. 1992) (citation omitted).
[25] Ex. 3, Frischer Decl. ¶¶ 2-3.
[26] Doc. 514, at 113–49 (identifying potential trial witnesses).
[27] Ex. 3, Frischer Decl. ¶ 10.

8

(approval appropriate in complex case that was "aggressively litigated" for six years, with a "voluminous record" and multiple pre-trial hearings and orders); *Class Plaintiffs*, 955 F.2d at 1292 (noting "complexity, duration, and sheer enormity" of the case weighed in favor of approval, in case that had been "aggressively litigated" for three years).

### B. The Proposed Settlement Agreement Is the Result of Extensive Arms-Length Negotiations

The proposed settlement agreement is the result of extensive, arm's length negotiations between experienced counsel on both sides, who have concluded that its terms are fair, reasonable, and adequate for the class members. First, this settlement proposal was "not hastily arrived at." *Officers for Justice*, 688 F.2d at 627. It is the result of five years of litigation, two failed attempts at settlement, and two months of intense negotiations between the parties, including many virtual in-person negotiation sessions with both lawyers and principals.[28]

And after five years of hard fought litigation, Counsel for all the parties have had ample opportunity to assess the case's strengths and weaknesses and thus to adequately value a settlement. Likewise, the extensive discovery in this case, including significant use of expert witnesses, ensured that the parties thoroughly understand the nuances of each claim. Courts routinely view the protracted nature and the complexity of a case as evidence that the required standards have been met. Here, as in most cases, the parties have litigation purposes "generally opposed to each other," and the resulting agreement "embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve." *United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971).

### C. The Relief Provided to the Class Effectively Addresses the Deficiencies Identified in Plaintiffs' Complaint

Under Rule 23(e)(2)(C), to approve the settlement the Court must determine

---

[28] Ex. 3, Frischer Decl. ¶¶ 9-11.

whether "the relief provided for the class is adequate" after "taking into account," among other things, "the costs, risks, and delay of trial and appeal" and "the terms of any proposed award of attorney's fees."[29]

Here the proposed settlement is more than merely adequate. The settlement agreement contains substantial enforceable commitments by DCS to redress each of the pending issues. As described above, DCS has agreed to make significant improvements to:

- the availability of behavioral health services to foster children;
- DCS policies and practices concerning the delivery of services;
- the timeliness of health care delivery and disability-related services;
- the availability of family foster care placement;
- placement mechanisms; and
- monitoring of front-line worker workload.

Each of these improvements addresses a major disputed allegation.[30] Even more, DCS has agreed to enhanced performance measures that will show whether children are receiving the services they are entitled to in each area. DCS has also agreed that Plaintiffs will monitor its compliance with the agreement. And DCS has agreed to meet outcome requirements representing meaningful improvement over current performance before it

---

[29] Rule 23(e)(2)(C) also directs the Court to consider the effectiveness of proposed methods for distributing relief to the class and any other agreement made in connection with the proposed settlement. Fed. R. Civ. P. 23(e)(2)(C)(ii), (iv), & 23(e)(3). These provisions are inapplicable as the relief is not monetary; rather it brings about changes to statewide policy and practice that will benefit all class members. *See* Section IV.D. And as the settlement agreement itself states, that agreement is "the final and exclusive agreement between the Parties" with respect to the settlement proposal. Ex. 1, Settlement Agreement § 8.10.

[30] Plaintiffs had intended to move to dismiss their third cause of action concerning the timeliness of investigations of abuse and neglect of children in care as DCS substantially improved in this area over the course of the litigation. Nevertheless, the proposed settlement includes a requirement that DCS track and report on Investigative Case Manager Workloads over the life of the agreement. Ex. 1, Settlement Agreement § 3.2.

exits from the agreement.

The "risk, expense, complexity, and likely duration of further litigation" also weigh in favor of preliminary approval. *Class Plaintiffs*, 955 F.2d at 1291 (citing *Officers for Justice*, 688 F.2d at 625). Class actions place an enormous burden of costs and expense upon the parties and litigating this case through trial and any subsequent appeals would not only add further risk and expense, but substantially delay potential relief to class members.

