# EXHIBIT 1

# Revised Settlement Agreement

This settlement agreement concerns the civil action captioned *B.K. ex rel. Tinsley, et al. v. Faust, et al.*, CV-15-00185-PHX-ROS and is dated August 14, 2020, but it will not be effective until the date of final approval by the Court. This agreement is between Defendants Michael Faust, in his official capacity as director of the Arizona Department of Child Safety ("**DCS**"), Defendant Jami Snyder in her official capacity as Director of the Arizona Health Care Cost Containment System ("**AHCCCS**"), (Faust and Snyder collectively, "**Defendants**"), and Plaintiff B.K., through her next friend Margaret Tinsley, for herself and those similarly situated. This agreement is conditioned on approval by the United States District Court for the District of Arizona, as required by Rule 23 of the Federal Rules of Civil Procedure.

# Recitals

Plaintiffs filed this action captioned *B.K. ex rel. Tinsley, et al. v. Faust, et al.*, CV-15-00185-PHX-ROS on Feb. 3, 2015, alleging ongoing federal statutory and constitutional violations and seeking prospective declarative and injunctive relief concerning the Arizona child welfare and Medicaid systems. The Court subsequently certified one General Class of all children who are or will be in the legal custody of the Arizona Department of Child Safety due to a report or suspicion of abuse or neglect, a Subclass of all children in the General Class who are entitled to early and periodic screening, diagnostic, and treatment services under the federal Medicaid statute, and a Subclass of children in the General Class who are not placed in the care of an adult relative or person who has a significant relationship with the child.

Defendants deny Plaintiffs' allegations in this action.

The Parties wish to amicably resolve this action in a way that addresses the concerns identified in the action and benefits the children and families served by DCS.

# Settlement Provisions

The Parties agree as follows:

# I.   Behavioral Health

**1.1   Principles of the Behavioral Health System.** The parties intend through this Agreement to further the following principles in the Children's System of Care – Vision and Guiding Principles in AHCCCS AMPM Policy Ch. 100:

(a)   Behavioral health services will be "tailored to the child and family and provided in the most appropriate setting, in a timely fashion and in accordance with best practices, while respecting the child's family's cultural heritage."

(b)   Consistent with the "12 Arizona Principles," children in out of home care will have "access to a comprehensive array of behavioral health services, sufficient to ensure that they receive the treatment they need," and will receive behavioral health services from "competent individuals who are adequately trained and supervised," "provided in their home and community to the extent possible."

**1.2   Behavioral Health Quality Assurance Program**

(a)   **Quality Assurance Program.** No later than the Integration Date, and consistent with its contractual requirements and continuous improvement and sustainability strategy, DCS shall incorporate behavioral health performance measures as part of its comprehensive quality assurance program and DCS Continuous Improvement and Sustainability Strategy. DCS shall develop and implement a scorecard to monitor and inform behavioral health care provided pursuant to behavioral health service plans of children in out of home care. The scorecard will be designed to monitor capacity, process adherence, and outcomes in the following areas: (1) the extent to which children in out of home care receive services identified in their behavioral health service plans, (2) the timeliness of the service delivery; and (3) fidelity to the AHCCCS Child and Family Team Practice Tool.

(b)   **CFT Performance Measures.** No later than the Integration Date, and consistent with its contractual requirements and continuous improvement and sustainability strategy, DCS shall develop and implement a scorecard to monitor and inform fidelity to the CFT process. The scorecard will measure fidelity to the AHCCCS Child and Family Team Practice Tool, including the frequency and timeliness of CFT meetings. As part of measuring and reporting on fidelity to the CFT process, DCS shall require designated members of its staff and/or the contracted managed care organization or its contracted provider to periodically attend a sample of CFT meetings and evaluate CFT practice, including compliance with the CFT policies DCS shall develop under section 1.4 of this agreement. DCS shall not be limited to the AHCCCS Child and Family Team Practice Tool in its evaluation of CFT fidelity, and will develop written training material to instruct designees on use of any additional tools DCS

develops for this purpose.

(c) **TFC Performance Measures.** No later than the Integration Date, and consistent with its contractual requirements and continuous improvement and sustainability strategy, DCS shall develop and implement a performance measure or measures to monitor and improve the utilization of therapeutic foster care. The measure or measures will include the number of DCS children in therapeutic foster homes; the number of licensed therapeutic foster homes and licensed and available beds; the number of children for whom TFC has been authorized but who have not been placed in a TFC home, and the average duration from when the CFT recommended placement in a TFC home until the first day the child is placed in a TFC home.

(d) **Monitoring Performance.** DCS shall regularly conduct business reviews of the performance measures developed under this section 1.2, and shall utilize the data to continuously improve performance in each of the four Behavioral Health Quality Assurance areas. The Parties understand that delivery of services assessed using the Behavioral Health Quality Assurance Measures is dynamic and that measures and targets reported on scorecards will be improved, adjusted, or expanded as circumstances require.