Finally, the fees award agreed upon by the parties should be approved because it is reasonable in light of the hours and recoverable expenses Plaintiffs' counsel expended prosecuting the claims.[31] The Federal Rules authorize the recovery of attorneys' fees and expenses in a class action that are allowable under law or the parties' agreement, provided that notice has been served on the parties and "directed to class members in a reasonable manner." Fed. R. Civ. P. 23(h)(1). The parties have reached a negotiated agreement to settle all Plaintiffs' claims for attorneys' fees and expenses, including, but not limited to, any claim under 42 U.S.C. § 1988 for fees incurred up to and including final approval of the settlement agreement, for $6,500,000.00 and a cap for attorneys' fees and costs incurred in monitoring and validating Defendants' compliance with this settlement agreement set at $150,000 a year.

The parties' agreement with respect to attorneys' fees is reasonable, meets the requirements of the Federal Rules and 42 U.S.C. § 1988, and should be approved. First, as explained above, the parties reached this agreement through arms-length negotiations. The parties exchanged numerous rounds of offers and counter-offers over a period of months and agreed on the above figure only after protracted talks.

Second, the agreed-upon award for the work of Plaintiffs' counsel through final approval of the settlement represents almost a 50% reduction from the total attorneys'

---

[31] *See* Ex. 3, Frischer Decl. ¶¶ 17-24; Ex. 4, Declaration of Joe Mais, Aug. 31, 2020 ("Mais Decl.") ¶¶ 3-10; Ex. 5, Declaration of Anne Ronan, Aug. 31, 2020 ("Ronan Decl.") ¶¶ 9-13.

fees and costs accrued by Plaintiffs in this action. Plaintiffs contributed over 30,000 hours of professional time to this labor-intensive, complex case, generating over $12.9 million in fees and costs.

Plaintiffs applied the following rate structure: $630/hour for partners and lead counsel; $390/hour for senior associates; $325/hour for junior associates; and $125/hour for paralegals and support staff. These rates are nearly identical to rates recently approved by the Superior Court of Arizona for work done by several attorneys involved in this case.[32] The fee amount agreed to by the parties in this case is consistent with several recent fee awards approved in analogous, considerably shorter, foster care reform class actions that did not involve appellate work:

- In *D.G. v. Yarbrough*, the District Court for the Northern District of Oklahoma entered a judgment approving $6,011,888.80 in 42 U.S.C. § 1988 attorneys' fees and costs to Plaintiffs after approximately four years of litigation. Opinion and Order at 16 (Doc. 858), *D.G. v. Yarbrough*, No. 4:08-cv-00074-GKF-FHM (N.D. Okla. Mar. 31, 2013).
- In *Dwayne B. v. Granholm*, the District Court for the Eastern District of Michigan approved a settlement regarding attorneys' fees and costs in the amount of $6,200,000.00 after approximately two years of litigation. Order Granting Joint Motion for Approval of Settlement Regarding Plaintiffs' Attorneys' Fees and Non-Taxable Expenses at 1 (Doc. 160), *Dwayne B. v. Granholm*, No. 2:06-cv-13548 (E.D. Mich. Jan. 22, 2009).
- In *Olivia Y. v. Barbour*, the District Court for the Southern District of Mississippi approved a settlement regarding attorneys' fees and costs in the amount of $4,863,557.50 after less than four years of litigation. Consent Order at 1 (Doc. 480), *Olivia Y. v. Barbour*, No. 3:04-cv-251LN (S.D. Miss. Aug. 7, 2008).

Third, the cap of $150,000 per year on fees accrued in monitoring and validating

---

[32] Ex. 4, Mais Decl. ¶ 8.

DCS's compliance with the settlement agreement is reasonable. Children's Rights and the Arizona Center for Law in the Public Interest have extensive experience monitoring and validating compliance with settlement agreements similar to the parties' proposal here. Over the past two decades, attorneys from Children's Rights have been involved with monitoring compliance with more than ten separate consent decrees. In Children's Rights experience, fees for such monitoring and validation rarely exceed $150,000 in a year.

### D. The Proposed Settlement Treats Class Members Identically

Finally, the proposed settlement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). The settlement does not differentiate between class members but rather requires DCS to make policy and practice changes to the systems that affect all class members. The settlement thus treats all class members identically.

## V. The Proposed Form and Plan for Providing Notice to the Class

Under Rule 23(e)(1)(B), "the court must direct notice in a reasonable manner to all class members who would be bound by the proposal."