## 1.3   Behavioral Health Case Review.

(a) DCS, with support from its Managed Care Organization, and as part of its larger Quality Management System, shall conduct the Behavioral Health Clinical Chart Audit required in AHCCCS AMPM 940, and shall further enhance the Clinical Chart Audit tool to account for the particular needs of children in foster care, including a determination of Yes, No, or Not Applicable to the following questions:

(1) Whether the behavioral health assessments, evaluations, service plans, and CFTs for Class Members during the period under review were conducted in compliance with measurements as defined in the Clinical Chart Audit tool.

(2) Whether the Class Members during the period under review received the services identified in, and in the timeframe contemplated by, their behavioral health service plans.

(3) Whether the behavioral health services received by Class Members during the period under review were effective. In evaluating the effectiveness of behavioral health services, the reviewer shall consider whether the services adequately addressed crises; reduced placement disruptions and placements in a more restrictive care setting; reduced symptoms; improved

educational progress; promoted normal and natural childhood development; and other relevant factors.

(4)   DCS shall annually compile the results of the audit in a written report that includes the number and percentage of cases reviewed for which the answers were Yes, No, or Not Applicable for each of the categories assessed. DCS shall utilize this information to develop its Practice/Quality Improvement plan for the following year.

(5)   DCS's Behavioral Health Clinical Chart Audit shall include a sufficient number of cases to achieve a 90% confidence level with a 10% margin of error, and shall include subpopulations of children: (i) children having high needs case managers; (ii) children not having a high needs case managers; and (iii) children who have been placed with multiple caregivers.

**1.4   Behavioral Health Practice Improvements.**  No later than the Integration Date, DCS shall do the following:

(a)   **CFT Policies.**  DCS shall evaluate and, if necessary to meet the terms of the settlement agreement, revise its written policies and training to ensure CFTs are conducted with fidelity to the AHCCCS Child and Family Team Practice Tool. DCS shall provide training for case managers, other relevant staff, and foster parents related to CFT participation. Consistent with the Arizona Vision as established by the *Jason K.* Settlement Agreement in 2001, the AHCCCS Child and Family Team Practice Tool, and Section 320 of the AHCCCS Medical Policy Manual, DCS will enhance CFT policies to provide as follows:

(1)   A qualified behavioral health professional, as defined in AHCCCS AMPM 310-B, must participate in the CFT process.

(2)   The CFT shall consider input from the qualified behavioral health professional(s) who participate(s) in the CFT, and shall develop a behavioral health services plan that identifies the least restrictive setting where the child's behavioral health needs can be met appropriately, and includes the behavioral health services and support most likely to enable the child to thrive in the least restrictive setting.

(3)   CFT facilitators shall be behavioral health providers with the specialized training and skill set to effectively implement the activities of the CFT practice model, as required in the AHCCCS CFT Practice Tool, and must be present at the CFT meeting and lead the CFT;

(4)   The assigned DCS case manager or case manager's supervisor must attend the CFT meeting in person, by telephone, or electronically, and must be

**Confidential Rule 408 Material**                    *To be used for settlement purposes only*
Aug. 26, 2020

knowledgeable about the child at the time of the CFT meeting;

(5)     Reasonably available relevant information about the child, including the child's behavioral health and medical history, must be provided to CFT meeting participants; and

(6)     If the behavioral health services previously recommended by the CFT were not provided as contemplated by the CFT, the CFT shall determine why not, document efforts that were made to provide the services, and determine what corrective actions are necessary to ensure the service delivery.

(b)     **Therapeutic Foster Care.**

(1)     **TFC Policies.** DCS shall refine and implement written policies relating to therapeutic foster care that must:

(i)     Permit placement of a child in a therapeutic foster home in advance of any determination of medical necessity for purposes of Medicaid reimbursement when a TFC home meets the child's needs.

(ii)     Absent a determination of medical necessity for the purpose of Medicaid reimbursement, permit a child to remain in a therapeutic foster home as a DCS placement option when it is in the child's best interest and consistent with the child's permanency plan.

(2)     **TFC Training and Recruitment.** DCS shall update its written training and recruitment programs for therapeutic foster families. DCS may do so directly or indirectly through an agent, contractor, or third party acting under DCS's control. DCS shall (a) evaluate the skills required of therapeutic foster parents; and (b) revise its recruitment strategy to ensure sufficient capacity of adequately skilled therapeutic foster home caregivers.

(3)     **Mercer Findings and Recommendations.** DCS shall refine and implement, by December 31, 2021, its work plan addressing the recommendations made in the 2018 Mercer report (Therapeutic Foster Care /Home Care Training to Home Care Client: Analysis and Recommendations Report) to remove barriers to therapeutic foster care. The work plan must include steps for further and ongoing evaluation of TFC "network adequacy" as recommended by Mercer.

(c)     **Behavioral Health Services Array.**

(1)     DCS's Network Development Plan shall include a long-term plan for creating and sustaining a network of qualified professionals sufficient to

assess and treat DCS children who have experienced trauma in varied ways; resulting in multiple expressions of adaptive behaviors that often require clinical support and intervention to facilitate optimal functioning and long term success, and to provide other specialized services needed by children in foster care.