The parties in this case have agreed to a Notice of Proposed Class Action Settlement attached as Exhibit 6. The proposed notice summarizes the topics addressed by the proposed settlement agreement, provides a process for the publication of notice of the settlement and instructions on how to obtain full copies of the settlement agreement, and advises recipients what to do if they have questions. The proposed notice describes the procedures for persons who wish to be heard in favor of or in objection to the settlement agreement. It will also specify the date, time, place, and manner of attendance for the formal fairness hearing to be set by the Court.[33] The form of proposed notice is clear and in plain language for class members, their representatives, and other

---

[33] The parties recognize that the conditions caused by the COVID-19 pandemic make it difficult, if not impossible, to hold a public in-person hearing for final approval of the settlement agreement and have thus left space in the notice to describe the manner in which the public may attend the hearing, whether virtual or otherwise.

stakeholders who may be interested in its terms. The parties have provided a detailed proposal for dissemination of the Notice in the Proposed Order attached as Exhibit 7.

The proposed Notice comports with Rule 23 and the requirements of due process, and it should be approved. Further, the parties suggest that the Court approve the following schedule for notice to the Class and final approval of the settlement agreement as follows:

| Event | Date |
| --- | --- |
| Court's Order on Preliminary Approval | To be determined by the Court |
| Completion of Notice Plan | 6 weeks after the Court's Order of Preliminary Approval |
| Motion for Final Approval the Parties' Settlement Agreement | 4 weeks after Completion of Notice Plan |
| Deadline To Submit Objections and Statements in Support; Deadline to Provide Notice of Intent to Appear at the Final Approval Hearing | 6 weeks after Completion of Notice Plan |
| Plaintiffs To Submit to the Court all Objections and Statements in Support; Parties' Responses to Objections and Statements in Support (if any) | 2 weeks after the deadline to submit objections |
| Final Approval Hearing | 2 weeks after Plaintiffs submit to the Court all objections and statements in support |

## VI. Conclusion

As demonstrated above, the parties' settlement agreement is fair, reasonable, and adequate. It will provide systemic changes to behavioral health services, physical and dental health services, and placement availability, all of which are thoughtfully designed to improve children's lives while in DCS care and beyond. The parties thus request that

the Court preliminarily approve the proposed settlement and award of attorneys' fees, approve the form and manner of proposed notice to the class, and set a schedule for a final hearing to decide whether to grant final approval of the agreement.

A proposed order is attached.

Respectfully submitted August 31, 2020.

        **CHILDREN'S RIGHTS, INC.**

        By: s/ Harry Frischer
        Harry Frischer
        Aaron Finch
        Daniele Gerard
        88 Pine Street, Suite 800
        New York, New York 10005

        **PERKINS COIE LLP**
        Joseph Mais
        Shane Swindle
        Andrea Diggs
        2901 N. Central Avenue, Suite 2000
        Phoenix, Arizona 85012-2788

        **ARIZONA CENTER FOR LAW IN THE PUBLIC INTEREST**
        Daniel J. Adelman
        Anne C. Ronan
        514 West Roosevelt Street
        Phoenix, Arizona 85003

        *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal to the following CM/ECF registrants:

Robert Ellman
rle@elgarizona.com
Karen J. Hartman-Tellez
kjh@elgarizona.com
**ELLMAN LAW GROUP LLC**
3030 North Central Avenue, Suite 1110
Phoenix, Arizona 85012

Daniel P. Quigley
dquigley@CDQLaw.com
Cindy C. Albracht-Crogan
ccrogan@CDQLaw.com
Stacey F. Gottlieb
sgottlieb@CDQLaw.com
Lauren M. LaPrade
llaprade@CDQLaw.com
J. Neil Stuart
nstuart@CDQLaw.com
**COHEN DOWD QUIGLEY P.L.C.**
The Camelback Esplanade One
2425 East Camelback Road, Ste. 1100
Phoenix, Arizona 85016

*Attorneys for Defendant Michael Faust*

Logan T. Johnston
ltjohnston@live.com
**JOHNSTON LAW OFFICES, P.L.C**.
1402 E. Mescal Street
Phoenix, Arizona 85020

Daniel P. Struck
dstruck@strucklove.com
Nicholas D. Acedo
nacedo@strucklove.com
Timothy J. Bojanowski
tbojanowski@strucklove.com
Dana M. Keene
dkeene@strucklove.com
**STRUCK LOVE BOJANOWSKI &ACEDO, P.L.C.**
3100 W. Ray Road, Suite 300
Chandler, Arizona 85226-2473

Catherine D. Plumb
plumblawoffice@gmail.com
**LAW OFFICES OF CATHERINE DODD PLUMB, P.L.C.**
17225 N. 16th Place
Phoenix, Arizona 85022

*Attorneys for Defendant Jami Snyder*

s/ Harry Frischer