(2)     DCS shall work with the Managed Care Organization to develop and implement a long-term plan to assess and build the capacity to provide community-based behavioral health services to meet the needs of children in foster care.

(d)     **Children Transitioning from Higher Levels of Care.** DCS shall reevaluate existing standards and protocols, for children who are transitioning from a higher level of behavioral health care. The standards must ensure (1) that all medically necessary behavioral health supports as determined by a qualified behavioral health professional are available and in place before the child is transitioned; (2) timely discharge planning; and (3) timely escalation of issues arising in connection with the transition.

**1.5**     **Behavioral Health Outcome.** DCS shall either (a) achieve a Compliance Percentage of at least 80% in the Behavioral Health Clinical Chart Audits conducted in accordance with section 1.3 for two consecutive 12-month periods; or (b) improve the Compliance Percentage over each of three consecutive 12-month periods, and achieve a Compliance Percentage of at least 80% over the third 12-month period.

The Compliance Percentage means the percentage of cases reviewed for the Behavioral Health Clinical Chart Audit for which the questions specified in sections 1.3(a)(i) and 1.3(a)(ii) were applicable, which met the criteria for an answer of "Yes" to both questions.

## 2.   Physical Health

2.1   **Physical and Dental Health Practice Improvements.**  No later than December 31, 2021, DCS shall do the following:

(a)   **Improved Tracking of Comprehensive Medical and Dental Examinations and Other Health Care Services.**  DCS shall refine and implement written policies designed to improve DCS's ability to monitor the timeliness of physical and dental EPSDT services, including well-child examinations, screenings, immunizations, and follow-up care. The policies should reflect the best practicable use of the IT systems and information available to CMDP including the Health Information Exchange. The policies must address a way to account for health care services received by class members outside of the CMDP health plan.

(b)   **Children with Developmental Disabilities.**

(1)   DCS shall develop and implement a training module for DCS case managers to help them recognize potential developmental disabilities in children. DCS shall develop and implement a written policy requiring DCS to promptly seek a developmental diagnosis and apply for eligibility and services with DDD when appropriate.

(2)   If a child already has a diagnosed developmental disability when they enter foster care, DCS shall promptly apply for eligibility and services with DDD.

(3)   For children eligible to receive services from DDD, DCS shall track whether those children receive the identified services from DDD and elevate issues to DDD if they do not. To the extent it is practicable to do so, DCS shall utilize the Guardian IT system to identify and track such children. DCS shall make all reasonable efforts to execute a memorandum of understanding with DDD under which DDD will inform DCS of services provided by DDD to each child in foster care.

2.2   **Performance Measures and Goals.**

(a)   Among other performance measures and goals, DCS shall regularly measure and report:

(1)   The number and percentage of youth in DCS out-of-home care who receive a comprehensive medical and dental exam meeting the requirements of the Periodicity Schedule[1] required by 42 CFR § 441.58 for a child of that

---

[1] The medical periodicity schedule is set forth in Policy 430, Attachment A of the AHCCCS Medical

**Confidential Rule 408 Material**             *To be used for settlement purposes only*
*Aug. 26, 2020*

age on or before 30 days following the child's entrance into out-of-home care;

(2)   The number and percentage of youth in DCS out-of-home care who receive a follow-up medical or dental service on or before 60 days following the date an EPSDT screening determines the service is necessary; and

(3)   The aggregate percentage of timely well-child examinations (the "**EPSDT Examination Percentage**") calculated as the aggregate number of well-child EPSDT examinations provided to children in out-of-home care on a timely basis during the reporting period, divided by the aggregate number of well-child EPSDT examinations that children in out-of-home care were entitled to receive under the Periodicity Schedule during the reporting period using the CMS-416 EPSDT Participation methodology set forth in 2700.4 Instructions for Completing Form CMS-416, found at: https://www.medicaid.gov/sites/default/files/2019-12/cms-416-instructions.pdf (last accessed August 22, 2020).

(4)   The number and percentage of youth that receive immunizations while in DCS care in accordance with the Immunization Schedule.

(b)   DCS shall set performance goals for the delivery of physical and dental health services that are materially greater than the goals set for Medicaid-eligible children in the general population who are not in the custody of the State.

**2.3   Physical and Dental Health Outcome.** Beginning on April 1, 2021, using CMS-416 EPSDT Participation methodology, the EPSDT Examination Percentage will be at least 85% for two consecutive 12-month periods

---

Policy Manual. The oral health periodicity schedule is set forth in Policy 431, Attachment A of the AHCCCS Medical Policy Manual. Both periodicity schedules are available at https://www.azahcccs.gov/shared/MedicalPolicyManual/ (last accessed August 22, 2020).

## 3.  Workload

**3.1  Principles of Case Manager Workload.** The parties acknowledge that the fundamental principles of monitoring case manager workload include the following and that the provisions in this article 3 are in furtherance of these principles:

(a)  The role of the DCS case manager is critical to ensuring that children are placed appropriately; that they are safe; and that the children, their families, and their caregivers receive the services they need for children to thrive.

(b)  Case manager workload must allow case managers sufficient time to do the following for each child on their caseload: (1) engage productively with children, families, and caregivers; (2) familiarize themselves with the relevant facts and circumstances in their cases; (3) investigate allegations of abuse and neglect made by the child; (4) attend meetings pertinent to case management; (5) ensure the child promptly receives all the medical, dental, developmental, and behavioral health services they need; (6) ensure visitation with parents and siblings consistent with DCS policy; (7) achieve permanency with reasonable promptness; and (8) prepare for and attend court hearings.

**3.2  Workload Monitoring.** DCS's scorecards and management system shall measure and monitor on a monthly basis the workload of case managers in DCS's practice areas. These measures will include, at minimum:

(a)  Measures concerning the distribution of caseloads carried by DCS's Ongoing Case Managers at the region and section levels;

(b)  Measures concerning the distribution of caseloads carried by DCS's Investigative Case Managers at the region and section levels;

(c)  Measures concerning the frequency of visits by case managers of children in their placements and parents; and

(d)  Measures concerning the frequency of visits between siblings (if separated) and between children and their parents.

**3.3  Practice Improvement Case Reviews.** DCS shall continue to perform practice improvement case reviews to monitor the quality of the services provided to children in out of home care. The case reviews will include the quality of visits by case managers of children in their placements and parents; the quality of visits between siblings (if separated) and between children and their parents; and whether case managers are updating the child's case file with updated behavioral health and physical and dental health care information, including the health care services and needs of the child.

## 4.     Placement Array

**4.1     Placement Principles.** The parties acknowledge that the fundamental principles of building and maintaining an adequate placement array for children in out-of-home care include the following and that the provisions in this article 4 are in furtherance of those principles:

(a)     The number of available family-like placements should be sufficient to ensure that children can be placed in family settings that are safe, stable, nurturing environments until the child's case plan goal is achieved. Children, particularly young children, are often best served by placement with a family.  Children should be placed in the least restrictive settings. No child should be placed in a congregate or group setting if their needs can be met in a family setting, merely because no appropriate family home is available.

(b)     The number of available family-like placements also should be sufficient for siblings to be placed together when it is safe to do so and to facilitate preservation of a child's connections to his or her own family and community. No siblings should be separated or placed in congregate or group settings merely because no appropriate family home is available. No child should be placed far from home or family merely because no appropriate family home within the child's community is available.

**4.2     Caregiver Selection.**

(a)     **Placement in a Family Setting.** DCS shall continue to develop, refine, and implement processes to maximize its ability to place Non-Kinship Subclass members in a family-like setting as the preferred placement. By July 1, 2021, DCS shall have in place processes providing that, for placement decisions within DCS's authority:

    (1)     DCS shall place Non-Kinship Class Members in a family home in circumstances where the family environment meets the child's needs;

    (2)     When a child is placed in any form of congregate care, the reasons for doing so are documented. The documentation shall include (a) the reasons why the child's needs are not best served in a family home or, alternatively (b) an indication that the child is being placed in congregate care because no appropriate family home is available.

    (3)     When a child is placed in congregate care, DCS revisits at regular intervals the appropriateness and possibility of moving the child into a family-like setting;

    (4)     A child who enters care within 60 days of a sibling be placed with that sibling if it is appropriate to do so; and

(5)   When siblings in DCS care are not placed together, the reasons for not doing so are to be reviewed in clinical supervision.

(b)   **Placement Administration.** DCS's centralized placement administration unit will continue to monitor caregiver availability. DCS's scorecards and management system shall measure and monitor on a monthly basis the data concerning the placement of children in out-of-home care.

(c)   **Placement Tool.** By July 1, 2021, DCS shall develop (and/or enhance, if one already exists) and implement a standardized Placement Tool to help standardize placement decisions. The Placement Tool will identify a child's most appropriate placement setting, regardless of placement availability. In particular, the Placement Tool will facilitate the identification of children for whom a family home would be the most appropriate placement but who are placed in congregate care because no appropriate family home is available. The Placement Tool will also take into account any relevant information in the child's behavioral health service plan or from the TDM; the policy of placing siblings together if appropriate; and minimization of disruptions to a child's education, services, and relationships.

**4.3**   **Long-term Program to Reduce the Use of Congregate Care.** DCS shall continue to develop, refine, and implement long term processes to reduce the use of congregate care, to identify the resources necessary to place Non-Kinship Subclass members in family-like settings, and to obtain such resources. By July 1, 2021, DCS shall have in place processes that must include:

(a)   A plan to identify and recruit potential foster parents with the desire and ability to care for children who DCS might otherwise place in congregate care, and to identify and develop training and support for these families.

(b)   A plan to identify and recruit foster parents with the desire and ability to care for historically challenging-to-place subpopulations of children, including but not limited to teenagers, sibling groups of four or more children, medically fragile children, and LGBTQ+ Youth, as set forth in section 4.4. DCS also shall identify and develop training and support for these families.

(c)   A plan to reduce the numbers and percentages of children placed in congregate care, including a plan to reduce to as close to zero as feasible, the number of children who are placed in congregate care because an appropriate family home is not available.

**4.4**   **Foster Family Recruitment Estimator Model.** DCS shall continue to employ a recruitment estimator model to identify Foster Family Home recruitment targets by estimating the number of Foster Family Homes DCS must recruit to meet the needs of children in out-of-home care. The model must incorporate the goal of recruiting a

surplus of Foster Family Homes to ensure the ability to match children to homes. The model should also generate recruitment targets for the number of Foster Family Homes needed to meet the particular needs of any subpopulations of children whom DCS might otherwise place in congregate care. And the model should generate recruitment targets for the number of Foster Family Homes that will need to be recruited to meet the need to place children in their home communities.

4.5   **Performance Measures.** DCS shall measure and monitor on a monthly basis:

(a)   The number and percentage of congregate care Bed Days used for each type of congregate care placement utilized by DCS.

(b)   The number and percentages of children placed in congregate care for each type of congregate care placement utilized by DCS (excluding BHRFs, BHIFs, inpatient psychiatric hospitals, and detention), and the time that children spend in such congregate care.

(c)   The number and percentages of children placed in congregate care because no appropriate family home is available.

(d)   The rate that siblings are placed together.

(e)   The rate that children are placed in their home communities.

(f)   The number of licensed foster homes to care for Non-Kinship Subclass Members, the number of those homes licensed to care for sibling groups of four or more children, the number of those homes with licenses restricted to specific children, the number of those homes with licenses restricted to respite care only, and the number of those homes that are not currently accepting foster children.

(g)   The extent to which DCS successfully met its recruitment targets as determined by the Recruitment Estimator and whether the assumptions underlying the Recruitment Estimator model were accurate.

4.6   **Placement Outcome.**

(a)   DCS shall either:

(1)   Reduce the utilization of congregate care to 10.5% or less, and sustain a utilization average of 10.5% or less for 12 months thereafter, or

(2)   If DCS does not achieve and sustain such reduction by December 31, 2022, DCS may meet this outcome requirement by satisfying all of the following:

(i)   DCS shall develop a practice improvement/corrective action plan reasonably designed to achieve congregate care utilization of 10.5% and implement the action plan for at least 12 months, and

**Confidential Rule 408 Material**                    *To be used for settlement purposes only*
*Aug. 26, 2020*

    (ii)    DCS shall achieve a decrease in the utilization of congregate care in each of three consecutive 12-month periods, for any three consecutive 12-month periods following January 1, 2021.

(b)    Utilization will be measured by the total number of bed days that 0-17 year old children in out-of-home care spend in DCS licensed congregate care, divided by the total number of bed days for all 0-17 year old children in out-of-home care.

Confidential Rule 408 Material                    *To be used for settlement purposes only*
*Aug. 26, 2020*

## 5.    Validation and Exit

**5.1    Cooperation on Implementation.** DCS shall provide to Plaintiffs' counsel, drafts of the written plans, policies, programs, tools, measurement methodologies, reports, and other materials contemplated under this agreement, including (without limitation) all such materials identified in articles 1, 2, 3, and 4. Plaintiffs' counsel shall have a reasonable opportunity to comment on such materials before they are finalized or made available for public comment more generally.

**5.2    Cooperation on Performance**. Plaintiffs shall monitor DCS's performance under the settlement agreement. DCS shall provide Plaintiffs' counsel, on a monthly basis, with the performance measures and goals, and subsequent improvement plans contemplated under this agreement, including (without limitation) all such materials identified in articles 1, 2, 3, and 4. DCS shall meet with Plaintiffs' counsel at 6-month intervals to review this information.

**5.3    Plaintiffs Validation of DCS Compliance.** As a condition for Exit under section 5.4, below, Plaintiffs' counsel shall verify DCS's compliance with the terms of this Settlement Agreement. On an ongoing basis, DCS shall provide Plaintiffs' counsel with documentation evidencing DCS's compliance and provide Plaintiffs' counsel with such additional information, data and documentation reasonably necessary to verify compliance. DCS shall respond promptly to requests for additional information, data and documentation, with any disputes to be resolved in accordance with article 6.

**5.4    Exit and Termination.**

(a)    All requirements in this settlement agreement as to which no other completion date is set forth in the agreement shall be completed no later than December 31, 2025.

(b)    This agreement will terminate and DCS will exit from the Court's continuing jurisdiction once DCS has achieved substantial compliance with the settlement agreement, including all the obligations identified in articles 1, 2, 3, and 4.

(c)    Whether DCS is in substantial compliance with any requirement of this settlement agreement is subject to Plaintiffs' validation of DCS's substantial compliance, with any disputes to be resolved in accordance with article 6.

(d)    Once DCS has achieved substantial compliance with respect to all the obligations in any of articles 1, 2, or 4 in accordance with section 5.4(c), DCS will be deemed to have exited from such article and no further showing shall be required with respect to such article for the purposes of exit from the Court's continuing jurisdiction under section 5.4(b). Once DCS has met an outcome requirement in any of articles 1, 2, or 4 in accordance with section 5.4(c), DCS will be deemed to be in substantial compliance with that outcome requirement

and no further showing will be required with respect to that outcome requirement. DCS will be deemed to have exited from article 3 upon exit from articles 1, 2, and 4.

**Confidential Rule 408 Material**                    *To be used for settlement purposes only*
*Aug. 26, 2020*

## 6.    Dispute Resolution and Enforcement Mechanisms

6.1    **Mediation of All Disputes.** All disputes arising out of or in connection with the settlement agreement will be mediated as set out in this article 6 before a Party may seek relief from the Court.

6.2    **Mediator.**

(a)    The Mediator shall be the Honorable Kenneth Fields (ret.). If Judge Fields becomes unable or unwilling to continue serving as the Mediator, DCS and Plaintiffs will choose a mutually agreeable alternative who has substantial experience in the field of child welfare. If DCS and Plaintiffs are unable to agree upon an alternative Mediator, DCS and Plaintiffs shall each identify three candidates with substantial child welfare experience and jointly submit a list of those six candidates to the Court, without indicating which party identified which candidate, and request that the Court select a Mediator from those candidates.

(b)    No Party will have supervisory authority over the Mediator. The Parties shall engage the Mediator at DCS's expense. DCS and Plaintiffs will have access to all information utilized by the Mediator. The Mediator will be bound by the Confidentiality Order governing this action.

6.3    **Raising a Dispute.** To raise a dispute under this settlement agreement, a Party shall provide written notice of the dispute or assertion of non-compliance to the other Parties and the Mediator. The written notice must be supported by reasoned argument, supported factual allegations, and a request for remedies. The other Parties may provide a response in writing to the initiating Party and the Mediator within 20 days.

6.4    **Mediation Process.** Once a dispute is raised, the Parties shall engage in a 60-day period of mediation and negotiation overseen by the Mediator. This Mediation Period will be extended only if the Parties mutually agree in writing to extend it. The Parties may also agree in writing to submit a dispute to the Mediator to issue a determination resolving the dispute that the Parties may then jointly request that the Court approve.

(a)    If a dispute asserting non-compliance has been raised under Section 6.3, and the parties cannot come to an agreement regarding resolution of the dispute, then the Mediator shall determine whether a Party has failed to comply with the Agreement and, if so, shall determine an appropriate remedy utilizing the criteria set forth in subsection (b).

(b)    In determining any remedy under this section, the Mediator may employ any enforcement mechanisms that are within the legal and equitable powers of the

**Confidential Rule 408 Material**                    *To be used for settlement purposes only*
*Aug. 26, 2020*

Court to enforce the Agreement, including requiring specific performance of the agreement; requiring Defendants to submit a plan for remedying any deficiencies; and awarding reasonable attorneys' fees and costs for enforcement of the agreement.

(c)     If the parties dispute whether DCS has substantially complied with an outcome requirement in Section 1.5, 2.3, or 4.6, the Mediator shall make a determination of substantial compliance or non-compliance.

**6.5     Court Enforcement and Appeal.** Any Party may (a) appeal to the Court any determination of compliance, non-compliance or remedy by the Mediator; or (b) apply to Court for an Order confirming the determination of a remedy by the Mediator for the purpose of enforcement. The Court retains all legal and equitable powers of the Court to enforce the Agreement.

(a)     In connection with any such appeal or application (i) the Mediator's determination and supporting reasons shall be presented to the Court; (ii) the mediator's determination of remedy shall be reviewed by the Court under an abuse of discretion standard; and (iii) the Mediator's findings of fact will be reviewed by the Court under a clear error standard.

(b)     Upon review of the Mediator's determinations, and upon finding non-compliance with this Agreement, the Court may issue an Order setting forth its finding of non-compliance and adopting any remedy within the Mediator's discretion, as described in Section 6.4(b). If the Court determines that the remedy exceeds the Mediator's discretion, the Court may modify the remedy up to the limit of the Court's legal and equitable powers, including those powers enumerated in Section 6.4(b). The Court shall retain jurisdiction to enforce such an Order through its power of contempt.

**6.6**     If the Mediator determines DCS is not in substantial compliance by December 31, 2025, then the Mediator also shall determine an appropriate remedy under section 6.4(b). Either party may appeal any such determination, or apply to the Court for confirmation in accordance with Section 6.5.

**Confidential Rule 408 Material**                    *To be used for settlement purposes only*
*Aug. 26, 2020*

## 7.   Court Approval

**7.1**   As soon as practical after the date of this agreement, the Parties will file a joint or unopposed motion seeking preliminary approval of this agreement. The motion will request that the Court set a schedule for a fairness hearing on the settlement, a process for providing notice to interested parties, and a schedule for moving for a judgment and order granting final approval of the agreement. The Parties shall use their best efforts to cause this settlement agreement to receive final approval from the Court.

**7.2**   The parties' proposed judgment and order granting final approval of this settlement will:

(a)   Grant final approval of the settlement without modification of its terms as fair, reasonable, and adequate to the Class and Subclasses under Fed. R. Civ. P. 23(e);

(b)   Find that the settlement agreement resulted from extensive arm's length, good faith negotiations between the Parties through experienced counsel;

(c)   Dismiss the action, under Fed. R. Civ. P. 41(a)(2) after compliance with Fed. R. Civ. P. 23(e);

(d)   Comply with the content and scope requirements of Fed. R. Civ. P. 65(d)(1), expressly incorporate the actual terms of this settlement agreement, and make the Parties' compliance with the terms of this settlement agreement part of the dismissal order;

(e)   Include a finding that by agreeing to settle the action, Defendants do not admit, and specifically deny, any and all liability in the action; and

(f)   Incorporate the entirety of the express terms of the settlement agreement and provide that the Court has and will retain jurisdiction over the judgment and order to enforce the settlement agreement.

**7.3**   This settlement agreement will be effective on the date of final approval by the Court. If the Court does not grant final approval of the settlement agreement and retain jurisdiction to enforce the settlement agreement, the settlement agreement will be null and void.

**Confidential Rule 408 Material**            *To be used for settlement purposes only*
*Aug. 26, 2020*

## 8.    Miscellaneous

8.1    **Attorney's Fees and Costs.** DCS shall pay Plaintiffs attorney's fees and costs as follows:

(a)    For attorney's fees and costs incurred up to and including the final approval of the settlement agreement, DCS shall pay Plaintiffs $6,500,000.00.

(b)    For attorney's fees and costs incurred in monitoring and validating Defendants' compliance with this settlement agreement and the Court's final judgment and order, DCS shall pay Plaintiffs reasonable attorney's fees, but in no event shall fees exceed $150,000.00 per year.

8.2    **Release of Claims.**  If the Court grants final approval of this settlement agreement, Plaintiffs will be deemed to have released all pending claims for class-wide declarative or injunctive relief based upon the facts asserted in the Second Amended Complaint (Dkt. 37) against Defendants.

8.3    **Confidentiality Order.** The Order for Protection of Privileged / Confidential Material entered by the Court on March 15, 2016 (Dkt. 104) will remain in full force and effect until the Court enters an order granting final termination of jurisdiction over and exit from the settlement agreement and the final judgment and order. All communications concerning the negotiation of the settlement agreement, including but not limited to its content or any details conveyed to or by the Parties during its negotiation are confidential. Nothing in this settlement agreement prohibits or restricts any Party or their representatives from publicly communicating the fact that the Parties have entered a settlement agreement. The Parties acknowledge that the terms of the settlement agreement will be made public when the settlement is filed with the Court.

8.4    **Funding.** DCS shall make all reasonable efforts to secure and provide funding and other resources necessary to implement and achieve the obligations under the settlement agreement, including by making requests for State funds or seeking federal/special fund authorization. Defendants' failure to secure or provide funding and resources does not excuse, or limit remedies to address the failure to implement or achieve any of the obligations in this settlement agreement.

8.5    **Governing Law.** Federal law governs this settlement agreement.

8.6    **Counterparts.** This settlement agreement may be executed in counterparts, each of which will be deemed to be an original, but all of which, taken together, will constitute one and the same agreement. Execution by facsimile, by scanned attachments, or by electronic signature has the same force and effect as an original.

**Confidential Rule 408 Material** *To be used for settlement purposes only*
*Aug. 26, 2020*

8.7   **Severability.** Each of the provisions in this settlement agreement is separately and independently enforceable. Every position in this settlement agreement applies to all Class Members.

8.8   The obligations of Defendants are binding regardless of whether they are performed, delivered, implemented, or managed directly by Defendants or by grantees, subcontractors, or agents.

8.9   **Successors and Assigns.** This settlement agreement binds and inures to the benefit of the successors and assigns of the Parties, including any agency or agencies with any of the responsibilities of DCS or AHCCCS.

8.10   **Entire Agreement.** This settlement agreement is the final and exclusive agreement between the Parties with respect to its subject matter.

8.11   **Modification.** Before the final judgment and order of the Court, no amendment to this agreement will be effective unless it is in writing and signed by each Party. After the final judgment and order, no modification of this agreement will be effective unless it is in writing signed by the Parties and approved by the Court.

8.12   Nothing in this Agreement shall be construed to mean that DCS is violating any law, or that DCS is not presently taking actions consistent with this Agreement's requirements.

8.13   The Parties and their counsel have each contributed to the preparation of this Settlement Agreement. No provision will be construed against a Party on the ground that one of the Parties or their counsel drafted the provision.

8.14   Each signatory states that they are fully authorized to execute this settlement agreement on behalf of the Party for which he or she signs.

**Confidential Rule 408 Material**       *To be used for settlement purposes only*
*Aug. 26, 2020*

## 9.   Definitions

In this settlement agreement the following definitions apply:

**"AHCCCS Child and Family Team Practice Tool"** means the clinical guidance tool developed by AHCCCS to describe (1) CFT practice in the AHCCCS System of Care, (2) indicators that contribute to a child and family's complexity of needs, (3) how the essential CFT practice activities are implemented on a continuum based on individualized needs, and (4) how the Child and Adolescent Service Intensity Instrument (CASII) is utilized in the AHCCCS System of Care.

**"AMPM"** means the AHCCCS Medical Policy Manual.

**"Arizona Vision"** means the following statement in the *J.K. v. Eden* settlement agreement:

> In collaboration with the child, family, and others, Arizona will provide accessible behavioral health services designed to aid children to achieve success in school, live with their families, avoid delinquency, and become stable and productive adults. Services will be tailored to the child and family and provided in the most appropriate setting, in a timely fashion, and in accordance with best practices, while respecting the child's and family's cultural heritage.

"**Bed Day**" means, for a given placement type and a given period, the sum of the number of children residing in the placement type on each day of the period.

**"Behavioral Health Clinical Chart Audit"** means review under AMPM Policy 940 of a random sample of case files to determine the extent to which behavioral health services met applicable, specified performance standards.

"**Behavioral Health Placement**" includes inpatient psychiatric hospitalization, Behavioral Health Inpatient Facilities, Behavioral Health Residential Facilities, and Therapeutic Foster Care.

"**BHIF**" means a behavioral health inpatient facility.

"**BHRF**" means a behavioral health residential facility.

"**CFT**" means a Child and Family Team as defined in the AMPM Chapter 100 Definitions List.

"**Class Member**" means a member of the General Class, the Non-Kinship Subclass, or the Medicaid Subclass as defined by the Court in its class certification order (Doc. #363).

**"Clinical Chart Audit Tool"** means the standardized tool for behavioral health record review referenced in AMPM Policy 940(14).

**Confidential Rule 408 Material**                    *To be used for settlement purposes only*
*Aug. 26, 2020*

"**Foster Family Home**" has the meaning given to that term in Title IV-E of the Social Security Act, as amended (42 U.S.C. § 672(c)(1)).

"**Guardian IT System**" means DCS's Comprehensive Child Welfare Information System (CCWIS)-compliant, cloud-based, mobile technology system.

"**Integration Date**" means the date upon which DCS incorporates behavioral health service coverage into its health plan, presently scheduled for April 1, 2021.

"**LGBTQ+ Youth**" means a child who identifies as lesbian, gay, bisexual, transgender, queer, questioning, or gender non-conforming.

"**Ongoing Case Manager**" means a case manager with primary responsibility for one or more children in out-of-home care.

"**Periodicity Schedule**" is the scheduled interval of medical and dental screening services set forth at AMPM Policy 430, Attachment A (medical) and AMPM Policy 431, Attachment A (dental).

"**Practice/Quality Improvement Plan**" means the written plan submitted by CMDP to AHCCCS under 42 CFR § 438.330 for the continuous study and improvement of processes with the intent to better services or outcomes, and prevent or decrease the likelihood of problems, by identifying areas of opportunity and testing new approaches to fix underlying causes of persistent/systemic problems or barriers to improvement.

"**QRTP**" means a qualified residential treatment program as that term is defined in Title IV-E of the Social Security Act, as amended (42 U.S.C. § 672 (k)(4)).

"**Scorecard**" means a performance management tool, usually in the form of a color-coded spreadsheet, displaying metrics, target conditions, and actual performance results, typically in monthly evaluation periods.

"**TDM**" means Team Decision Making as that term is defined in DCS: Policy and Procedure Manual Ch. 2 § 8: Team Decision Making (Effective Date: April 3, 2019).

"**TFC**" or "**Therapeutic Foster Care**" means a family-based placement option for children with serious behavioral or emotional needs who can be served in the community with intensive support. Providers are standard licensed foster homes who receive additional training and a special certification to provide TFC.

[Signature Page Follows]

**Confidential Rule 408 Material**                    *To be used for settlement purposes only*
*Aug. 26, 2020*

**Plaintiffs:**


By: _____

      Harry Frischer
      Lead Counsel



**Arizona Department of Child Safety**


By: _____

      Michael Faust
      Director of DCS



**Arizona Health Care Cost Containment System**


By: _____

      Jami Snyder
      Director of AHCCCS

Plaintiffs:

By:  _____
Harry Frischer
Lead Counsel

## Arizona Department of Child Safety

By:  _____
Michael Faust
Director of DCS

## Arizona Health Care Cost Containment System

By:  _____
Jami Snyder
Director of AHCCCS

**Confidential Rule 408 Material**
*Aug. 26, 2020*                                        *To be used for settlement purposes only*

**Plaintiffs:**

By: _____

        Harry Frischer
        Lead Counsel


**Arizona Department of Child Safety**

By: _____

        Michael Faust
        Director of DCS


**Arizona Health Care Cost Containment System**

By: _____

        Jami Snyder
        Director of AHCCCS

23